Slip Op. 21-35

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, ET AL., | |
| Plaintiffs, | |
| and | |
| BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD. AND NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., | |
| Plaintiff-Intervenors, | Before: Mark A. Barnett, Judge Court No. 20-00007 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the eleventh administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: April 2, 2021

<u>Dharmendra N. Choudhary</u> and <u>Jordan C. Kahn</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for Plaintiffs and Plaintiff-Intervenors. With them on the brief was <u>Francis J. Sailer</u>.

<u>Mollie L. Finnan</u>, Senior Trial Counsel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of Washington, DC, for Defendant.  With her on the brief were <u>Jeffrey B. Clark</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel were <u>Ian A. McInerney</u> and <u>Ayat Mujais</u>, Attorneys, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors.  With her on the brief were <u>John M. Herrmann</u>, <u>R. Alan Luberda</u>, and <u>Julia A. Kuelzow</u>.

       Barnett, Judge: This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the eleventh administrative review ("AR11") of the antidumping duty order on certain activated carbon from the People's Republic of China ("China") for the period of review ("POR") April 1, 2017, through March 31, 2018.  *See Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019) (final results of antidumping duty admin. review; 2017–2018) ("*Final Results*"), ECF No. 39-2, and accompanying Issues and Decision Mem., A-570-904 (Dec. 11, 2019) ("I&D Mem."), ECF No. 39-3.[1]

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 39-5, and a Confidential Administrative Record ("CR"), ECF No. 39-4.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF Nos. 52 (Vol. I; Tabs 1–13), 52-1 (Vol. II; Tabs 14–15), 52-2 (Vol. III; Tabs 16–30); Confidential J.A. ("CJA"), ECF Nos. 57 (Vol. I; Tabs 1–9), 57-1 (Vol. II; Tabs 10–15), 57-2 (Vol. III; Tabs 16–30); Suppl. Confidential J.A. ("Suppl. CJA"), ECF No. 62.  Citations are to the confidential joint appendices unless stated otherwise.

Plaintiffs and Plaintiff-Intervenors (collectively, "Plaintiffs")[2] challenge

Commerce's (1) selection of Malaysia instead of Romania as the primary surrogate

country; (2) selection of surrogate values for Carbon Activated's and DJAC's inputs of

bituminous coal and coal tar pitch; and (3) calculation of surrogate financial ratios.  *See*

Confidential Pls.' and Pl.-Ints.' Mot. for J. on the Agency R. Pursuant to Rule 56.2, ECF

No. 43, and accompanying [Corrected] Confidential Mem. of Law in Supp. of Pls.' and

Pl.-Ints.' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("Pls.' Mem."), ECF

No. 59; Confidential Pls.' and Pl.-Ints.' Reply to Def. and Def.-Ints.' Resps. to Pls.' and

Pl.-Ints.' Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 50.

Defendant United States ("the Government") and Defendant-Intervenors Calgon

Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon") filed response

briefs in support of Commerce's determinations respecting each contested issue.  *See*

Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No.

45; Confidential Def.-Ints.' Resp. Br. in Opp'n to Pls.' Mot. for J. on the Agency R.

("Def.-Ints.' Resp."), ECF No. 48.  At oral argument, the Government acknowledged that

a remand with respect to financial ratios may be appropriate given Commerce's recent

consideration of similar adjustments on remand in the tenth administrative review

("AR10") of the underlying order.  Oral Arg. 1:38:55–1:40:05 (approximate time stamp

---

[2] Plaintiffs consist of Carbon Activated Tianjin Co., Ltd. ("Carbon Activated"), Carbon
Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), Beijing
Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated
Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial
Co., Ltd.

from oral argument), *available at* https://www.cit.uscourts.gov/sites/cit/files/031121-20-00007-MAB.mp3 (last visited Apr. 2, 2021).

For the following reasons, the court sustains Commerce's selection of surrogate data to value coal tar pitch and remands Commerce's determinations with respect to surrogate country selection, selection of surrogate data to value bituminous coal, and calculation of financial ratios.

**BACKGROUND**

Commerce initiated AR11 on June 6, 2018.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 26,258, 26,260 (Dep't Commerce June 6, 2018).  On July 3, 2018, Commerce selected Carbon Activated and DJAC as mandatory respondents.[3]  Selection of Respondents for Individual Review (July 3, 2018) at 5, PR 27, CJA Tab 2.

On June 14, 2019, Commerce issued its preliminary results.  *Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 27,758 (Dep't Commerce June 14, 2019) (prelim. results of antidumping duty admin. review and prelim. determination of no shipments; 2017–2018) ("*Preliminary Results*"), PR 234, CJA Tab 21, and accompanying Decision Mem. for the Prelim. Results, A-570-904 (June 10, 2019) ("Prelim. Mem."), PR 225, CJA Tab 19.  Commerce calculated preliminary weighted-average dumping margins for Carbon Activated and DJAC in the amounts of 1.65 percent and 4.33 percent, respectively.  *Prelim. Results*, 84 Fed. Reg. at 27,759.

---

[3] When in reference to the underlying agency proceeding, the court refers to Carbon Activated and DJAC as "Respondents" and Calgon as "Petitioners."

Commerce calculated a separate rate for non-examined respondents in the amount of 3.90 percent, equal to the weighted-average rate of the mandatory respondents based on U.S. sales volume.  *Id.*

Commerce issued the *Final Results* on December 17, 2019.  Following several changes to the *Preliminary Results*, Commerce calculated final weighted-average dumping margins for Carbon Activated and DJAC in the amounts of 1.02 percent and 0.86 percent, respectively.  *Final Results*, 84 Fed. Reg. at 68,882.  The separate rate was therefore reduced to 0.89 percent.  *Id.*

This appeal followed.  *See* Summons, ECF No. 1; Compl., ECF No. 7.  The court heard oral argument on March 11, 2021.  *See* Docket Entry, ECF No. 65.[4]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C. § 1581(c) (2018).[5]  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.     Legal Framework for Surrogate Country and Surrogate Value Selection

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

---

[4] Additional background information is summarized in each discussion section.
[5] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

When an antidumping duty proceeding involves a nonmarket economy country,

Commerce determines normal value by valuing the factors of production[6] used in

producing the subject merchandise; general expenses; profit; and "the cost of

containers, coverings, and other expenses" in a surrogate market economy country.  *Id.*

§ 1677b(c)(1).  In selecting these "surrogate values," Commerce must, "to the extent

possible," use data from a market economy country that is at "a level of economic

development comparable to that of the nonmarket economy country" and is a

"significant producer[] of comparable merchandise."  *Id.* § 1677b(c)(4).

