A-570-904
Remand – ARP 4/1/17—3/31/18
Ct. No. 20-00007
Slip Op. 21-35
**Public Document**
E&C/OVIII:  MJA

***Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al. v. United States***
**Consol. Court No. 20-00007 (CIT April 2, 2021)**

FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I.   SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the Court of International Trade (CIT) in

*Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al. v. United States*,

Court No. 20-00007, Slip Op. 21-35 (CIT April 2, 2021) (*Remand Order*).  These final remand

results concern the eleventh administrative review of certain activated carbon from China.[1]  The

CIT directed Commerce to reconsider the surrogate value (SV) for bituminous coal, surrogate

country (SC) selection, and adjustments to the surrogate financial ratios.[2]

As set forth in detail below, pursuant to the CIT's *Remand Order*, we have further

explained, and reconsidered, in part, our determination regarding the SV for bituminous coal, SC

selection, and adjustments to the surrogate financial ratios.  Consequently, for the purposes of

these final results of redetermination, Commerce has made certain changes to the mandatory

respondents' margin calculations,[3] and consequently, to the rate of Beijing Pacific Activated

---

[1] *See Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 68881 (December 17, 2019) (*AR11 Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 4.
[3] The mandatory respondents in this administrative review are Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang) and Carbon Activated Tianjin Co., Ltd. (Carbon Activated) (collectively, the mandatory respondents).

Carbon Products Co., Ltd. (Beijing Pacific), Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. (GHC), Ningxia Mineral & Chemical Limited (Ningxia Mineral), and Shanxi Sincere Industrial Co., Ltd. (Shanxi Sincere).[4]

## II.   REMANDED ISSUES

### 1.   <u>Bituminous Coal Surrogate Value</u>

**Background**

In the *AR11 Final Results*, Commerce selected the average unit value (AUV) for Romanian import data under Harmonized System (HS) heading 2701.12 as the SV for bituminous coal used to produce activated carbon after finding that the AUV for Malaysian imports under HS 2701.12 was aberrantly high and based on a limited import volume, and thus unreliable.[5]  In making this decision, Commerce rejected the mandatory respondents' request to use import data under HS 2701.19, which covers "Other Coal," to value certain inputs of bituminous coal.[6]  The mandatory respondents based their request on the text of Chapter 27, Subheading Note 2, as excerpted from the Thai HS code.[7]  Specifically, Note 2 limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit equal to or greater than 5,833 kilocalorie (kcal)/kilogram (kg)."[8]  The mandatory respondents therefore asserted that Commerce should value bituminous coal with a calorific value that is less than 5,833 kcal/kg under HS 2701.19.[9]  Commerce declined to do so, finding that Note 2 applied solely to Thai import data and declining to apply Note 2 to another country's (*i.e.*, Malaysia) import data.[10]

---

[4] Beijing Pacific, GHC, Ningxia Mineral, Shanxi Sincere were not selected for individual examination during the review, but qualified for a separate rate, and are participating in the litigation.
[5] *See AR11 Final Results* IDM at 9-16.
[6] *Id.* at 14.
[7] *Id.*; *see also* Carbon Activated's Letter, "Carbon Activated Response to Section D Supplemental Questionnaire (Part I)," dated February 21, 2019 (Carbon Activated's SDQR Part I), at 19 and Exhibit SD-27.
[8] *See AR11 Final Results* IDM.
[9] *Id.*
[10] *Id.* at 13.

In litigation before the CIT, the mandatory respondents, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere (collectively, the Plaintiffs, or the Respondents) challenged Commerce's decision not to recognize the applicability of Note 2 to all countries in the World Customs Organization (WCO) through the Harmonized System of Nomenclature.[11]

In the *Remand Order*, the CIT concluded that it was unable to discern the path of Commerce's reasoning and remanded for reconsideration and further explanation with respect to the applicability of Note 2 and Commerce's understanding of the relevant parts of the record.[12] The CIT stated that the Plaintiffs' argument is not without precedent, noting that, in prior determinations, Commerce has taken the position that products subject to international trade generally will enter WCO countries under the same six-digit subheading.[13]

**Analysis**

In light of the CIT's *Remand Order*, Commerce has reconsidered and provided further explanation regarding the applicability of Note 2 of the Thai HS code to Chapter 27 of the Malaysian tariff schedule in determining the appropriate SV for the bituminous coal input. Based on the following analysis, Commerce has now determined to use import data reported under Malaysian HS subheading 2701.19 to value the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers.  With regard to

---

[11] *See Remand Order* at 19.
[12] *Id.* at 20.
[13] *Id.* at 21 (citing *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 37715 (July 2, 2014) (*PET Film from China*), and accompanying IDM at 20 (stating that "{t}he International Convention on the Harmonized Commodity and Coding System applies the same {HS} six-digit prefix to products subject to international trade"); and *First Administrative Review of Sodium Hexametaphosphate from the People's Republic of China:  Final Results of the Antidumping Duty Administrative Review*, 75 FR 64695 (October 20, 2010) (*Sodium Hex from China*), and accompanying IDM at 8 n.32. (stating same).

bituminous coal used by Carbon Activated's other supplier, Supplier C,[14] and by Carbon Activated's uncooperative supplier[15] for which we applied Supplier C's factors of production (FOPs) data to compute the normal value (NV), we continue to use Romanian import data reported under HS 2701.12.  We explain in detail below.

Commerce's practice when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) of the Tariff Act of 1930, as amended (the Act), is to select, to the extent practicable, SVs which are publicly available, contemporaneous with the period of review (POR), representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[16]  While there is no hierarchy for applying the SV selection criteria, "{Commerce} must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' {SV} is for each input."[17]  Additionally, Commerce has a strong preference to value all FOPs in a single SC, pursuant to 19 CFR 351.408(c)(2), as well as a practice "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[18]

---

[14] The identity of this supplier is business proprietary.  For Supplier C's identity, *see* Memorandum, "Draft Remand Redetermination Results Calculation Memorandum for Carbon Activated Tianjin Co., Ltd. in the Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China," dated May 28, 2021 (CAT Draft Remand Calculation Memorandum).  Because we are making no changes to the determinations as set forth in the Draft Remand Results, we are adopting the analysis in the CAT Draft Remand Calculation Memorandum for the final remand results.  Commerce also notes that FOPs reported for Supplier C's CONNUMs comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database; *see also* Memorandum, "Business Proprietary Information regarding Carbon Activated's Supplier-Supplier C," dated concurrently with this this final results of redetermination pursuant to remand (BPI Memorandum).
[15] The identity of the uncooperative supplier is business proprietary.  For the uncooperative supplier's identity, *see* CAT Draft Remand Calculation Memorandum.
[16] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 2.
[17] *See, e.g.*, *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 55039 (September 24, 2008) (*PET Film 2008*), and accompanying IDM at Comment 2.
[18] *See Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012) (*Sodium Hex from China 2012*), and accompanying IDM at Comment I.

Here, the Respondents assert that the Thai Note 2 to Chapter 27 on the record (which defines sub-heading 2701.12, "bituminous coal" as coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit equal to or greater than 5,833 kcal/kg) can be applied to Malaysian import data under the same HS subheading, because the identical six-digit HS breakouts and sub-heading notes exist for all WCO countries, such that Note 2 to Chapter 27 is the same across countries, including Romania, Malaysia, and Thailand.[19]  Further, they claim that the test reports on the record demonstrate the heat value of the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers is calculated to be below 5,833 kcal/kg.[20]  However, for Carbon Activated's other supplier (*i.e.*, Supplier C), and for Carbon Activated's uncooperative supplier for which we applied Supplier C's FOPs data to compute the NV, there is no record evidence regarding the heat value of its bituminous coal input used in the production of activated carbon.

Because the record for this segment of the proceeding did not contain information to evaluate the Respondents' assertion that the subheading notes at the six-digit level are the same for all WCO countries, Commerce placed on the record information published by the WCO (*i.e.*, Harmonized System Compendium).[21]  The Harmonized System Compendium states that:

---

[19] *See* Memorandum in Support of Plaintiffs' and Plaintiff-Intervenors' Motion for Judgment on the Agency Record Pursuant to USCIT Rule 56.2, Case No. 20-0007 (CIT) filed on June 24, 2020, at 17.

[20] *See* Datong Juqiang's Letter, "DJAC Supplemental Section D response," dated February 12, 2019 (DJAC Supp D Response), at Exhibits SD-12, SD-13, SD-56; *see also* Carbon Activated's Letter, "Carbon Activated Response to Section D Parts II and III First Supplemental Questionnaire," dated March 15, 2019 (CAT Supp D Response), at Exhibit SD-15; *see also* Mandatory Respondents' Letter, "Case Brief of Datong Juqiang Activated Carbon Co., Ltd., Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation in the Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China (A-570-904)," dated October 7, 2019, at 28.

[21] *See* Memorandum, "Draft Remand Redetermination Results in the Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China:  Surrogate Values for the Draft Redetermination," dated May 28, 2021 (Draft Remand SV Memorandum), at Attachment 2, page 21 (Harmonized System Compendium) (Commerce notes this document is also available at:  http://www.wcoomd.org/-/media/wco/public/global/pdf/topics/nomenclature/activities-and-programmes/30-years-hs/hs-compendium.pdf?la=en).