Commerce has adopted a four-step process for selecting a primary surrogate

country:

> (1) the Office of Policy ("OP") assembles a list [("the OP List")] of potential
> surrogate countries that are at a comparable level of economic
> development to the [non-market economy] country; (2) Commerce
> identifies countries from the list with producers of comparable
> merchandise; (3) Commerce determines whether any of the countries
> which produce comparable merchandise are significant producers of that
> comparable merchandise; and (4) if more than one country satisfies steps
> (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016)

(second alteration original); *see also* Import Admin., U.S. Dep't of Commerce, Non–

Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004)

("Policy Bulletin 04.1"), http://enforcement.trade.gov/policy/bull04-1.html (last visited

---

[6] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

Apr. 2, 2021).  Commerce generally values all factors of production in a single surrogate

country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2)

(excepting labor).  *But see Antidumping Methodologies in Proceedings Involving Non–*

*Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092,

36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor

based on industry-specific labor rates from the primary surrogate country).  Commerce

prefers surrogate values that are "product-specific, representative of a broad-market

average, publicly available, contemporaneous with the POR, and tax and duty

exclusive."  I&D Mem. at 13 & n.68 (citation omitted); *see also* 19 C.F.R.

§ 351.408(c)(1),(4) (directing Commerce to select "publicly available"/"non-proprietary

information" to value factors of production and "manufacturing overhead, general

expenses, and profit").  Commerce has broad discretion to determine what constitutes

"the best available information" for the selection of surrogate values.  *QVD Food Co. v.*

*United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

## II.    Primary Surrogate Country Selection

For the *Preliminary Results*, Commerce determined that Malaysia and Romania,

among other countries on the OP List, constituted significant producers of comparable

merchandise for the POR based on their respective export volumes.  *See* Prelim. Mem.

at 14.  Commerce also found that Thailand constituted a significant producer of

comparable merchandise based on net exports by volume.  *See id.* at 15.  Based on its

subsequent analysis of surrogate value data, Commerce preliminarily selected Malaysia

as the primary surrogate country and Romania as the secondary surrogate country.

*See id.* at 15–16.  Commerce selected Malaysian import data to value Respondents'

"raw materials, energy, and packing material inputs," *id.* at 24, and used a financial

statement from a Romanian company, Romcarbon S.A. ("Romcarbon"), to value

financial ratios, *id.* at 26.

For the *Final Results*, Commerce continued to select Malaysia as the primary

surrogate country notwithstanding Respondents' arguments favoring Romania.  I&D

Mem. at 6–7.  Commerce noted that both Malaysia and Romania are "at the same level

of economic development as China."  *Id.* at 6.  With respect to the significant producer

criterion, however, Commerce departed from its preliminary analysis.

Commerce stated that it relied on "exports of comparable merchandise from the

six OP List countries, as a proxy for production data."  *Id*. at 7.  Commerce did not,

however, explain its analysis of any country's exports or incorporate its preliminary

analysis.  *See id.* at 7–8.  Commerce concluded that the record demonstrated that

Malaysia was "a significant producer of identical merchandise" during the POR, but that

the record did not support a finding that Romania was a significant producer of

comparable merchandise.  *Id.* at 8.  Commerce explained that the record contained

"three Malaysian financial statements" indicating that the "principal business activity" for

each company "is the manufacture of activated carbon," *id.* at 7, whereas the record

contained "only one financial statement . . . from a Romanian company," *id.* at 8.

Commerce noted that Romcarbon produced some activated carbon but primarily

produced "polyethylene, polypropylene, polyvinyl chloride, polystyrene processing,

filters and protective materials." *Id.*[7]  Thus, while rejecting the Malaysian financial

statements to value financial ratios, *id*. at 9, Commerce selected Malaysia as the

primary surrogate country because "it provides stronger evidence of production of the

subject merchandise in the form of multiple financial statements," *id*. at 7–8.  Commerce

declined to compare the quality and availability of Malaysian and Romanian data for the

purpose of primary surrogate country selection, finding the issue to be "moot."  *Id.* at 8.

Commerce used Malaysian data to value Respondents' factors of production with

exceptions for financial ratios and bituminous coal, for which the agency used

Romanian data.  *See* Surrogate Values for the Final Results (Dec. 11, 2019) ("Final SV

Mem."), Attach. 1, PR 265–66, CJA Tab 28.

### A.  Parties' Contentions

Plaintiffs raise several challenges to Commerce's surrogate country selection.

Plaintiffs first contend that Commerce failed to address its departure from the

*Preliminary Results* with respect to Romania's status as a significant producer.  Pls.'

Mem. at 32.  Plaintiffs further contend that "Commerce's elimination of Romania was not

'supported by substantial evidence.'"  *Id.*  Plaintiffs point to record evidence concerning

Romcarbon's share of Romanian consumption of activated carbon, which Plaintiffs

argue can be used to ascertain total Romanian consumption of activated carbon in 2017

and, in turn, total Romanian production of activated carbon.  *See id.* at 32–33.  Plaintiffs

---

[7] Plaintiffs assert that at least some of this merchandise may be considered comparable to the subject merchandise.  Pls.' Mem. at 33.  Commerce did not, however, state its views on that issue.

also contend that Commerce's selection of Malaysia rests on a misinterpretation of both

Commerce policy, which disfavors the "comparison of production data," *id.* at 34, and 19

U.S.C. § 1677b(c)(4), which permits the identification of more than one significant

producer country and does not contain a preference for identical merchandise, *see id.* at

34–36; Pls.' Reply at 9–10.  Lastly, Plaintiffs contend that Commerce should have

selected Romania as the primary surrogate country pursuant to statutory language

indicating that the significant producer criterion need only be satisfied "to the extent

possible" because Romania provided quality surrogate values for Respondents' main

inputs.  Pls.' Mem. at 36 (quoting 19 U.S.C. § 1677b(c)(4)).