The Harmonized System comprises:

• General Rules for the interpretation of the Harmonized System;

• Section and Chapter Notes, including Subheading Notes;

• A list of headings arranged in systematic order and, where appropriate, subdivided into subheadings.[22]

The Harmonized System Compendium also states that the "Harmonized System constitutes a coherent set of headings and subheadings, which, together with the General Interpretative Rules (GIR) and Section, Chapter and Subheading Notes, provide for the systematic and uniform classification of goods."[23]  Further, the introductory paragraph for GIR in the Harmonized System Compendium provides:

> {T}o be completely sound, a classification system must associate each individual product with a single heading (and, as the case may be, subheading), to which that product can be simply and unequivocally assigned.  Hence it must contain rules designed to ensure that a given product is always classified in one and the same heading (and subheading), to the exclusion of any others which might appear to merit consideration.  All classification decisions must be based upon the application of these rules.[24]

Further, GIR No.6 provides:

> 6.  For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related Subheading Notes and, *mutatis mutandis*, to the above Rules, on the understanding that only subheadings at the same level are comparable.  For the purpose of this Rule the relative Section and Chapter Notes also apply, unless the context otherwise requires.[25]

This information provides additional context to, and is consistent with, prior determinations in which Commerce has concluded that "{t}he International Convention on the Harmonized

---

[22] *Id.*
[23] *Id.* at 20.
[24] *Id.* at 21.
[25] *Id.* at 24.

Commodity and Coding System applies the same {HS} six-digit prefix to products subject to international trade").[26]  Based on this information, and because Thai Note 2 to Chapter 27 explains "bituminous coal" means coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit equal to or greater than 5,833 kcal/kg), we now find that Malaysian HS subheading 2701.19 covers the same merchandise as Thai HS subheading 2701.19.  Additionally, because the test reports on the record demonstrate the heat value of the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers is below 5,833 kcal/kg,[27] for these final remand results we have valued the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers using import data reported under Malaysian HS subheading 2701.19.  We find that the AUV under Malaysian HS subheading 2701.19 is reliable, as there is no indication that the AUV is unusable as a result of being, for example, aberrantly high or based on a limited amount of imports.[28]  With regard to bituminous coal used by Carbon Activated's other supplier, Supplier C, and by Carbon Activated's uncooperative supplier for which we applied Supplier C's FOP data to compute the NV, we continue to use Romanian import data reported under HS 2701.12, as we do not have record evidence, such as test reports for the bituminous coal input used by these suppliers, that would support valuing this input using imports under subheading 2701.19.[29]  This determination is consistent with Commerce's practice

---

[26] See *PET Film from China* IDM at 20; *see also Sodium Hex from China* IDM at 8 n. 32.

[27] See *DJAC Supp D Response* at Exhibits SD-12, SD-13 and SD-56; *see also CAT Supp D Response* at Exhibit SD-15.

[28] See Petitioners' Letter, "Eleventh Administrative Review of the Antidumping Order on Certain Activated Carbon from the People's Republic of China:  Petitioners' Final Affirmative Surrogate Value Submission," dated May 13, 2019, at Attachment 2.

[29] See Carbon Activated's SDQR Part I at 9 and Exhibit SD-27 (Commerce notes that the test report provided by Supplier C in this exhibit is the test report for smoke coal, which Supplier C asserts is a type of energy coal, whose technical grate is bituminous coal, that Supplier C used to provide energy for activation.).

in which we apply different SVs for the same input used by different respondents, based on the available evidence regarding input specificity.[30]

2. **Surrogate Country Selection**

**Background**

In the *AR11 Preliminary Results*, Commerce determined that Malaysia and Romania constituted significant producers of comparable merchandise during the POR based on their respective export volumes.[31]  Because none of the six OP List countries[32] were net exporters during the POR,[33] we used the export volumes of the primary HS heading included in the scope, *i.e.*, exports of HS number 3802.10 (activated carbon), as a proxy for domestic production.[34]  Commerce preliminarily determined that all six OP List countries were significant producers of comparable merchandise, stating that none of the total export volumes from the OP List countries were insignificant.[35]  Based on its subsequent analysis of availability of SV data,

---

[30] *See Certain Activated Carbon from the People's Republic of China:  Final Results and Partial Rescission of Second Antidumping Duty Administrative Review*, 75 FR 70208 (November 17, 2010) (*Carbon AR2*), and accompanying IDM at Comment 4b (Commerce used Coal India Limited (CIL) data to value steam coal where the necessary data have been reported by the respondents and where the useful heat value (UHV) specificity of the CIL data corresponds to the UHV specificity of the steam coal input used by the respondents.  Otherwise, Commerce used WTA Indian imports of steam coal under Indian HTS number 2701.19.20:  "Steam Coal" for the respondent's suppliers, which did not report the UHV of their steam coal input.).

[31] *See Certain Activated Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 27758 (June 14, 2019) (*AR11 Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 14.

[32] *See* Commerce's Letter Re:  "Certain Activated Carbon from the People's Republic of China (China):  Request for Comments re:  (1) Economic Development, (2) Surrogate Country and (3) Surrogate Value Information," dated September 14, 2018, at Attachment (OP List) (Commerce notes that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia are the countries identified as countries that are at the same level of economic development as China based on per capita 2017 Gross National Income (GNI) data in the OP List).

[33] On the record, we have import and export data from the Global Trade Atlas (GTA) and UN Comtrade for entries made under the HS subheading 3802.10, covering the subject merchandise.  *See* Mandatory Respondents' Letter, "DJAC and Carbon Activated Surrogate Country Comments:  Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated October 12, 2018 (Respondents' SC Comments), at Exhibit 1.  The export volumes for the OP List countries are:  16,475,976 kg (Malaysia); 1,308,800 kg (Brazil); 8,778,259 kg (Mexico); 849,850 kg (Russia); 612,474 kg (Kazakhstan); and 34,000 kg (Romania).  The import volumes for the OP List countries are:  32,892,163 kg (Malaysia); 14,854,141 kg (Russia); 14,449,228 kg (Mexico); 5,797,030 kg (Brazil); 2,004,526 kg (Kazakhstan); and 1,106,000 kg (Romania).

[34] *See AR11 Preliminary Results* PDM at 14.

[35] *Id.*

Commerce preliminarily selected Malaysia as the primary SC and used a financial statement

from a Romanian company, Romcarbon S.A. (Romcarbon) (a producer of polyethylene,

polypropylene and filters), to calculate surrogate financial ratios.  In the *AR11 Final Results*,

Commerce continued to select Malaysia as the primary SC and continued to use the Romcarbon

statements for financial ratios.[36]  However, with respect to the significant producer criterion,

Commerce departed from its preliminary finding and determined that Romania was not a

significant producer of comparable merchandise, explaining that the record contained financial

statements from three Malaysian producers of activated carbon, providing more direct evidence

of significant production of activated carbon which is identical to the subject merchandise in the

form of multiple financial statements.  Further, Commerce explained that there is no equivalent

information on the record with respect to Romanian production, as there is only one financial

statement on the record from Romcarbon.  Romcarbon's statements indicate that its principal

business activity is the manufacture of polyethylene, polypropylene and filters, although one of

its seven profit centers is dedicated to the production of respiratory protective equipment and

active carbon.[37]  Commerce found that this is not evidence of "significant production," compared

to the three financial statements from Malaysian activated carbon producers on the record.[38]

Therefore, for the *AR11 Final Results*, Commerce selected Malaysia as the primary SC, stating

"{b}ecause there are multiple Malaysian financial statements on the record, all of which contain

evidence of production of identical merchandise, there is more direct evidence on the record that

Malaysia is a significant producer of identical merchandise."[39]  Commerce did not compare the

---

[36] *See AR11 Final Results* IDM at 4.
[37] *Id.* at 7-8.
[38] *Id.*
[39] *Id.*

quality and availability of Malaysian and Romanian data for the purpose of primary SC selection in the *AR11 Final Results*, finding the issue to be "moot."[40]

During litigation at the CIT, Plaintiffs challenged Commerce's use of Malaysia as the primary SC.

In the *Remand Order*, the CIT remanded Commerce's selection of Malaysia as the primary SC for further explanation, concluding that Commerce did not adequately explain its decision to depart from its preliminary finding that Romania is a significant producer of comparable merchandise.  With regard to this issue, the CIT further stated that although section 773(c)(4)(B) of the Act "does not distinguish between identical and comparable merchandise" for purposes of identifying significant producer countries, Commerce's conclusion that "Malaysia provides the best available information … because it is the only country on the OP List that is a significant producer of identical merchandise" suggests that the agency favored the production of identical merchandise when selecting a primary SC.[41]  The CIT also stated that Plaintiffs did not fail to exhaust their administrative remedies with regard to their argument that Romcarbon's financial statements demonstrated that Romania was a significant producer, because Romania's status as a significant producer was not among the issues raised by interested parties or by Commerce prior to Commerce's issuance of the *AR11 Final Results*.[42]

**Analysis**

In light of the CIT's *Remand Order*, Commerce has reconsidered and provided further explanation regarding its determination to use Malaysia as the primary SC.  Based on the following analysis, for these final results of redetermination on remand, Commerce now finds

---

[40] *Id.*
[41] *See Remand Order* at 12 (citing *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313, 1322 (CIT 2013)).
[42] *Id.* at 17-18.

that Romania is a significant producer of comparable merchandise, based on export volumes. Further, Commerce has determined to continue to use Malaysia as the primary SC based on its subsequent analysis of the availability of SV data.  We explain in detail below.