      The Government contends that Commerce's selection of Malaysia as the primary

surrogate country is supported by substantial evidence.  Def.'s Resp. at 12.  The

Government points to evidence concerning Malaysia's export value and volume, *id.* at

14 (citing I&D Mem. at 7 & n.34), and the three Malaysian companies' production of

identical merchandise, *id.* at 15.  The Government further contends that "[s]ubstantial

evidence in the record supports Commerce's ultimate conclusion that Romania was not

a significant producer of comparable merchandise during the period of review," *id.* at 16,

and Plaintiffs failed to exhaust their argument that Romcarbon's financial statements

demonstrated that Romania was a significant producer, *id.* at 18–21; *see also* Def.-Ints.'

Resp. at 11–12 & n.1.

      Calgon contends that Plaintiffs' arguments amount to an impermissible request

for the court to reweigh the evidence and rest on the erroneous conclusion that the

record supports a finding that Romania is a significant producer of comparable

merchandise.  *See* Def.-Ints.' Resp. at 10–13.

In their Reply, Plaintiffs counter that the Government has advanced

impermissible *post hoc* justifications for Commerce's decision with respect to the

Government's analysis of export data.  Pls.' Reply at 9.  Plaintiffs further contend that

the doctrine of administrative exhaustion should not preclude arguments concerning

Romania's production of comparable merchandise because Commerce preliminarily

found that Romania was a significant producer of comparable merchandise and

Petitioners did not challenge that finding in their administrative case brief.  *Id.* at 4–6.

### B. Commerce's Selection of Malaysia as the Primary Surrogate Country Requires Reconsideration

Commerce has failed to adequately explain or support with substantial evidence

its selection of Malaysia and rejection of Romania as the primary surrogate country.

While Commerce stated that it "analyzed exports of comparable merchandise from the

six OP List countries," the agency neglected to explain its analysis or state any findings

in that regard.  *See* I&D Mem. at 7.  The Government's assertion that Commerce based

its determination on Global Trade Atlas and 2017 UN Comtrade data regarding export

values and volume is not persuasive.  *See* Def.'s Resp. at 14 (citing I&D Mem. at 7 &

n.34).  The Government relies on a footnote in the Issues and Decision Memorandum

containing import and export volume data for each country on the OP List that merely

substantiates Commerce's assertion that no country is a net exporter by volume.  *See*

I&D Mem. at 7 n.34.  Commerce did not, however, analyze the data or reference the

value of any country's exports.  *See id*.  The Government's assertion at oral argument

that the court may instead infer Commerce's "analysis . . . from the record," Oral Arg.

8:25–8:47, also lacks merit.  The standard of review requires *Commerce*, not the court,

to "examine the record and articulate a satisfactory explanation for its action."

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir.

2013).

      Commerce's statements regarding Malaysian production of identical

merchandise does not save its determination.  Commerce's "explanation must

reasonably tie the determination under review to the governing statutory standard and

to the record evidence by indicating what statutory interpretations the agency is

adopting and what facts the agency is finding."  *CS Wind Vietnam Co. v. United States*,

832 F.3d 1367, 1376 (Fed. Cir. 2016).  Section 1677b(c)(4)(B) "does not distinguish

between identical and comparable merchandise" for purposes of identifying significant

producer countries.  *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United

States*, 37 CIT 256, 264, 896 F.Supp.2d 1313, 1322 (2013).  Commerce's conclusion

that "Malaysia provides the best available information . . . because it is the only country

on the OP List that is a significant producer of *identical* merchandise" suggests,

however, that the agency favored the production of identical merchandise when

selecting a primary surrogate country.  I&D Mem. at 8 (emphasis added).  Commerce

failed to explain why any such preference comports with the plain statutory language or

constitutes a permissible interpretation thereof.[8]   Commerce also did not explain why

production of identical merchandise by three companies was "significant" pursuant to

section 1677b(c)(4).  *See id.*; *cf.* Policy Bulletin 04.1 (explaining that Commerce's

decision "should be made consistent with the characteristics of world production of, and

trade in, comparable merchandise (subject to the availability of data on these

characteristics)").

    With respect to Commerce's consideration of Romania, although "Commerce has

the flexibility to change its position" from the *Preliminary Results* to the *Final Results*,

the agency must "explain the basis for its change" and that explanation must be

"supported by substantial evidence."  *Asociacion Colombiana de Exportadores de*

*Flores v. United States*, 22 CIT 173, 185, 6 F. Supp. 2d 865, 880 (1998); *see also Peer*

*Bearing Co. v. United States*, 22 CIT 472, 481–82, 12 F. Supp. 2d 445, 456 (1998).

    For these *Final Results*, Commerce purported to reconsider the export quantities

it had relied on for the *Preliminary Results*.  I&D Mem. at 7; *see generally* Prelim. Mem.

at 14.  Without any analysis, however, Commerce reached the contrary conclusion that

"the record . . . does *not* support a finding that Romania . . . is a significant producer of

---

[8] At oral argument, the Government relied on Policy Bulletin 04.1 to assert that
Commerce maintains a preference for production of identical merchandise in its
surrogate country selection process, but that this preference only arises when
Commerce is comparing data quality.  Oral Arg. 15:05–16:28.  Policy Bulletin 04.1
merely states the steps Commerce must follow in order to identify the countries on the
OP List subject to examination for significant production of comparable (inclusive of
identical) merchandise.  *See* Policy Bulletin 04.1.  It does not support the existence of a
policy preference concerning production of identical merchandise, either with respect to
significant production or otherwise.

comparable merchandise."  I&D Mem. at 8 (emphasis added).  Commerce failed to

explain why its preliminary finding based on export quantity was no longer valid or cite

substantial evidence for the change.[9]

Commerce appears to have based its decision on a comparison of the number of

financial statements on the record from Romania as compared to Malaysia and

differences in the principal production activities among the companies.  *See id*. at 7–8.