*Economic Comparability*

Malaysia and Romania are both economically comparable to China, as both countries are on the OP List, and are, therefore, determined, based on per capita GNI, to be at the same level of economic development as China.[43]

*Significant Producer of Comparable Merchandise*

Section 773(c)(4)(B) of the Act requires Commerce to value FOPs, to the extent possible, in an SC that is a significant producer of comparable merchandise.  Neither the statute nor Commerce's regulations provide further guidance on the definition of comparable merchandise or significant producer.  Given the absence of any definition in the statute or regulations, Commerce looks to other sources such as the Policy Bulletin 04.1 and legislative history for guidance.[44]  Policy Bulletin 04.1 explains that Commerce should not compare production levels in the non-market economy (NME) country and the potential surrogate countries in order to identify significant producers.[45]  Instead, Policy Bulletin 04.1 provides, "Commerce should define 'significant producer' in relation to world production and trade (subject to the availability of data on these characteristics)."[46]  Moreover, the legislative history provides that the term "significant producer" includes any country that is a "net exporter" of identical or comparable merchandise.[47]  However, that text does not define the phrase "net exporter" or explain whether a

---

[43] *See* OP List.
[44] *See* Enforcement and Compliance Policy Bulletin 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1), available at https://enforcement.trade.gov/policy/bull04-1.html.
[45] *Id.*
[46] *Id.*; *see also DuPont Teijin Films v. United States*, 997 F. Supp. 2d 1338, 1342 (CIT 2014).
[47] *See Conference Report to the 1988 Omnibus Trade & Competitiveness Act*, H.R. Rep. No. 100-576 (1988) at 590.

potential SC must constitute a net exporter in terms of quantity, value, or both to fit the example provided in the legislative history.[48]  The CIT has held that this term (*i.e.*, significant producer) is not statutorily defined, and is "inherently ambiguous,"[49] and that this ambiguous provision of the Act does not compel Commerce to define "significant producer" in any particular manner.[50] Accordingly, Commerce may examine export volumes from among those countries that are at the same level of economic development to determine whether a country is a significant producer.[51]

Also, Policy Bulletin 04.1 states that "in all cases, if identical merchandise is produced, the country qualifies as a producer of comparable merchandise."[52]  Commerce has also previously stated that, if comparable merchandise is produced, a country qualifies as a producer of comparable merchandise.[53]  Therefore, if the record contains evidence of domestic production of comparable merchandise, then this evidence directly addresses the requirement of production of comparable merchandise under section 773(c)(4) of the Act.  Such evidence may include the financial statements of a commercial producer of comparable merchandise in the SC.[54]

In this review, the record contains the import and export quantity and value data during the POR for all six OP List countries of the primary HS heading included in the scope, *i.e.*, HS subheading 3802.10., published by the GTA (for Brazil, Malaysia, Mexico, Romania, and

---

[48] *Id.*
[49] *See Fresh Garlic Producers Ass'n v United States*, 121 F. Supp. 3d 1313, 1338-39 (CIT 2015).
[50] *See Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1274 n.5 (CIT 2006).
[51] *See Certain Uncoated Paper from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 81 FR 3112 (January 20, 2016), and accompanying IDM at Comment 1.
[52] *Id.*; *see also* Policy Bulletin 04.1.
[53] *See Sebacic Acid from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 62 FR 65674, 65676 (December 15, 1997) ("{T}o impose a requirement that merchandise must be produced by the same process and share the same end uses to be considered comparable would be contrary to the intent of the statute.").
[54] *See Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1683-1684  (CIT 2006) (upholding Commerce's selection of India as a significant producer using the financial statements of Indian companies), *rev'd on other grounds*, *Dorbest Ltd. v. United States*, 604 F.3d 1363 (2010).

Russia) and 2017 UN Comtrade (for Kazakhstan).[55]  These data demonstrate that none of the countries in the OP List are net exporters of subject merchandise.[56]  Further, world production and trade data of comparable merchandise are not available on the record of this administrative review.  Therefore, for these final results of redetermination on remand, we analyzed exports of comparable merchandise (*i.e.*, POR export quantities under HS subheading 3802.10) from the six OP List countries, as a proxy for production data.

Pursuant to the guidance provided by Policy Bulletin 04.1, which provides that Commerce should not compare production levels in the NME country and the potential surrogate countries in order to identify significant producers, we now find that all six OP List countries are significant producers of comparable merchandise, based on export volumes.[57]  Specifically, we now find that the exports from Romania, while relatively small compared to the export volumes under HS subheading 3902.10 from the other OP List countries, are not negligible; thus, we determine that they are significant.

Further, the three Malaysian financial statements on the record indicate that each company's principal business activity is the manufacture of activated carbon, which is identical, and thus comparable, to the subject merchandise in this proceeding.  While Romcarbon's principal activities are the manufacture of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials, its financial statements indicate that its profit center no.2 includes an "Active Coal Workshop," which is dedicated to the production of activated carbon.[58]  Therefore, for both Malaysia and Romania, the financial statements on the

---

[55] *See* Respondents' SC Comments at Exhibit 1.
[56] *Id.*
[57] *Id.*
[58] *See* Mandatory Respondents' Letter, "First Surrogate Value Comments by DJAC and CA Tianjin:  Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated November 9, 2018 (Respondents' Surrogate Value Submission), at Exhibit 9, page 1303 (Romcarbon's profit center no. 2 includes a "Workshop of Active Carbon").

record provide evidence of domestic production of comparable merchandise under section 773(c)(4) of the Act.

*Data Considerations*

If more than one potential SC is determined to be economically comparable and a significant producer of comparable merchandise, Commerce selects the primary SC based on data quality and availability.[59]  When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[60]  There is no hierarchy among these criteria.  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs.[61]

The record contains complete, publicly-available, contemporaneous, and input-specific Malaysian data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR – including the bituminous coal input used to produce nearly the entire production volume of the subject merchandise reported in both mandatory respondents' respective FOP databases – with the exception of the financial ratios, as discussed below.[62]  Further, the record also contains complete, publicly-available, and contemporaneous

---

[59] *See* Policy Bulletin 04.1.
[60] *Id.*; *see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 2.
[61] *See Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.
[62] *See* Petitioners' Letter, "Certain Activated Carbon from the People's Republic of China – Petitioners' Submission of Surrogate Values," dated November 9, 2018 (Petitioners' SV Comments).

and input-specific Romanian data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR.[63]

We have considered the quality of data on the record and find that, on the basis of input specificity of the available data, the Malaysian SV data are superior to those of Romania. Malaysia is one of only a small number of countries with an HS subheading that includes a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents. On the other hand, Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents. Further, although Malaysia provides multiple financial statements from producers of identical (and thus comparable) merchandise which are representative of the experience of the mandatory respondents, they do not provide breakouts for raw material, labor, and energy. In contrast, the one Romanian financial statement on the record provides the specificity needed to calculate the financial ratios because it provides breakouts for these categories of expenses. Therefore, we continue to select Malaysia as the primary SC for these final results of redetermination, because it provides the best available information from which to value the mandatory respondent's FOPs.

Additionally, while the three Malaysian financial statements provide evidence that Malaysia is a producer of identical merchandise, they lack usable financial data in that none of them have separate line items breaking down the cost of raw materials and energy. Therefore, we continue to use the Romcarbon financial statements for the calculation of the surrogate

---

[63] *See* Mandatory Respondents' Letter, "Final Surrogate Value Comments by DJAC and CA Tianjin: Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated May 13, 2019 (Respondents' Final SV Comments).

financial ratios, as they are the only financial statements on the record which present the financial data in a manner that is feasible for the calculation of these ratios.