However, "Commerce's practice is not to evaluate [t]he extent to which a country is a

significant producer . . . against . . . the comparative production of the five or six

countries on [Commerce's] surrogate country list."  *Jacobi Carbons AB v. United States*,

43 CIT ___, ___, 365 F. Supp. 3d 1344, 1353 (2019) (citation omitted) (alterations

original); *see also* Policy Bulletin 04.1.

The Government offers no persuasive defense of Commerce's determination.

The Government asserts that "Commerce reasonably concluded that Romania's exports

by value (102,387 USD) and quantity (3051 kg) were too small to reflect significant

production on this record."  Def.'s Resp. at 16 (citing DJAC and Carbon Activated

Surrogate Country Cmts. (Oct, 12, 2018) ("Respondents' SC Cmts."), PR 99, CJA Tab

---

[9] The court takes no position on the soundness of Commerce's preliminary conclusion
respecting Romania or any other potential surrogate country.  However, the court must
ensure that Commerce's change in position is not arbitrary.  *See Asociacion
Colombiana de Exportadores de Flores*, 22 CIT at n.20, 6 F. Supp. 2d at n.20
(explaining that "[a] change [in position] is arbitrary [when] the factual findings
underlying the reason for [the] change are not supported by substantial evidence" or
when the change is unsupported by a reasoned explanation that is "[]consistent with the
statutory mandate").

6).[10]  The Government further asserts that "Commerce reasonably concluded that

Romanian production of activated carbon was not significant in terms of world

production of, and trade in, comparable merchandise."  Def.'s Resp. at 17 (citing Policy

Bulletin 04.1; *Fresh Garlic Prods. Assoc. v. United States*, 40 CIT ___, ___, 180 F.

Supp. 3d 1233, 1244 (2016)).  Notably, the Government does not cite to Commerce's

determination, which lacks any such analysis of Romanian production in the context of

world production.  The Government's *post hoc* rationalizations are not a basis upon

which the court may sustain Commerce's determination.  *See Burlington Truck Lines,*

*Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

        The Government also argues that the court should sustain Commerce's selection

of Malaysia as the primary surrogate country irrespective of any shortcomings in

Commerce's decision regarding Romania because Commerce expressed its clear view

that the quality of the available data supports Malaysia.  Oral Arg. 23:46–24:34; *cf.*

Def.'s Resp. at 14 (arguing that Commerce based its selection of Malaysia, in part, on

consideration of the fourth selection criterion—data quality).  The Government

misconstrues Commerce's sequential surrogate country selection methodology and the

court's standard of review.  Commerce selected Malaysia after concluding that Malaysia

was a significant producer of identical merchandise and Romania was not a significant

producer of comparable merchandise.  *See* I&D Mem. at 7–8.  Commerce subsequently

---

[10] Contrary to the Government's assertion, the volume of Romanian exports in the cited
source documentation is 34,000 kg, not 3051 kg.  *See* Respondents' SC Cmts., Ex. 1;
Prelim. Mem. at 14.

considered Malaysian data quality in isolation and without reference to the comparable

quality of Romanian data because Commerce found that Romania did not meet the

significant producer requirement of section 1677b(c)(4)(B).  *See id.* at 8.[11]  Thus, the

court cannot sustain Commerce's determination on this basis.

Plaintiffs argue that record evidence concerning Romcarbon's share of the

domestic market establishes that Romania is a significant producer of comparable

merchandise.  Pls.' Mem. at 32–33.  It is not the court's role to determine in the first

instance whether the evidence favors Plaintiffs' position.  As discussed below, the

question is whether Plaintiffs waived those arguments, as Defendant and Calgon

contend, or should have the opportunity to present the arguments to Commerce.

Congress has directed the court to, "whe[n] appropriate, require the exhaustion

of administrative remedies."  28 U.S.C. § 2637(d).  While exhaustion is not jurisdictional,

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1363–64 (Fed. Cir.

2019), the statute "indicates a congressional intent that, absent a strong contrary

reason, the [USCIT] should insist that parties exhaust their remedies before the

pertinent administrative agencies," *id.* at 1362 (quoting *Boomerang Tube LLC v. United

States*, 856 F.3d 908, 912 (Fed. Cir. 2010)).

The Government argues that Respondents should have raised their domestic

market share argument before Commerce because they "had full and fair notice of the

---

[11] Commerce compared the Malaysian and Romanian financial statements on the
record for purposes of its significant producer analysis, but otherwise declined to
compare the quality of each country's data.  I&D Mem. at 7–8.

agency's intent to rely on Malaysia rather than Romania or another country."  Def.'s

Resp. at 20; *cf.* Def.-Ints.' Resp. at 11–12 & n.1.[12]  For the *Preliminary Results*,

however, Commerce determined that Romania, among other countries, was a

significant producer of comparable merchandise and reached its surrogate country

decision based on an analysis of each countries' respective data quality.  Prelim. Mem.

at 14–16.  Petitioners did not advance arguments challenging Commerce's findings

regarding the significant producer criterion, *see generally* Pet'rs' [Case] Br. (Oct. 7,

2019), CR 422, PR 253, CJA Tab 23, and Commerce did not signal any intention to

revisit its analysis.  Commerce need not "expressly notify interested parties any time it

intends to change its methodology between its preliminary and final determinations"

when there is "relevant data in the record" and interested parties advance "arguments

related to that data before Commerce."  *Boomerang*, 856 F.3d at 913.  However,

"*Boomerang* does not require parties to anticipate issues that have not been raised by a

party or the agency at that point."  *Calgon Carbon Corp. v. United States* ("*Calgon

AR10*"), 44 CIT ___, ___, 443 F. Supp. 3d 1334, 1353 (2020)) (citing *Boomerang*, 856

F.3d at 913).