**3.** **Commerce's Accounting Adjustments in Romcarbon's Financial Ratio Calculations**

**Background**

In the *AR11 Final Results*, Commerce valued financial ratios using the 2017 financial statements from the Romanian company, Romcarbon.[64]  Before the CIT, Plaintiffs argued that Commerce's allocation of certain line items in Romcarbon's financial statements are not in accordance with Commerce's practice and not supported by substantial evidence.  Further, Plaintiffs argued that Commerce's decision in the *AR11 Final Results*, issued December 11, 2019, is inconsistent with Commerce's subsequent financial ratios adjustments in the *AR10 Remand Redetermination*, where Commerce used the POR-contemporaneous financial statements from the same Romanian company that we used to value financial ratios for the *AR11 Final Results* (*i.e.*, Romcarbon).[65]  Specifically, Plaintiffs argued that:  (1) "other gains" should offset selling, general, and administrative (SG&A) expenses instead of being excluded, because this line item is treated as part of a company's general operations; (2) "gain/(loss) on adjustment of investment property at fair value," and "gain/(loss) on disposal of investment property" should offset the reported "profit before tax" instead of being excluded, because all of these gains accrue from activities outside of Romcarbon's general business, *i.e.*, manufacturing of goods; and (3) "social contributions" and "meal tickets" should be allocated under "labor," instead of SG&A expenses, in order to avoid double counting because both line items capture indirect labor cost

---

[64] *See AR11 Final Results*; *see also* Memorandum, "Eleventh Administrative Review of Certain Activated Carbon from China:  Surrogate Value for the Final Results," dated December 11, 2019 (Final SV Memorandum), at Attachment 1.

[65] *See Final Results of Redetermination Pursuant to Court Remand*, *Calgon Carbon Corporation et al. v. United States*, Consol. Court No. 18-00232, Slip Op.20-65, dated August 4, 2020 (*AR10 Remand Redetermination*), available at https://enforcement.trade.gov/remands/20-65.pdf.

expenses, which Commerce already included in the NV build-up.[66]  Commerce argued that the accounting adjustments are supported by substantial evidence in the record and are not contrary to law.  In the *Remand Order*, the CIT directed Commerce to consider Plaintiffs' arguments, given the inconsistencies between Commerce's determinations in the *AR10 Remand Redetermination* and the *AR11 Final Results* and the discrepancies in Commerce's explanations for declining the adjustments.[67]

**Analysis**

In light of the CIT's *Remand Order*, Commerce has reconsidered the allocation of the expenses at issue as follows below.

*Gain/(Loss) on adjustment of investment property at fair value, and Gain/(Loss) on disposal of investment property*

In the *AR11 Final Results*, Commerce excluded "gain/(loss) on adjustment of investment property at fair value," and "gain/(loss) on disposal of investment property," from the calculation of financial ratios.[68]  Commerce's established practice is to deduct income from investment property from a manufacturing entity's reported "profit before tax," as the income from investment does not pertain to the company's general business activity (*i.e.*, manufacturing of goods).[69]  Because Romcarbon included the line items "gain/(loss) on adjustment of investment property at fair value" and "gain/(loss) on disposal of investment property" in the revenue build-up, these two line items contribute to, and are included in, its reported "profit before tax."[70]

---

[66] *See* Plaintiffs' Motion at 39-44.
[67] *See Remand Order* at 30.
[68] *See* Final SV Memorandum at Attachment 1.
[69] *See, e.g.*, *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2009-2010*, 78 FR 11143, 11146 (February 15, 2013), and accompanying IDM at Comment 16.
[70] *See* Respondents' Surrogate Value Submission at Exhibit 9, page 1323.

Because Romcarbon's general business activity is the manufacture of goods,[71] these two line items are extrinsic to Romcarbon's ordinary business operation.  Therefore, for this final remand redetermination, we have offset Romcarbon's reported "profit before tax" with the amounts under these two line items and recalculated the profit ratio accordingly.

*Other Gains*

In the *AR11 Final Results*, Commerce excluded "other gains" from its computation of financial ratios.[72]  It is Commerce's practice to calculate the SG&A expense ratio to include only items that relate to the general operation of the company as a whole.[73]  In determining whether it is appropriate to include in or exclude from the SG&A calculation particular income or expense items, Commerce reviews the nature of the item and its relation to the general operations of the company.[74]  Commerce's practice is to treat incomes accrued from miscellaneous activities as a part of the general operations of the company unless the financial statements explicitly indicate otherwise.[75]

With respect to "Other Gains," as noted above, Commerce's practice is to treat income accrued from miscellaneous activities as a part of the general operations of the company unless the financial statement explicitly indicates otherwise.[76]  Because there is no indication on the record that the amount under the line item "other gains" does not pertain to the general operations of the company,[77] for this final remand redetermination we have offset Romcarbon's

---

[71] *Id.* at page 1303.
[72] *See* Final SV Memorandum at Attachment 1.
[73] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 2.
[74] *Id.*
[75] *See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FF 55039 (September 24, 2008), and accompanying IDM at Comment 3.
[76] *Id.*
[77] *See* Respondents' Surrogate Value Submission at Exhibit 9, page 1376.

reported SG&A with the amounts under "other gains," and recalculated the financial ratios accordingly.

*Social Contributions and Meal Tickets*

In the *AR11 Final Results*, we categorized "Social Contributions" and "Meal Tickets" under SG&A expenses.[78]  When labor items, such as social security contributions, clothing, housing, meals, *etc.*, are clearly included in the SV for labor, we will include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses.[79]  The Malaysian SV for labor which we used to value labor cost in *AR11 Final Results* (*i.e.*, POR-contemporaneous Malaysian labor SV from Trading Economics) provides no information on whether Social Contributions and/or Meal Tickets are included in the SV for labor.[80]  Therefore, because the record does not contain evidence to conclude that Commerce's labor SV already includes the cost of employer's contribution to social security and meal expenses, it is not appropriate to make the adjustments requested by the Respondents.[81]  Thus, in the *AR11 Final Results*, by allocating these two items to SG&A, we did not double count these expenses.  Therefore, for this final remand redetermination we continue to classify the "meal tickets" and "social contribution" line items as SG&A expenses.

---

[78] *See* AR11 Final SV Memorandum at Attachment 1.
[79] *See Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 82 FR 11428 (February 23, 2017) (*Xanthan Gum*), and accompanying IDM at Comment 14.
[80] *See* Petitioners' SV Comments at Attachment 4.
[81] *See, e.g., Frozen Warmwater Shrimp Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 FR 52049 (September 12, 2007) (*Frozen Warmwater Shrimp*), and accompanying IDM at Comment 3 (Commerce notes that the  International Labor Organization data, used to value labor in *Frozen Warmwater Shrimp*, did not include labor related costs, such as employers' contributions in respect of their employees paid to social security and pension schemes.  Accordingly, for the purposes of financial ratio calculations, Commerce categorized "Contributions to Gratuity Fund" as a part of the overhead calculation.).

### III.   SUMMARY AND ANALYSIS OF RESPONDENTS' COMMENTS ON DRAFT REMAND RESULTS

Commerce released the Draft Remand Results to parties for comments on May 28, 2021.[82]  The Plaintiffs filed comments on the Draft Remand Results on June 8, 2021.[83]  On June 11, 2021, Commerce issued a letter to the Respondents, noting that the Respondents' Original Comments contained untimely filed factual information, and requesting that they remove the new factual information and refile the submission.[84]  The Respondents filed the redacted version of the comments on June 14, 2021.[85]  On June 15, 2021, the Respondents filed a letter requesting that Commerce reconsider Commerce's rejection of Respondents' Original Comments, arguing that the information at issue does not constitute new factual information because it is "widely available and public reference material."[86]  On June 23, 2021, Commerce issued a memorandum responding to the Request for Reconsideration, explaining that for reasons of administrative finality and for notice and due process considerations, it is reasonable and necessary to close the record to new factual information – including information that is publicly available.[87]  Commerce also explained that it had not reopened the record on remand and thus it would not be accepting new factual information.  Further, Commerce issued an additional letter to the Respondents, noting that the Respondents' Redacted Comments continued to include new factual information, and requested that they remove the new factual information and resubmit the

---

[82] *See* Draft Remand Results.
[83] *See* Respondents' Letter, "Comments on Draft Remand:  Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated June 8, 2021 (Respondents' Original Comments).
[84] *See* Commerce's Letter, "Rejection of June 8, 2021, Comments on Draft Remand," dated June 11, 2021; *see also* Memorandum, "Rejection of Factual Information from GDLSK," dated June 11, 2021; *see also* Memorandum, "Rejection of Factual Information from GDLSK," dated June 14, 2021.
[85] *See* Respondents' Letter, "Redacted and Resubmitted Comments on Draft Remand:  Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated June 14, 2021 (Respondents' Redacted Comments).
[86] *See* Respondents' Letter," Request for Reconsideration of Draft Remand Comments Rejection," dated June 15, 2021 (Request for Reconsideration).
[87] *See* Memorandum, "Request for Reconsideration from GDLSK," dated June 21, 2021.

comments.[88]  On June 24, the Respondents filed the second redacted version of the comments.[89]

No other parties filed comments on the Draft Remand Results.  As explained below, we continue

to reach the same conclusions that we reached in the Draft Remand Results.  We address each of

the Respondents' comments and provide our analysis in turn.

**Issue 1:  Bituminous Coal Surrogate Value**

*Respondents' Comments*

- In the Draft Remand Results, Commerce has now reconsidered and properly
  acknowledges that HS chapter notes apply to all WCO countries, and accordingly, has
  properly changed the SVs for a portion of bituminous coal (*i.e.*, bituminous coal with
  known calorific value) from those used in the *AR11 Final Results*.