---

[12] The Government argues that "[P]laintiffs offer no legal authority that would require consideration or adoption of a single company's share of its own domestic marketplace as a measure of significant producer status on a worldwide scale."  Def.'s Resp. at 20.  Commerce, however, is not required to adopt any specific measure. Agency policy provides that "the standard for 'significant producer' will vary from case to case," and thus leaves open the possibility that Commerce will consider alternative measures.  Policy Bulletin 04.1.

Here, Romania's status as a significant producer was not among the issues
raised by interested parties or Commerce prior to Commerce's issuance of the *Final
Results*.  Thus, Plaintiffs' arguments are not precluded by the doctrine of administrative
exhaustion.[13]

In sum, Commerce has not provided an adequate explanation supported by
substantial evidence giving effect to the statutory term "significant producer of
comparable merchandise" pursuant to 19 U.S.C. § 1677b(c)(4)(B).  The court is unable
to discern Commerce's reasons for rejecting Romania as a primary surrogate country;
selecting Malaysia as the primary surrogate country; and avoiding any comparative
analysis of data quality for that purpose.  Accordingly, Commerce's determination is
remanded for reconsideration and further explanation.

## III.    **Bituminous Coal**

For the *Final Results*, Commerce selected Romanian import data under
Harmonized Schedule ("HS") 2701.12 as the surrogate value for bituminous coal after
finding that the average unit value of Malaysian imports under HS 2701.12 was
unreliable.  I&D Mem. at 13–15.  Commerce rejected Respondents' request to use
import data under HS 2701.19, which covers "Other Coal," to value certain inputs of
bituminous coal.  *Id.* at 13–14.  Respondents based their request on the application of

---

[13] Plaintiffs also argued that Commerce should have selected Romania as the primary
surrogate country even if the evidence did not support a finding that Romania was a
significant producer.  *See* Pls.' Mem. at 36.  Neither the Government nor Calgon directly
responded to this argument.  For the same reasons discussed above in relation to
Plaintiffs' arguments concerning Romcarbon's domestic market share, the argument
may be addressed by Commerce, as appropriate, on remand.

Chapter 27, Subheading Note 2 ("Note 2") to their inputs.  *See id.* at 14.  Note 2 limits

HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit . . . equal to or

greater than 5,833 kcal/kg."  *Id*.  Respondents therefore reasoned that Commerce

should value bituminous coal with a calorific value that is less than 5,833 kcal/kg under

HS 2701.19.  *Id.*

    Upon review of the record, Commerce concluded that Note 2 applied solely to

Thai import data and declined to apply Note 2 to another country's import data.  *Id.* at 14

& n.76 (citing Carbon Activated Resp. to Sec. D Suppl. Questionnaire (Pt. I) (Feb. 21,

2019) ("Carbon Activated's 1SDQR (Pt. I)") at 19, CR 254–88, PR 162–65, CJA Tab

12); *see also* Carbon Activated's 1SDQR (Pt. I), Ex. SD-27 (copy of Note 2).

Commerce also found that Respondents had failed to demonstrate consumption of the

type of sub-bituminous coal typically "used as a heat source" that would be covered by

HS 2701.19.  I&D Mem. at 14.

## A.  Parties' Contentions

    Plaintiffs contend that Commerce's declination to recognize the applicability of

Note 2 to all countries in the World Customs Organization ("WCO") through the

Harmonized System of Nomenclature contradicts Commerce practice and judicial

precedent.  Pls.' Mem. at 17–19.[14]  Plaintiffs also contend that Commerce erred in

---

[14] Plaintiffs cite *Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 42 CIT ___, ___, 322 F. Supp. 3d 1308, 1320 (2018); Issues and Decision Mem. for the Final Determination in the Antidumping Duty Investigation of Certain Stilbenic Optical Brightening Agents from the People's Republic of China, A-570-972 (Mar. 19, 2012) at 2–6 ("*Stilbenic* Mem."), *available at* https://enforcement.trade.gov/frn/summary/prc/

incorporating use as a consideration in its surrogate value selection because HS

2701.19 is not delimited by use.  *Id.* at 20.

The Government contends that Commerce's reliance on Romanian import data

under HS 2701.12 is supported by substantial evidence.  Def.'s Resp. at 22.  The

Government asserts that there is no record evidence demonstrating that Note 2 is

identical for all WCO countries or that Respondents used the type of bituminous coal

that would be covered by HS 2701.19.  *See id.* at 22–23; *cf.* Def.-Ints.' Resp. at 16–18.

Calgon contends that the precedent relied on by Plaintiffs is distinguishable.

Def.-Ints.' Resp. at 16–17.  Calgon further contends that the inclusion of "Additional U.S.

Notes" in the U.S. Harmonized Tariff System ("HTSUS") supports Commerce's decision

not to assume that subheading notes are identical across countries.  *See id.* at 17.

### B. Commerce's Selection of Surrogate Data to Value Bituminous Coal Requires Reconsideration and Further Explanation

The court is unable to discern the path of Commerce's reasoning on this issue

and remands the matter for reconsideration and further explanation with respect to the

applicability of Note 2 and Commerce's understanding of the relevant parts of the

record.

Commerce addressed Respondents' request to apply Note 2 as a factual matter

and found the request unsupported by the record.  I&D Mem. at 14.  Commerce did not,

---

2012-7215-1.pdf (last visited Apr. 2, 2021); and Issues and Decision Mem. for the Final Results of the 2011 - 2012 Admin. Review on Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, A-570-924 (June 24, 2014) at 14–20 ("*PET* Mem."), *available at* https://enforcement.trade.gov/frn/summary/prc/2014-15574-1.pdf (last visited Apr. 2, 2021).  *See* Pls.' Mem. at 17–18; Pls.' Reply at 2.

however, address Respondents' argument that Note 2 applied to the tariff systems of

countries other than Thailand given the harmonization of WCO tariff classification at the

six-digit level.  *See* Case Br. of [DJAC], [Carbon Activated] and Carbon Activated Corp.