- However, in preferring Malaysian import data reported under HS 2701.19 to value the
  bituminous coal with known calorific value, Commerce failed to select the best available
  information on this record.[90]  Given that Commerce already determined that the
  Malaysian data reported under HS 2701.12 was aberrant and unreliable, the agency
  should be skeptical of Malaysian import data reported under 2701.19, which covers the
  same input of lower heat value, because the SV reported thereunder could likewise be
  distorted.[91]  At a minimum, between the two available choices, Romanian HTS
  subheading 2701.19 and Malaysian HTS subheading 2701.19, the former is preferable
  because – unlike Malaysian import data under HS 2701.12 – the Romanian import data
  reported under 2701.12 is undistorted.[92]

---

[88] *See* Commerce's Letter, "Rejection of June 14, 2021, Redacted and Resubmitted Comments on Draft Remand," dated June 23, 2021.
[89] *See* Respondents' Letter, "Second Redacted and Resubmitted Comments on Draft Remand," June 23, 2021 (Respondents' Comments).
[90] *See* Respondents' Comments at 10.
[91] *Id.* at 11.
[92] *Id.*

- Further, the Draft Remand Results improperly value bituminous coal having unknown heat value with data reported under Romanian HS 2701.12, stating that Commerce does not have record evidence, such as test reports for the bituminous coal input used by these suppliers, that would support valuing this input using imports under subheading 2701.19.[93]

- However, Commerce likewise does not have record evidence to support valuing this input using imports under HS 2701.12 only.[94]  Therefore, in the Draft Remand Results, Commerce impermissibly speculates that bituminous coal having unknown calorific value should be classified under HS 2701.12.[95]

- Given other record evidence showing that similar bituminous coal utilized in producing identical merchandise had a calorific value less than 5,833 kcal/kg, the most reasonable inference regarding the calorific value for such bituminous coal with unknown heat value, is that their calorific value should be likewise less than 5,833 kcal/kg.[96]

- While Commerce specifically required Datong Juqiang and Datong Juqiang's supplier to provide calorific value information and test reports for their bituminous coal input, Commerce never asked Supplier C to provide such information.[97]

- Because Commerce never requested Supplier C to evidence the calorific value of its bituminous coal, Supplier C never provided such evidence.  Under these facts, Commerce is precluded from drawing an adverse inference that such coal invariably had a calorific value equal to or great than 5,833 kcal/kg (and thereby meriting classification under HS

---

[93] *Id.* at 3.
[94] *Id.*
[95] *Id.*
[96] *Id.* at 4.
[97] *Id.* at 5.

2701.19).[98]  The CIT in *AR1 Litigation*, under similar factual circumstances where specificity for an input was on the record for one mandatory respondent, but not for another mandatory respondent because Commerce did not request that information from the second mandatory respondent, disfavored application of different SVs between the two parties.[99]

- Therefore, in its final remand redetermination, Commerce should apply Romanian import data under HS 2701.19 to value bituminous coal of unknown calorific value. Alternatively, an inference based on equal probability suggests that the calorific value of such bituminous coal could be either (1) less than 5,833 kcal/kg or; (2) equal to or greater than the threshold limit of 5,833 kcal/kg.  Accordingly, a conservative methodology for valuing such unknown calorific value bituminous coal requires Commerce to average the SVs reported in HS 2701.19 with those reported under HS 2701.12.[100]

- Further, Commerce correctly recognized that Malaysian import data reported under HS 2701.12 are not viable in *AR11 Final Results*.  Therefore, in the final remand redetermination, Commerce should average data reported under Romanian HS 2701.12 and Romanian HS 2701.19, as averaging the Romanian data under HS 2701.12 with the Malaysian data under HS 2701.19 would result in a potentially distortive SV because it would be drawing SVs for the same input--bituminous coal, varying only in terms of calorific value, from two different source countries.[101]

---

[98] *Id.* (citing *Calgon Carbon Corp. v. United States*, 35 CIT 235, 244 (2011) (*AR1 Litigation*)).
[99] *Id.*
[100] *Id.* at 6.
[101] *Id.*

- Commerce's regulatory policy underlying surrogate valuation – repeatedly affirmed by the CIT – is to minimize the distortion that occurs from using data from multiple countries.[102]

- While Commerce may on occasion have to employ data from a secondary surrogate country based on the absence of viable data for a particular input, there is no basis for Commerce to employ data from different countries to value bituminous coal for the final remand redetermination, given the indisputably reliable Romanian data on the record.[103]

- Therefore, in the final remand redetermination, Commerce should value both the bituminous coal input with known heat value and unknown heat value with Romanian import data reported under HS 2701.19.  Or, alternatively, apply the Romanian HS 2701.19 to value bituminous coal with a known heat value, and use the average of the data reported under Romanian HS 2701.12 and 2701.19 to value the bituminous coal input with unknown heat value.[104]

**Commerce's Position:**  The respondents claim that Commerce should (1) use Romanian import data reported under HS 2701.19 for bituminous coal with both a known calorific value and unknown calorific values, or (2) in the alternative, apply Romanian HS 2701.19 to value bituminous coal with a known calorific value, and use an average of the data under Romanian HS 2701.12 and 2701.19 for bituminous coal with unknown calorific value.  We disagree with the respondents and explain in detail below.

---

[102] *Id.* at 6 and 11 (citing *Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27, *21 (Feb. 10, 2013) ("the use of a 'single surrogate country' is justified when, as here, all other factors are 'fairly equal' because minimizing distortion supports a finding that Commerce relied upon the best available information on the record."); also citing *Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337, 1353 (CIT 2011); 19 C.F.R. § 351.408(c)(1)).
[103] *Id.* at 12.
[104] *Id.* at 2.

As stated above, Commerce's practice, when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) the Act, is to select, to the extent practicable, SVs which are input-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax- and duty-exclusive.[105]  Further, Commerce undertakes its analysis of valuing the FOPs on a case-by-case basis, carefully considering the available evidence in light of the particular facts of each industry.[106]  In addition, it is a long-standing Commerce practice that a party arguing that data are aberrational or unreliable must provide sufficient evidence to support its argument.[107]  Commerce has previously noted that "{i}nterested parties must provide specific evidence showing the value is aberrational.  If a party presents sufficient evidence to demonstrate a particular surrogate value is not viable, {Commerce} will assess all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question."[108]  When there is insufficient evidence to find certain data aberrational, Commerce does not discard the data.[109]  Additionally, Commerce has a strong preference to value all FOPs in a single surrogate country, pursuant to 19 CFR 351.408(c)(2), as well as a practice "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[110]

In the Draft Remand Results, we continued to find Malaysia as the proper selection for the primary surrogate country, and, as discussed *infra*, for the final results of redetermination, we

---

[105] *See, e.g.*, *First Administrative Review of Certain Polyester Staple Fiber from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 FR 1336 (January 11, 2010), and accompanying IDM at Comment 1.
[106] *See Glycine from the People's Republic of China:  Notice of Final Results of Antidumping Duty Administrative Review*, 70 FR 47176 (August 12, 2005), and accompanying IDM at Comment 1.
[107] *See, e.g.*, *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) (*Carbazole Violet Pigment*), and accompanying IDM at Comment 4.
[108] *Id.*
[109] *See Carbazole Violet Pigment* IDM at Comment 6.
[110] *See Sodium Hex from China 2012* IDM at Comment I.

continue to use Malaysia as the primary surrogate country.  Because Commerce selected

Malaysia as the primary surrogate country, our first preference in selecting SVs for these final

results of redetermination is to utilize publicly available prices within Malaysia.[111]

Although Respondents assert that the Malaysian import data reported under HS 2701.19

could be distorted merely because we determined Malaysian import data reported under HS

2701.12 to be aberrant and unreliable, we find this claim unavailing and without merit.  As stated

above, the party arguing that data are unreliable must provide sufficient evidence to support its

argument.  The Respondents do not identify any record information to support their claim that

data reported under HS 2701.19 could be distorted, and the record lacks any appropriate

benchmark data or other price information to support their contention.  As there is no evidentiary

basis to find that the Malaysian import data reported under HS 2701.19 are aberrantly high,

Commerce cannot discard the data.[112]

Likewise, the Respondents' assertion that Commerce improperly valued bituminous coal

having unknown heat value with data reported under Romanian HS 2701.12 because Commerce

never asked Supplier C to provide test reports, is without merit.  Although Commerce did not ask

Supplier C to provide test reports for its bituminous coal input, Commerce asked Supplier C to

"provide a detailed description of 'smoke coal' and explain the difference between smoke coal

and bituminous coal."[113]  In response to this question, Supplier C stated, "Smoke coal is a type of

energy coal, whose technical grade is bituminous coal, that {Supplier C} used to provide energy

for activation."  Supplier C further stated, "{b}oth bituminous coal and smoke coal belong to the

same technical grade of bituminous coal."[114]  In relation to this statement, Supplier C only