(Oct. 7, 2019) ("Respondents' Case Br.") at 27 n.38, CR 421, PR 250, CJA Tab 22.

      Respondents' argument is not without precedent.  In prior determinations,

Commerce has taken the position that products subject to international trade generally

will enter WCO countries under the same six-digit subheading.  *See PET* Mem. at 20

(stating that "[t]he International Convention on the Harmonized Commodity and Coding

System applies the same [HS] six-digit prefix to products subject to international trade");

First Admin. Review of Sodium Hexametaphosphate from the People's Republic of

China: Issues and Decision Mem. for the Final Results, A-570-908 (Oct. 12, 2010) at 8

n.32, *available at* https://enforcement.trade.gov/frn/summary/prc/2010-26458-1.pdf (last

visited Apr. 2, 2021) ("*Hex* Mem.") (stating same).  Commerce has relied on this

principle to apply a subheading chapter note placed on an administrative record in

connection with South African import data to Indonesian data for purposes of surrogate

valuation.  *See PET* Mem. at 20.  Commerce also has considered the way in which the

United States classifies an input to determine the correct six-digit heading under

another country's classification system for surrogate valuation.  *See Stilbenic* Mem. at 4

& n.22; *Hex* Mem. at 7–8.  Commerce's rationale for rejecting Respondents' argument

on this issue, without further explanation, is arbitrary; thus, a remand is necessary for

Commerce to clarify or revise its position.[15]

Additionally, Commerce's understanding of the record evidence concerning the

characteristics of Respondents' bituminous coal inputs is unclear.  Commerce stated

that "[R]espondents have not provided *any* evidence that they used [the type of

bituminous coal that] would be categorized as HS 2701.19."  I&D Mem. at 14 (emphasis

added).  There is, however, some indication in the record that Respondents (or their

respective suppliers) consumed bituminous coal with a calorific value that is less than

5,833 kcal/kg.  *See* Carbon Activated Resp. to Sec. D Pts. II and III First Suppl.

Questionnaire (Mar. 15, 2019) ("Carbon Activated's SDQR Pts. II–III"), Ex. SD-15, CR

---

[15] Parties' remaining arguments are not persuasive.  Calgon's argument regarding the
inclusion of "Additional U.S. Notes" in the HTSUS is based on information that is not
part of the administrative record and was not the basis of an argument before
Commerce.  Def.-Ints.' Resp. at 17 (citing Pls.' Mem. at 17–18 & n.6, which in turn, cites
a webpage as evidence of the HTSUS).  While there is no indication that Note 2 is
specific to Thailand, such arguments are better left for Commerce to consider and
address in the first instance.

      Plaintiffs' reliance on *Jiangsu Senmao* is also misplaced.  In that case, the court
held that Commerce erred in rejecting a respondent's administrative case brief because
it contained purportedly untimely factual information in the form of HS Explanatory
Notes ("ENs").  *Jiangsu Senmao*, 322 F. Supp. 3d at 1323–24.  The court reasoned that
"[t]he ENs are not evidence" or factual information used to value factors of production
but are instead "an international legal reference essential to the proper interpretation of
the HS nomenclature and [General Rules of Interpretation]."  *Id.* at 1324.  The court
distinguished ENs from import data—factual information—used to value the factors of
production.  *See id.*  Note 2 falls within the latter category.  *Cf. Degussa Corp. v. United
States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) ("The section and chapter notes are
integral parts of the HTSUS, and have the same legal force as the text of the
headings.").  However, as discussed, the inquiry does not end there to the extent that
Commerce must address Respondents' arguments concerning the harmonization of six-
digit subheadings.

301–17, PR 180, CJA Tab 13; DJAC Suppl. Sec. D Resp. (Feb. 12, 2019) ("DJAC's

SDQR") at 8, Exs. SD-12, SD-13, SD-56, CR 174–252, PR 148–56, CJA Tab 11.  It is

unclear whether Commerce considered this evidence or found it insufficient.

Accordingly, on remand, Commerce must also reconsider and further explain its view of

the record on this issue.[16]

**IV.    Coal Tar Pitch**

      For the *Preliminary Results*, Commerce valued coal tar pitch using Malaysian

import data under HS 2706.00, which covers "Coal Tar."  I&D Mem. at 18; *see also*

Surrogate Values for the Prelim. Results (June 10, 2019) ("Prelim. SV Mem."), Attach.

1, PR 226–29, CJA Tab 20.[17]  For the *Final Results*, Commerce instead used Malaysian

import data under HS 2708.10, which covers "Pitch from Coal and Other Mineral Tars."

*Id.* at 18, 19.  Commerce offered several rationales for its decision.

      Commerce explained that Respondents each reported the input as "coal tar

pitch" and not "coal tar" for certain suppliers, *id.* at 19, and that coal tar pitch "is

commonly known as 'pitch' in the industry," *id.* at 19 & n.112 (citation omitted).

Regarding the production process, Commerce noted that two types of coal tar pitch—

---

[16] The court further leaves to Commerce, on remand, to address Plaintiffs' arguments concerning the valuation of bituminous coal inputs with an undetermined calorific value. *See* Pls.' Mem. at 20–21 (asserting that, for such inputs, Commerce should use the average of Romanian data under HS 2701.12 and HS 2701.19); Pls.' Reply at 3 (same).
[17] In the narrative portion of its preliminary surrogate value memorandum, Commerce listed both coal tar and coal tar pitch as surrogate values with corresponding tariff provisions of HS 2706.00 and HS 2708.10, respectively.  *See* Prelim. SV Mem. at 5. Commerce preliminarily used only HS 2706.00, however, to value Respondents' coal tar pitch.  Prelim. SV Mem., Attach. 1; *see also* I&D Mem. at 18 n.106 (noting the discrepancy).

binder and impregnating grade—are derived from the fractionated distillation of coal tar. *Id.* at 19 & n.114 (citing First Surrogate Value Cmts. By [Respondents] (Nov. 9, 2018) ("Respondents' SV Cmts."), Ex. 5E, PR 109–14, CJA Tab 9).  Commerce thus found "that HS 2706.00 covers coal tar, which is a by-product of the coke production process, whereas HS 2708.10 covers pitch, a product of the coal tar distillation process."  *Id.* at 19.  Commerce rejected as unsupported Respondents' "assertion that HS 2708.10 covers [only] 100 percent pure pitch distilled in a tar workshop."  *Id.* at 19 & n.115 (citing Respondents' Case Br. at 29).