---

[111] *See* Draft Remand SV Memorandum at Attachment 1.
[112] *Id.*
[113] *See* Carbon Activated's SDQR Part I at 19, Exhibit SD-27.
[114] *Id.*

provided a test report for its smoke coal input, thereby failing to substantiate its claim that "{b}oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal"[115] with supporting documents (such as bituminous coal test reports).  The Respondents' reference to the CIT's decision in *AR1 Litigation* to support their contention that Commerce should apply Romanian HS 2701.19 to value the bituminous coal with unknown heat values is unavailing and not on point.  The circumstances the Respondents cite to in *AR1 Litigation* pertain to the acceptance of additional evidence at verification.[116]  The CIT in *AR1 Litigation* noted that although Commerce had no obligation to accept additional evidence at verification, once Commerce did accept such evidence from one respondent at verification, however, Commerce had an obligation to treat the other respondent fairly by giving it a similar opportunity.[117]  Because similar circumstances do not exist here, the CIT's decision in *AR1 Litigation* is inapplicable to this case.  Further, it is our long-standing practice in this case for parties to provide the calorific values of the inputs.[118]

      Additionally, a party arguing that data are unreliable must provide sufficient evidence to support its argument.  In this administrative review segment of the proceeding, the Respondents request that Commerce use HS 2701.19 (Other Coal), instead of HS 2701.12 (Bituminous Coal) to value bituminous coal.  In *AR11 Final Results*, Commerce declined to apply Thai notes to Chapter 27, which limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit equal to or greater than 5,833 kcal/ kg,"[119] to the Malaysian subheading, stating that "Subheading Note 2 to Chapter 27" pertains specifically to Thai HS data, not Malaysian data."[120]  Therefore,

---

[115] *Id.* at SD-27.
[116] *See AR1 Litigation*, 35 CIT 235 at 244.
[117] *Id.*
[118] *See, e.g.*, *Carbon AR2*; *see also Certain Activated Carbon from the People's Republic of China:  Final Results of the Fifth Antidumping Duty Administrative Review*, 78 FR 70533 (November 20, 2013) (*AR5 Final Results*).
[119] *See AR11 Final Results* IDM.
[120] *Id.* at 14.

Commerce decided to continue to use HS 2701.12 to value bituminous coal, concluding that the record did not contain similar information with respect to the Malaysian imports under Chapter 27, and as such there was no record evidence to support the use of Malaysian import SV data under HS 2701.19 for the bituminous coal input.[121]  However, while we have now applied the Thai HS subheading notes to the Malaysian HS 2701.12 for these final results of redetermination, we still lack record evidence to depart from using HS 2701.12 to value the bituminous coal used by Supplier C and the uncooperative supplier, which comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database.

Moreover, the plain language description of the GTA data for HS 2701.12 (Bituminous Coal, Not Agglomerated)[122] matches the mandatory respondents' description of their input (*i.e.*, bituminous coal) and supports Commerce's decision to rely on this HS category for the input. Commerce has long relied on a plain reading of the HS descriptions to determine the best available information to value a specific input.[123]  Commerce cannot consider the application of HS 2701.19 with the description "Other Coal," without record evidence to demonstrate that the coal input the mandatory respondents identify as "bituminous coal," is actually of the kind and grade that is more appropriately classified under HS 2701.19 (Other Coal).  Based on the information placed on the record by the mandatory respondents, there is only sufficient evidence to determine that the bituminous coal used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers can be valued with import data reported under HS 2701.19. The record lacks evidence to support a departure from our finding in the *AR11 Final Results* that HS 2701.12 is the appropriate HS code to value Supplier C's, and accordingly, Carbon

---

[121] *Id.*
[122] *See* Draft Remand SV Memorandum at Attachment 1.
[123] *See, e.g.*, *Certain Woven Electric Blankets from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 75 FR 38459 (July 2, 2010), and accompanying IDM at Comment 5.

Activated's uncooperative supplier's bituminous coal input.  Because the Respondents did not provide evidence demonstrating that it would be inappropriate for Commerce to value Supplier C's bituminous coal input using data reported under HS 2701.12, Commerce continues to find that HS 2701.12, based on the description of the input, is the best available information to value Supplier C and the uncooperative supplier's bituminous coal input.

Respondents also failed to provide any evidence to support their alternative claim that Commerce should average the surrogate values reported in HS 2701.19 with those reported under HS 2701.12.  As noted above, in *AR11 Final Results*, the AUV for Malaysian imports under HS 2701.12 was determined to be aberrantly high and based on a limited import volume. As Commerce generally seeks to minimize the number of countries that it relies on for SV data,[124] and as Commerce continues to use Romania as the secondary SC as explained *infra*, Commerce continues to use the AUV for Romanian import data under HS heading 2701.12 as the SV for bituminous coal used by Supplier C and the uncooperative supplier, which comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database.[125]

Further, as the Plaintiffs have correctly noted, Commerce may on occasion have to employ data from a secondary SC based on the absence of viable data from the primary SC for a particular input.[126]  As explained *infra*, we continue to use Malaysia as the primary SC based on the availability of input-specific data, and to use Romania as the secondary surrogate country, as Romania provides usable financial statements.  Therefore, for these final results of

---

[124] *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review, 2016-2017*, 83 FR 46704 (September 14, 2018), and accompanying IDM at Comment 1.
[125] *See* BPI Memorandum.
[126] *See, e.g.*, *Fresh Garlic from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 36168, 36170 (June 17, 2013), and accompanying IDM at Comment 9.

redetermination, Commerce continues to use import data reported under Malaysian HS subheading 2701.19 to value the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers, and to use Romanian import data reported under HS 2701.12 to value bituminous coal used by Supplier C, and by Carbon Activated's uncooperative supplier.[127] This determination is consistent with Commerce's practice in which we apply different SVs for the same input used by different respondents, based on the available evidence regarding input specificity.[128]

## Issue 2:  Surrogate Country Selection

*Respondents' Comments*

- In the Draft Remand Results, Commerce now finds that both Romania and Malaysia are significant producers of comparable merchandise.  This determination is a departure from Commerce's determination in the *AR11 Final Results*, where Commerce found Malaysia to be the only significant producer of comparable merchandise among the OP List countries.[129]

- Accordingly, in the Draft Remand Results, Commerce relied on data considerations to choose Malaysia over Romania as the primary SC, stating that Malaysia provides "data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR – including the bituminous coal input used to produce nearly the entire production volume of the subject merchandise reported in both

---

[127] The identity of the uncooperative supplier is business proprietary.  For the uncooperative supplier's identity, *see* CAT Draft Remand Calculation Memorandum.
[128] *See Carbon AR2* IDM at Comment 4b.
[129] *See* Respondents' Comments at 12.

mandatory respondents' respective FOP databases – with the exception of the financial ratios."[130]

- However, Commerce's proffered rationale in favor of Malaysia is unsupported by substantial record evidence.[131]

- First, Commerce's findings concerning bituminous coal are directly contrary to the record evidence.  Commerce already rejected the unreliable Malaysian HS subheading 2701.12 data for valuing higher calorific heat value (heat value equal to or greater than 5,833 kcal/kg) bituminous coal.  As such, the record lacks a usable Malaysian SV under HS 2701.12.  Indeed, Commerce applied Romanian HS subheading 2701.12 for valuing bituminous coal of unknown heat value.  Therefore, for valuing bituminous coal of an unknown heat value used by two different suppliers, Malaysia demonstrably fails to afford a reliable SV, whereas in contrast, Romania affords reliable SVs for both grades of bituminous coal (*i.e.*, bituminous coal with lower calorific value (covered by import data reported under HS 2701.19) and unknown calorific value (covered by the average of import data reported under HS 2701.12 and 2701.19).[132]

- Second, the financial ratios represent a significant portion of both mandatory respondents' NV.[133]  This impact on NV must be considered when selecting surrogate countries per Commerce's practice, which has been affirmed by the CIT.[134]  The Romcarbon financial data therefore provide a compelling basis for Commerce to have

---

[130] *Id.* at 13.

[131] *Id.*

[132] *Id.* at 14.