### A. Parties' Contentions

Plaintiffs contend that Commerce's reliance on commercial parlance instead of pitch content to select HS 2706.00 represents an unexplained departure from the agency's approach in the prior administrative review, which was affirmed by the court. Pls.' Mem. at 22–23 (citing *Calgon (AR10)*, 443 F. Supp. 3d at 1343–45); Pls.' Reply at 14.  Plaintiffs argue that HS 2706.00 must be construed to cover coal tar or coal tar pitch with less than 100 percent pitch content and "[HS] 2708.10 must be construed to cover 100[ percent] pure pitch."  *Id.* at 24.  Concluding otherwise, Plaintiffs argue, could result in the same input being covered by both subheadings.  *Id.*  Plaintiffs also contend that Malaysian import data under both HS 2706.00 and HS 2708.10 are aberrant based on the predominance of Spanish exports in the average unit values and Commerce should instead rely on Russian import data under HS 2706.00.  *See id.* at 24–27.

The Government contends that Commerce's surrogate value selection is supported by substantial evidence.  Def.'s Resp. at 24.  The Government argues that

"Commerce reasonably rejected the premise that coal tar and coal tar pitch are indistinguishable" based on the process by which coal tar and pitch are produced and Respondents failed to establish that their respective inputs were covered by HS 2706.00. *Id.* at 25; *cf.* Def.-Ints.' Resp. at 20–21.  The Government also contends that Plaintiffs failed to present their arguments regarding the aberrancy of the Malaysian data to Commerce and those arguments are now barred by the doctrine of administrative exhaustion.  Def.'s Resp. at 26–27; *cf.* Def.-Ints.' Resp. at 22–23 & n.3.

Plaintiffs counter that the ENs to HS 2706.00 establish that coal tars with pitch content above 60 percent are covered by that subheading.  Pls.' Reply at 16; *see also id.* at 15–16 (averring that ENs are judicially noticeable pursuant to *Jiangsu Senmao*, 322 F. Supp. 3d at 1324).  Plaintiffs also contend that the Government's exhaustion argument lacks merit because Respondents challenged the aberrancy of HS 2706.00 before Commerce and lacked the opportunity to present to Commerce arguments concerning HS 2708.10.  *Id.* at 16–17.

### B. Commerce's Selection of Surrogate Data to Value Coal Tar Pitch is Supported by Substantial Evidence

Plaintiffs are correct that, in AR10, Commerce valued inputs of coal tar pitch using HS 2706.00.  *Calgon (AR10)*, 443 F. Supp. 3d at 1343.  In that proceeding, Commerce based its decision on pitch content and discounted evidence demonstrating that the respondents used coal tar pitch and a separate pitch input for the same production purpose.  *Id.* at 1344.  It is well settled, however, that "each administrative review is a separate exercise of Commerce's authority that allows for different

conclusions based on different facts in the record." *Jiaxing Brother*, 822 F.3d at 1299

(quoting *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed.

Cir. 2014)).  Thus, the question is whether Commerce has offered an adequate

explanation "for treating similar situations differently."  *SKF USA Inc. v. United States*,

263 F.3d 1369, 1382 (Fed. Cir. 2001) (citation omitted).

      This issue presents a close call.  While Commerce's determination may have

benefitted from greater recognition that the agency had departed from its treatment of

coal tar pitch in AR10, the court discerns from Commerce's discussion an adequate

explanation, supported by substantial evidence, for the change.

      Respondents' submissions in the underlying proceeding demonstrate that the

distillation of coal tar yields coal tar pitch.  I&D Mem. at 19 & n.114 (citing Respondents'

SV Cmts., Ex. 5E).  Further distillation of coal tar pitch yields higher grades of pitch.

*See* Respondents' SV Cmts., Ex. 5E, Fig. 1 (a schematic illustration of the production of

coal tar pitch and anthracene oil-based pitch beginning with the distillation of coal tar).

Given that coal tar pitch is referred to as "pitch" in commercial parlance, Commerce was

within its discretion to identify HS 2708.10 instead of HS 2706.00 as the best available

information.  *See* I&D Mem. at 19; *QVD Food Co.*, 658 F.3d at 1323.

      Plaintiffs' assertion that HS 2706.00 covers coal tar and coal tar pitch with less

than 100 percent pitch content and HS 2708.10 covers 100 percent pure pitch is

unsupported by citations to record evidence.  *See* Pls.' Mem. at 24; I&D Mem. at 19.

Plaintiffs' argument that a contrary conclusion would result in the same input being

covered under both headings also is not persuasive.  *See* Pls.' Mem. at 24.  At the

hearing, the court afforded Plaintiffs an additional opportunity to explain why their inputs

of coal tar pitch are necessarily covered by HS 2706.00.  Letter to Counsel (Mar. 3,

2021) ("Ltr. to Counsel") ¶ 3(a)(i), ECF No. 61.  Plaintiffs referred to record evidence

concerning the processing of coal tar into coal tar pitch, but which also demonstrates

that coal tar generally has a lower pitch content than the coal tar pitch consumed by

Respondents.  Oral Arg. 1:17:33–1:18:54, 1:23:11–1:27:55.  *Compare* Pls.' Mem. at 23

(citing Respondents' SV Cmts., Ex. 5G), *and* Respondents' Case Br. at 29–30 & nn.47–

48 (citing Respondents' SV Cmts., Ex. 5K), *with* Carbon Activated's SDQR Pts. II–III,

Ex. SD-6 (reflecting the pitch content of their inputs), *and* DJAC's SDQR, Ex. SD-53

(same).  This evidence is insufficient to require the distinction Plaintiffs seek to draw

with respect to the competing subheadings and, thus, does not detract from the

substantial evidence supporting Commerce's determination.