[133] *Id.*

[134] *Id.* (citing *Certain Steel Nails from the People's Republic of China:  Final Results of Third Antidumping Duty Administrative Review*, 78 Fed. Reg. 16,651 (Mar. 18, 2013), and accompanying IDM at Comment 1D; and *Jiaxing Brother Fastener Co. v United States*, 11 F.Supp.3d 1326, 1333 (CIT 2014) (*Jiaxing Brother*)).

selected Romania as the primary surrogate country for China.  At a minimum, Commerce must in its final remand explain its deviation from its normal practice by selecting the surrogate country without regards to data availability for such a large portion of NV.[135] Commerce's SV choices for two key FOPs – bituminous coal and surrogate financial ratios – strongly support selecting Romania and undermine the choice of Malaysia.[136]

- Third, in the Draft Remand Results, Commerce advances a new rationale to favor Malaysia for the first time in AR11, *i.e.*, for valuing carbonized materials.  Specifically, Commerce states, "Malaysia is one of only a small number of countries with an HS subheading that includes a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents.  On the other hand, Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents."[137]

- This draft remand position is both unavailing and unsupported by record evidence.  First, in a remand proceeding Commerce should not rely on an entirely new substantive basis in support of its SC choice (*i.e.*, Malaysia).[138]

- Second, the assertion that coconut-shell charcoal was used by mandatory respondents is unsupported for at least three of Carbon Activated's suppliers.[139]  While one of the mandatory respondents (Datong Juqiang) used coconut shell charcoal, the record lacks

---

[135] *Id.*
[136] *Id.*
[137] *Id.* at 17.
[138] *Id.*
[139] *Id.* at 17.

information about the underlying material (whether coal, coconut, wood, or nut) of the carbonized material utilized by the three Carbon Activated suppliers, who appear to have used coal-based carbonized material – not coconut shell charcoal.[140]  Commerce never requested that the three Carbon Activated suppliers in question provide this additional information.[141]

- Consequently, the rationale that the Malaysian HTS subheading 4402.90.1000 for coconut-shell charcoal affords greater product specificity in relation to the input as compared to Romanian HS subheading 4402.90 (Wood Charcoal (Including Shell Or Nut Charcoal), Excluding That Of Bamboo), which is a basket category heading encompassing coconut shell charcoal as well as wood charcoal, is unavailing.[142]

- To the contrary, Romanian HS 4002.90 affords a superior SV choice for all three of Carbon Activated suppliers' coal-based carbonized material.[143]  In *AR5 Final Results*, Commerce accepted that wood and nut charcoal could also be used to produce certain types of activated carbon.[144]  The CAFC also affirmed Commerce's decision that:  (a) wood charcoal could be used to produce the subject merchandise; and (b) between wood charcoal and coconut shell charcoal, the latter is not more comparable to coal-based carbonized materials.[145]

---

[140] *Id.* (citing Carbon Activated's SDQR Part I at12; and Carbon Activated Letter, "Section D Questionnaire Response, Part I," dated September. 28, 2018, at Exhibit D-2 in Attachment D.  (Plaintiffs note that Supplier C's production process shows it used bituminous coal to produce carbonized material at the carbonization stage and mixed such self-produced carbonized material with purchased carbonized material at the activation stage.  Plaintiffs assert that this fact also indicates that purchased carbonized materials should have the same initial substrate, *i.e.*, coal, in order to form a homogeneous mixture, and ensure that the integrity of the final product is not compromised.)).

[141] *Id.* at 17.

[142] *Id.* at 18.

[143] *Id.*

[144] *Id.* at 20 (citing*AR5 Final Results* IDM Comment 6.

[145] *Id.* (citing *Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015)).

- Therefore, as compared to the Malaysian HTS subheading 4402.90.1000 data for coconut shell charcoal only, the choice of Romanian HS subheading 4402.90 (which encompasses both coconut shell charcoal and wood- and nut-based charcoal) affords a more reliable and representative SV for all three of Carbon Activated's suppliers' coal-based carbonized material.[146]

- Third, Romanian HS subheading 4402.90 is vastly superior to Malaysian HTS subheading 4402.90.1000 in terms of data quality.  Romanian HS subheading 4402.90 import data are based on imports from 23 partner countries with a total quantity of 27,152,840 kg.  On the other hand, Malaysian HTS subheading 4402.90.1000 import data are based on Malaysian imports from only four partner countries with a total quantity of merely 336,395 kg.  That is, the commercial significance of the Romanian import data is 81 times greater than that of Malaysia.[147]

- As such, Commerce's reliance on an additional metric – the carbonized material SV – to support its choice of Malaysia as the surrogate country is demonstrably misguided and undermined by record evidence and longstanding agency and judicial precedent.[148]

**Commerce's Position:**  Commerce disagrees with the Respondents' contention that the lack of usable Malaysian data for surrogate financial ratios, and some of the bituminous coal input used by the mandatory respondents during the POR, makes Romania a more appropriate choice of primary SC for this review.  We continue to find that Malaysia provides the best available information based on data quality and availability.

---

[146] *Id.* at 22.
[147] *Id.*
[148] *Id.* at 23.

As noted above, Commerce undertakes to select SVs using the best available information that is on the record in light of our established SV analytical criteria.[149]  There is no hierarchy among these criteria.  It is Commerce's practice to carefully consider the available evidence considering the particular facts of each industry when undertaking its analysis of valuing the FOPs.[150]

Respondents first contend that Commerce should have used import data reported under HS 2701.12 and HS 2701.19 to value bituminous coal used by Supplier C and the uncooperative supplier, instead of using import data reported under HS 2701.12.  The Respondents further argue that because Romania provides usable data under HS 2701.12, whereas the Malaysian data under the same HS code was determined to be aberrantly high and based on a limited import volume, Romania provides better quality data with regards to the bituminous coal input with unknown heat values.  However, as noted, *supra*, there is no information on the record of this administrative review that supports the conclusion that an *average* of the Romanian data reported under HS 2701.12 and HS 2701.19 is more specific than Romanian data reported under HS 2701.12 alone to value bituminous coal used by Supplier C and the uncooperative supplier.  As explained above, based on available record evidence, we continue to value the bituminous coal input used by Supplier C and the uncooperative supplier with Romanian import data reported under HS 2701.12 because the description of this HS code matches the description of the input. Further, while we continue to use data under Romanian HS 2701.12 (*i.e.*, data from the secondary surrogate country) to value the bituminous coal input used by Supplier C and the

---

[149] *Id.*; *see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 2.

[150] *See Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

uncooperative supplier, we have a usable SV from the primary SC (*i.e.*, data reported under Malaysian HS 2701.19) covering nearly all of the bituminous coal input used by the mandatory respondents.  In addition, Commerce notes that contrary to the Respondents' assertion that the Romanian HS 2701.19 is preferable to Malaysian HS 2701.19 in terms of data quality, the Romanian import data that the Respondents placed on the record is not POR-specific because the data cover the period 2016-2018,[151] whereas the Malaysian data under HS 2701.19 is contemporaneous with the POR (*i.e.*, April 2017-March 2018).[152]  Because the FOPs reported for Supplier C's CONNUMs comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database, it is appropriate to use data from the primary SC, that is input-specific and POR-contemporaneous, as are the data reported under Malaysian HS 2701.19 in this case.  For these final results of redetermination, Commerce continues to select the primary SC based on data quality and availability, and only resort to a secondary SC when data from the primary SC are unavailable.

Second, the Respondents' contention that the financial ratios represent a significant portion of both mandatory respondents' NV, and that this impact on NV must be considered when selecting surrogate countries, is unsupported by prior agency determinations and CIT precedents.  The Respondents cite to a Commerce determination and a CIT decision where the *main input's* outsized impact on the NV buildup led Commerce to prioritize that input in making its surrogate country selection,[153] and thus their reliance on these cases is misplaced.  In *Steel Nails*, the dispute was on the choice of SC between Ukraine and Thailand, and the discussion

---

[151] *See* Respondents' Final SV Comments at Exhibit 2.
[152] *See* Petitioners' SV Comments at Attachment 2.
[153] *See* Respondents' Comments at 14 (citing *Certain Steel Nails from the People's Republic of China:  Final Results of Third Antidumping Duty Administrative Review*, 78 FR 16651 (March 18, 2013) (*Steel Nails*), and accompanying IDM Comment 1D; and *Jiaxing Brother*).

was on which country better provides reliable information to value all of the inputs.[154]  In *Steel Nails*, Thailand was determined to be the SC, because not only did Thailand provide usable financial ratios, it also provided "{s}pecific data to value *the two primary inputs*, steel wire rod and steel plate, that comprise the majority of normal value."[155]  Similarly, in *Jiaxing Brother*, the CIT affirmed Commerce's choice of Thailand as the primary SC, noting that Thai steel data provide superior quality for the main input:  steel.[156]  In *Jiaxing Brother*, the CIT noted Commerce's rationale for why it would choose Thailand as the primary SC, despite the relative weakness in the Thai financial statements and another input, is reasonable, stating, "{n}either input influences Plaintiffs' normal value nearly as much as *the steel input*, meaning a reasonable mind could conclude as Commerce did that the overall accuracy of the calculation is best enhanced by reliance on a more specific steel surrogate value than on the financial statements or the Philippine HCl surrogate value."[157]  As stated *infra*, we continue to choose Malaysia as the primary SC based on data considerations.  Therefore, to best enhance the overall accuracy of the calculation by relying on a more input-specific SV, we continue to use Malaysia as the primary surrogate country and rely on the Romanian financial statements for the calculation of financial ratios.

Third, this is the first time in this review where Commerce reached the analysis of data reliability with respect to Romania, as Romania was determined not to be a significant producer of subject merchandise in *AR11 Final Results*.  Moreover, the CIT has ordered Commerce to further explain its SC selection.[158]  Thus, Respondents' contention that in a remand proceeding

---

[154] *See Steel Nails* IDM at Comment 1D.
[155] *Id.* (emphasis added).
[156] *See Jiaxing Brother*, 11 F. Supp. 3d at 1333.
[157] *Id.* (emphasis added).
[158] *See Remand Order* at 18.

Commerce should not rely on an entirely new substantive basis in support of its SC choice (*i.e.*, Malaysia), is unavailing.  Further, the record clearly demonstrates that Datong Juqiang used coconut shell charcoal in the production of the subject merchandise,[159] and therefore, a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000) is the most appropriate SV to value this input.