  Plaintiffs' argument that the ENs to HS 2706.00 support a finding that coal tar

pitch is covered by that subheading, Pls.' Reply at 15–16, is precluded by the doctrine

of administrative exhaustion.  *See* 28 U.S.C. § 2637(d); *Weishan Hongda*, 917 F.3d

1362.  Notwithstanding the ENs' usefulness as a legal reference for purposes of tariff

classification, *see Jiangsu Senmao*, 322 F. Supp. 3d at 1324, Respondents failed to

argue the relevance of the ENs before Commerce.  A remand to the agency to consider

the ENs in the first instance would undermine the interest in judicial efficiency that

administrative exhaustion is intended to protect.  *See, e.g.*, *Corus Staal BV v. United

States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Plaintiffs likewise failed to exhaust their arguments regarding the aberrancy of Malaysian import data under HS 2708.10 based on the predominance of Spanish exports in the average unit values.  Pls.' Mem. at 25–26.  Plaintiffs' argument that they had "no opportunity" to present arguments concerning the reliability of this value to Commerce is unconvincing.  Pls.' Reply at 17.  Respondents' administrative case brief presented arguments against the use of HS 2708.10 based on Respondents' understanding that Commerce had preliminarily used that subheading to value Carbon Activated's coal tar pitch.  *See* Respondents' Case Br. at 29–30.  Respondents thus had ample opportunity to present this argument to Commerce and cannot now "seek[] a new 'bite at the apple.'"  *Calgon (AR10)*, 443 F. Supp. 3d at 1353–54; *see also Boomerang*, 856 F.3d at 913 (finding an abuse of the discretion afforded by 28 U.S.C. § 2637(d) when the court declined to require exhaustion of arguments the proponent of which had the opportunity to present to Commerce).[18]

Accordingly, Commerce's determination to use Malaysian data under HS 2708.10 to value coal tar pitch is sustained.

---

[18] Commerce declined to consider Respondents' argument that the Malaysian average unit value under HS 2706.00 is aberrant because it is higher than the Malaysian average unit value under HS 2708.10.  I&D Mem. at 19.  Commerce reasoned that the issue is moot given Commerce's decision not to rely on HS 2706.00.  *Id.*  Because the court is sustaining Commerce's decision to use HS 2708.10, the court need not address Plaintiffs' arguments concerning an alternative basis for finding HS 2706.00 to be aberrant or whether such arguments are foreclosed by the doctrine of administrative exhaustion.

## V.      Financial Ratios

For the *Final Results*, as noted, Commerce valued financial ratios using Romcarbon's 2017 financial statement.  I&D Mem. at 6.  At issue are various adjustments to the financial ratios.  *See id.* at 21–23.  Respondents requested Commerce to (1) offset pre-tax profit by the amounts listed under "Gain/(Loss) on adjustment of investment property at fair value" and "Gain/(Loss) on disposal of investment property"; (2) offset sales, general, and administrative expenses ("SG&A") by the amount listed under "Other Gains"; and (3) allocate the amount listed under "Social Contributions" and "Meal Tickets" to labor costs instead of SG&A.  Respondents' Case Br. at 32–36.  Commerce declined each request.  I&D Mem. at 22–23.  In so doing, however, Commerce treated Respondents' request to offset pre-tax profit as a request to offset SG&A.  *See id.* at 22.

In its response brief, the Government urged the court to sustain Commerce's determinations as to the contested adjustments.  Def.'s Resp. at 27–31.  Following the Government's filing of the response, the court sustained Commerce's determination on remand in AR10 to make adjustments to the financial ratios based on Romcarbon's financial statement that are similar to—if not the same as—certain adjustments Commerce declined to make in this case.  *See* Pls.' Reply at 19–22 (discussing *Calgon Carbon Corp., et al. v. United States, et al.*, Court No. 18-cv-00232, Final Results of Redetermination Pursuant to Court Remand at 8–13, 23 (CIT Aug. 5, 2020)); *Calgon Carbon Corp. v. United States*, 44 CIT ___, ___, 487 F. Supp. 3d 1359, 1362 (2020)

(sustaining Commerce's adjustments as uncontested and consistent with the court's remand instructions).

At oral argument, the Government stated that it could not identify distinguishing features in the financial statements that merited different treatment in this administrative review.  Oral Arg. 1:39:25–1:40:04; *see also* Ltr. to Counsel ¶ 4(a).  The Government further stated that although there might be differences in other aspects of the factual record that would support different treatment, particularly in relation to indirect labor costs, any remand should encompass all aspects of the adjustments so as not to constrain Commerce's redetermination.  Oral Arg. 1:40:35–1:40:55.  Calgon argued that the administrative record in AR11 as compared to AR10 supports certain distinctions but reserved its arguments for Commerce's consideration on remand.  Oral Arg. 1:41:31–1:42:30.

Accordingly, given the inconsistencies between Commerce's determinations in AR10 and AR11 and the discrepancies in Commerce's explanations for declining the adjustments, this issue is remanded for reconsideration.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results* are sustained in part and remanded in part, consistent with this Opinion; it is further

**ORDERED** that Commerce's selection of surrogate data to value coal tar pitch is sustained; it is further

Court No. 20-00007                                                              Page 31

     **ORDERED** that, on remand, Commerce shall reconsider its selection of Malaysia as the primary surrogate country; it is further

     **ORDERED** that, on remand, Commerce shall reconsider its selection of surrogate data to value bituminous coal; it is further

     **ORDERED** that, on remand, Commerce shall reconsider the adjustments to the surrogate financial statements; it is further

     **ORDERED** that Commerce shall file its remand redetermination on or before July 1, 2021; it is further

     **ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

     **ORDERED** that any comments or responsive comments must not exceed 5,000 words.


                                        /s/     Mark A. Barnett
                                        Mark A. Barnett, Judge

Dated: April 2, 2021
        New York, New York