       For the three Carbon Activated suppliers, we agree that we could value coal based carbonized material with either coconut shell or wood charcoal.  However, while the Respondents contend that the Romanian data are better, they do not identify any record evidence that the Malaysian data under HS 4402.90.1000 are aberrational, not a commercial quantity, or otherwise unreliable.  In addition, contrary to the Respondents' assertion that the Romanian HS subheading 4402.90 is vastly superior to Malaysian HS subheading 4402.90.1000 in terms of data quality, the Romanian import data that the Respondents put on the record are not POR-specific, as the data cover the period 2016-2018,[160] while the import data under Malaysian HS subheading 4402.90.1000 are contemporaneous with the POR (*i.e.*, April 2017-March 2018).[161] Further, Commerce has a strong preference for valuing all SVs from a single surrogate country.[162]  Therefore, we will continue to value coal-based carbonized materials using Malaysian data for imports reported under HS subheading 4402.90.1000 because these data are not aberrational, reflect a commercial quantity from the primary surrogate country, and as noted

---

[159] *See* Datong Juqiang's Letter, "DJAC Second Supplemental Sections C and D response," dated March 6, 2019, at Exhibit 1; *see also* Memorandum, "Draft Redetermination Results Calculation Memorandum for Datong Juqiang Activated Carbon Co., Ltd. in the Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China," dated May 28, 2021 (DJAC Draft Calculation Memorandum).  Because we are making no changes to the determinations as set forth in the Draft Remand Results, we are adopting the analysis in the DJAC Draft Calculation Memorandum for the final remand results.
[160] *See* Respondents' Final SV Comments at Exhibit 2.
[161] *See* Petitioners' SV Comments at Attachment 2.
[162] *See Sodium Hex from China 2012* IDM at Comment I.

in previous segments of this proceeding,[163] are viable proxy to value coal-based carbonized materials.

Therefore, for these final results of redetermination, Commerce continues to use Malaysia as the primary SC, on the basis of data availability and quality, and continues to use Romania as the secondary SC for the valuation of financial ratios and a small quantity of the bituminous coal input.

## Issue 3:  Adjustments in Romcarbon's Financial Ratio Calculations

*Respondents' Comments*

- In the Draft Remand Results, Commerce continued to classify the "meal tickets" and "social contribution" line items as SG&A expenses, stating that the record does not contain evidence to conclude that Commerce's labor SV already includes the cost of employer's contribution to social security and meal expenses, thus it is not appropriate to make the adjustments requested by the Respondents.[164]

- This rationale is unpersuasive because there is no evidence that the Malaysian wage labor data exclude "meal tickets" and "social contribution" either.  Commerce merely speculates that these two cost elements are not included in the Malaysian wage data.[165]

- This determination is also facially inconsistent with Commerce's rationale in the Draft Remand Results in support of allocating "other gains" as an offset to SG&A instead of excluding them from the calculation of financial ratios, in which Commerce noted that

---

[163] *See Certain Activated Carbon from the People's Republic of China:  Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 FR 67142 (October 31, 2011), and accompanying IDM.
[164] *See* Respondents' Comments at 23.
[165] *Id.*

there is no record evidence demonstrating that the amount reported under the line item "other gains" does not pertain to the general operations of the company.[166]

- Therefore, by applying the same rationale, Commerce should allocate "social contributions" and "meal tickets" to labor cost in the final remand.[167]

- Alternatively, at a minimum, a fair determination requires that given the uncertainty as to whether the two cost elements – "social contributions" and "meal tickets" – are included in the Malaysian wage data, Commerce should exclude these two cost elements from the ratio calculations altogether.[168]

**Commerce's Position:**  Commerce disagrees with the Respondents' contention that Commerce's classification of "meal tickets" and "social contribution" line items as SG&A expenses is based on mere speculation.

In deriving surrogate financial ratios, "it is {Commerce}'s longstanding practice to avoid double-counting costs where the requisite data are available to do so."[169]  Furthermore, in *Labor Methodologies*, Commerce has stated, "{Commerce} will adjust the surrogate financial ratios when the available record information-in the form of itemized indirect labor costs-demonstrates that labor costs are overstated."[170]  Therefore, when labor items, such as social security contributions, clothing, housing, meals, *etc.*, are clearly included in the SV for labor, we will

---

[166] *Id.* at 24.
[167] *Id.*
[168] *Id.*
[169] *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 56158 (September 12, 2011), and accompanying IDM at Comment 5.B. (citing *Certain Tissue Paper Products from the People's Republic of China:  Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 72 FR 58642 (October 16, 2007), and accompanying IDM at Comment 2).
[170] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092, 36094 (June 21, 2011) (*Labor Methodologies*).

include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses.[171]

However, for this review, the source of the Malaysian SV for labor which we used to value labor cost in *AR11 Final Results* (*i.e.*, POR-contemporaneous Malaysian labor SV from Trading Economics) provides no information on whether "social contributions" and/or "meal tickets" are included in the SV for labor,[172] and there is no record evidence demonstrating that the labor SV used was overstated.  Therefore, for this final remand redetermination, Commerce has finalized the adjustments of allocation and classification of the expenses in Romcarbon's financial statements, and continues to classify the expenses reported under "Social Contributions" and "Meal Tickets" as SG&A expenses.  As this allocation of indirect labor costs is in line with Commerce's prior determinations,[173] CIT precedents,[174] and the guidelines provided in *Labor Methodologies*,[175] the Respondents' assertion that the Commerce's allocation of "social contributions" and "meal tickets" under SG&A expenses is inconsistent with Commerce's rationale in support of offsetting Romcarbon's SG&A with the amounts under "other gains" is without merit.

Further, Commerce continues to offset Romcarbon's reported "profit before tax" with the amounts under "Gain/(Loss) on adjustment of investment property at fair value" and "Gain/(Loss) on disposal of investment property," because, as stated above, these two line items are extrinsic to Romcarbon's ordinary business operations (*i.e.*, manufacture of goods). Commerce continues to offset Romcarbon's reported SG&A with the amounts under "other

---

[171] *See Xanthan Gum* IDM at Comment 14; *see also Drawn Stainless Steel Sinks from the People's Republic of China:  Investigation, Final Determination*, 78 FR 13019 (February 26, 2013), and accompanying IDM at Comment 3.
[172] *See* Petitioners' SV Comments at Attachment 4.
[173] *See, e.g.*, *Xanthan Gum* IDM at Comment 14.
[174] *See, e.g.*, *Jiaxing Brother Fastener Co. v. United States*, 461 F. Supp. 3d 1346, 1351 (CIT 2020).
[175] *See Labor Methodologies*, 76 FR at 36094.

gains," because there is no indication on the record that the amount under this line item does not pertain to the general operations of the company.

## IV.    RESULTS OF FINAL REMAND REDETERMINATION

Consistent with the *Remand Order*, we reconsidered our choice of HS code for the bituminous coal SV used in the production of activated carbon, the choice of SC, and adjustments in financial ratios, and additionally have addressed and clarified these issues in this remand redetermination.  Based on the foregoing explanations, we made certain changes to our determinations regarding the choice of the input-specific HS code used to value bituminous coal, and the adjustments to our calculation of financial ratios based on Romcarbon's financial statements.  Accordingly, we revised the margin calculations for the mandatory respondents, Carbon Activated and Datong Juqiang, from those in the *AR11 Final Results*.  Thus, we also revised the separate rate margin for Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere, the non-individually examined respondents that qualified for a separate rate and participated in the litigation.[176]  Based on these changes, the estimated weighted-average dumping margins for Carbon Activated, Datong Juqiang, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere for the POR, April 1, 2017, through March 31, 2018, are listed in the chart below.

| Exporter | Weighted-Average Dumping Margin from *AR11 Final Results* (USD/kg) | Weighted-Average Dumping Margin for the Remand Redetermination (USD/kg) |
|---|---|---|
| Carbon Activated Tianjin Co., Ltd. | 1.02 | 0.94 |

---

[176] *See AR11 Final Results*, 84 FR at 68882 (explaining method for determining rate for non-examined separate rate respondents); *see also* CAT Draft Remand Calculation Memorandum; DJAC Draft Remand Calculation Memorandum; and Memorandum, "Calculation of the Margin for Respondents Not Selected for Individual Examination," dated May 28, 2021 (Draft SR Remand Calculation Memorandum) (Because we are making no changes to the determinations as set forth in the Draft Remand Results, we are adopting the analysis in the Draft SR Remand Calculation Memorandum for the final remand results.).

| | | |
|---|---|---|
| Datong Juqiang Activated Carbon Co., Ltd. | 0.86 | 0.55 |
| Beijing Pacific Activated Carbon Products Co., Ltd. | 0.89 | 0.61 |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | 0.89 | 0.61 |
| Ningxia Mineral & Chemical Limited | 0.89 | 0.61 |
| Shanxi Sincere Industrial Co., Ltd. | 0.89 | 0.61 |

6/30/2021

X _____

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance