**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, and DATONG JUQIANG ACTIVATED CARBON CO., LTD., <br><br> Plaintiffs, <br><br> and <br><br> BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA MINERAL & CHEMICAL LIMITED, and SHANXI SINCERE INDUSTRIAL CO., LTD., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Case No. 20-00007 <br><br> PUBLIC VERSION |

**PLAINTIFFS' COMMENTS IN OPPOSITION
TO REMAND REDETERMINATION**

Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005

*Counsel for Plaintiffs/ Plaintiff-Intervenors
Carbon Activated Tianjin Co. Ltd., Carbon
Activated Corporation, Datong Juqiang
Activated Carbon Co., Ltd., Beijing Pacific
Activated Carbon Products Co., Ltd.,
Ningxia Guanghua Cherishmet Activated
Carbon Co., Ltd., Ningxia Mineral &
Chemical Limited, and Shanxi Sincere
Industrial Co., Ltd.*

## **TABLE OF CONTENTS**

BACKGROUND ..................................................................................................... 1

STANDARD OF REVIEW .................................................................................... 2

I.    COMMERCE UNLAWFULLY USED MALAYSIAN DATA TO VALUE BITUMINOUS
      COAL ........................................................................................................... 2

    A.    Bituminous Coal Having Unknown Calorific Value .......................................... 3
    B.    Bituminous Coal Having Known Calorific Value .............................................. 6


II.   COMMERCE UNLAWFULLY SELECTED MALAYSIA AS THE SURROGATE
      COUNTRY FOR CHINA .................................................................................. 7

    A.    Romania Provides Superior Data Quality ........................................................ 7
    B.    Commerce's New Bases To Favor Malaysia Are Without Merit .................................. 10
    C.    AR7/AR8 Precedent Supports Switching to Romania ..................................... 16

III.  COMMERCE UNLAWFULLY DECLINED TO FURTHER ADJUST FINANCIAL
      RATIOS ........................................................................................................ 17

CONCLUSION ...................................................................................................... 17

i

# **TABLE OF AUTHORITIES**

**Cases**

*Ancientree Cabinet Co. v. United States*, CIT Slip Op. 21-87 (July 12, 2021) ............................ 9

*Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312 (CIT 2016).................................... 5

*Calgon Carbon Corp. v. United States*, 35 CIT 234 (2011) ..................................................... 4, 12

*Carbon Activated v. United States*, 503 F.Supp.3d 1278 (CIT 2021) ....................................... 1, 7

*Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27 (Feb. 10, 2013) ........................ 6

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................................... 2

*Globe Metallurgical Inc. v. United States*, 781 F.Supp.2d 1340 (CIT 2011) .............................. 15

*Goldlink, Indus. Co. v. United States*, 30 CIT 616 (2006) .......................................................... 15

*Jacobi Carbons AB v. United States*, 422 F.Supp.3d 1308 (CIT 2019) ...................................... 16

*Jacobi Carbons AB v. United States*, 443 F.Supp.3d 1312 (CIT 2020) ...................................... 16

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992 (Fed. Cir. 2015) ............................... 14

*Jiaxing Brother Fastener Co. v. United States*, 11 F.Supp.3d 1326 (CIT 2014), *aff'd*,
    822 F.3d 1289 (Fed. Cir. 2016).................................................................................................. 8

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ........................................ 3

*Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (2008) .......................... 2

*Peer Bearing Co.-Changshan v. United States*, 804 F.Supp.2d 1337 (CIT 2011) ....................... 6

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................. 10

*Tianjin Wanhua Co. v. United States*, 253 F.Supp.3d 1318 (CIT 2017) ...................................... 9

**Statutes**

19 U.S.C. § 1516a.......................................................................................................................... 2, 5

19 U.S.C. § 1677b.......................................................................................................................... 15

19 U.S.C. § 1677e.......................................................................................................................... 12

19 U.S.C. § 1677m.................................................................................................................... 11, 12

**Rules**

Fed. Rule Evid. 201 ............................................................................................... 5, 12

**Regulations**

19 C.F.R. § 351.408 ................................................................................................. 6

**Administrative Decisions**

*Activated Carbon from China*, Inv. No. 731-TA-1103 (Final),
    USITC Pub. 3913 (Apr. 2007) ......................................................................... 13

*Activated Carbon from China*, Inv. 731-TA-1103 (2nd Review),
    USITC Pub. 4797 (June 2018) ......................................................................... 13

*Activated Carbon from China*, 75 Fed. Reg. 70,208 (Nov. 17, 2010) ................... 5

*Activated Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013) ................... 14

*Activated Carbon from China,* 84 Fed. Reg. 68,881 (Dec. 17, 2019) .................... 2

*Cased Pencils from China*, 78 Fed. Reg. 42,932 (July 18, 2013) .......................... 9

*Diamond Sawblades from China*, 79 Fed. Reg. 40,062 (July 11, 2015) ................ 12

*Diamond Sawblades from China*, 85 Fed. Reg. 78,827 (Dec. 7, 2020) ................. 12

*Silicomanganese from China*, 65 Fed. Reg. 31,514 (May 18, 2000) ...................... 7

*Steel Nails from China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) .............................. 8

*Xanthan Gum from China*, 82 Fed. Reg. 11,434 (Feb. 23, 2017) ...................... 4, 5

Plaintiffs Carbon Activated Tianjin ("Carbon Activated"), Carbon Activated Corporation ("CAC"), and Datong Juqiang Activated Carbon ("DJAC"), and Plaintiff-Intervenors Beijing Pacific Activated Carbon Products, Ningxia Guanghua Cherishmet Activated Carbon ("GHC"), Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial, hereby oppose the Final Results of Redetermination (July 30, 2021), ECF68-1/PRR20 ("Remand") issued by the U.S. Department of Commerce ("Commerce") in response to *Carbon Activated v. United States*, 503 F.Supp.3d 1278 (CIT 2021). As detailed below, the Remand is unlawful.

## **BACKGROUND**

This Court on April 2, 2021, remanded three Commerce determinations in the eleventh administrative review ("AR11") of the antidumping duty ("ADD") order on activated carbon from the People's Republic of China ("China"), having the April 1, 2017, to March 31, 2018 period of review ("POR"). This Court ordered Commerce to reconsider its: valuation of all bituminous coal under Romanian Harmonized Tariff Schedule ("HTS") 2701.12; selection of Malaysia as the primary surrogate country; and calculation of surrogate financial ratios. *Carbon Activated*, 503 F.Supp.3d at 1286-1291, 1294-95.

In its Draft Results of Redetermination (May 28, 2021), PRR1 ("Draft Remand"), Commerce made certain financial ratio adjustments and changed the surrogate value ("SV") for bituminous coal of known heat value to Malaysian HTS 2701.19. Draft Remand at 3-8. Plaintiffs commented that Commerce should make further changes to the financial ratios and bituminous coal valuation, and should select Romania as the surrogate country. Letters from GDLSK to Commerce (June 8, 14 & 23, 2021), CRR11-13/PRR10,12,19 ("Draft Remand Comments"). Commerce required resubmission of these comments redacting references to prior Commerce and U.S. International Trade ("ITC") actions – over Plaintiffs' objection. Letters from

Commerce to GDLSK (June 14 & 23, 2021), PRR11,13,16; Letter from GDLSK to Commerce

(June 15, 2021), PRR15; Letter from Commerce to GDLSK (June 23, 2021), PRR17

("Reconsideration Denial"). Commerce thereafter finalized all aspects of its Draft Remand,

declining to change the surrogate country or make further changes to either the bituminous coal

valuation or financial ratios. Remand at 2-43.

## STANDARD OF REVIEW

"The court reviews remand determinations for compliance with the court's remand

order." *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F.Supp.2d 1303 (2008). As with any

aspect of Commerce's final determination in an AD proceeding, this Court must hold unlawful a

remand redetermination that is "unsupported by substantial evidence on the record, or otherwise

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence . . . means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938).

## I.   COMMERCE UNLAWFULLY USED MALAYSIAN DATA TO VALUE BITUMINOUS COAL

Commerce initially valued all bituminous coal under Romanian HTS 2701.12 for

"Bituminous coal." *Activated Carbon from China,* 84 Fed. Reg. 68,881 (Dec. 17, 2019), PR273

("*AR11 Final Results*"), Issues and Decision Memorandum ("IDM"), PR261, at 13-15.

Commerce now accepts that only bituminous coal having a calorific value ≥5,833 kcal/kg is

valued under HTS 2701.12, and that having a lower calorific is valued under HTS 2701.19 for

"Other Coal." Remand at 3-7. As shown below, bituminous coal: (1) having unknown heat value

should be valued through averaging Romanian HTS 2701.12 and 2701.19 data; and (2) with

known heat value <5,833 kcal/kg should be valued using Romanian HTS 2701.19, per

Commerce's longstanding regulatory preference.

### A.  Bituminous Coal Having Unknown Calorific Value

The Remand recognizes that **Romanian data are required to value bituminous coal having unknown heat value**, having found "that the Malaysian bituminous coal value under HS code 2701.12 . . . is aberrational." IDM at 14. For this category of bituminous coal, Commerce "do{es} not have record evidence, such as test reports for the bituminous coal input used by these suppliers, that would support valuing this input using imports under {either} subheading 2701.19" or 2701.12. Remand at 7. However, Commerce concedes that "the test reports on the record demonstrate the heat value of the bituminous coal input used by {DJAC}, {DJAC's} supplier, and one of Carbon Activated's suppliers is below 5,833 kcal/kg," *i.e.*, under 2701.19. *Id*. Yet Commerce inexplicably relies on the "plain reading" of HTS 2701.12 to assume the remaining bituminous coal had a completely different calorific value. Remand at 28.

Commerce therefore impermissibly speculates that the bituminous coal having unknown calorific value should be classified under HTS 2701.12. "**It is well established that speculation does not constitute substantial evidence**." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009) (emphasis added). Commerce specifically required DJAC and [    ] to provide calorific value information for their bituminous coal, pursuant to which both evidenced that input being <5,833 kcal/kg. DJAC Supplemental Section D Questionnaire Response (Feb. 12, 2019), at 7-8 (Q. 15), 32 (Q. 58), Exs. SD-12–13 (Q. 15) & SD-53 (Q. 58), CR174-252/PR148-56. Conversely, Commerce never asked Carbon Activated's Supplier C, *i.e.*, [

], to provide calorific value information for its bituminous coal input. Carbon Activated Supplemental Section D Questionnaire Response (Part I) (Feb. 21, 2019), CR254-88/PR162-65, at 19 (Q. 29). Commerce acknowledges asking Supplier C to provide supporting documentation for only "smoke coal," that was submitted, evidencing calorific value as <5,833 kcal/kg. *Id*.; Remand at 26.

3

PUBLIC VERSION

Commerce improperly relied on the absence of Supplier C's bituminous coal calorific value information to value all such bituminous coal under HTS 2701.12. Remand at 7, 26-27. Without having asked Supplier C to provide its calorific value and the record evidencing all of the input's known heat values being consistently below the HTS 2701.12 threshold, Commerce is precluded from – as this Court stated when ordering remand in the first administrative review ("AR1") – "**impos{ing} a de facto adverse facts available rate**." *Calgon Carbon Corp. v. United States*, 35 CIT 234, 244 (2011) (emphasis added). While Commerce tries distinguishing this precedent based on its verification context, it recognizes that there "Commerce had an obligation to treat the other respondent fairly by giving it a similar opportunity." Remand at 27. Here, Commerce gave Supplier C no such "similar opportunity" to evidence that its calorific value was <5,833 kcal/kg. *Id*.; *Calgon Carbon*, 35 CIT at 244.

Given the unknown calorific value of Supplier C's bituminous coal, Commerce should average the SVs reported in HTS 2701.19 and 2701.12. Having correctly found Malaysian HTS 2701.12 data unreliable, IDM at 14, Commerce must average data from Romanian HTS 2701.12 and 2701.19; averaging Romanian HTS 2701.12 data and Malaysian HTS 2701.19 data is distortive by drawing SVs for the same input – varying only in terms of heat content – from two different source countries. On this record, consistency and harmonization require that Commerce use Romanian data for both categories of bituminous coal instead of mixing data sources from different countries. Indeed, longstanding Commerce practice averages SV data reported in two HTS codes when the specificity attribute necessary to pinpoint the precise HTS classification is unknown: "**Consistent with Department practice, where we calculate an SV for a specific HTS category, we weight average the values reported under all HTS subcategories under that HTS category.**" *Xanthan Gum from China*, 82 Fed. Reg. 11,434 (Feb. 23, 2017), IDM

Comment 11. Where Commerce lacks information for an input potentially classifiable under multiple HTS codes, it averages data under multiple HTS codes to obtain a more representative and reliable SV. *Id*.; Draft Remand Comments at 9-10 & nn.19-20 (citing ACCESS Barcodes 3421393 & 3476434).[1]

Commerce practice does not support the Remand's speculative valuation of bituminous coal of unknown heat value, despite its strained reliance on the second review ("AR2"). Remand at 8, 30 & nn.30, 128. AR2 is distinguishable as involving two different SV sources to value steam coal: Coal India Limited ("CIL") data; and Indian HTS 2701.19.20. *Activated Carbon from China*, 75 Fed. Reg. 70,208 (Nov. 17, 2010), IDM at 17-19. Commerce there had to value coal with heat values that were either specific or unknown. While respondents argued to value both types of coal based on the CIL data, petitioners argued to value both types based on HTS 2701.19.20; none of the parties argued that coal with unknown heat value should be valued by averaging CIL and HTS 2701.19.20 data. As such, the AR11 issue of averaging two different data sources was not involved in AR2.

The choice of HTS 2701.19.20 data in AR2 supports using the corresponding 6-digit HTS 2701.19 for valuing bituminous coal with an unknown heat value. AR2 does not support the Remand, which constitutes impermissible speculation unsupported by the record, let alone substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[1] Commerce improperly rejected these references to prior Department actions that averaged HTS data in an effort to avoid consideration of such adverse precedent. Reconsideration Denial. Because Commerce documents on ACCESS "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," they can and are judicially noticed. Fed. Rule Evid. 201(b)(2); *Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312, 1327 (CIT 2016).

### B.  Bituminous Coal Having Known Calorific Value

Commerce improperly employs Malaysian HTS 2701.19 to value bituminous coal having known calorific value. Remand at 7. Having found Malaysian HTS 2701.12 "aberrant and unreliable," *id*. at 26, Commerce should be skeptical of Malaysian HTS 2701.19, which covers the same input of lower heat value. For HTS 2701.19 data, Romania is preferable to Malaysia because – unlike Malaysian HTS 2701.12 – Romanian HTS 2701.12 data is undistorted. Moreover, Commerce acknowledges that **Romanian data is necessary to value bituminous coal**. *Id*. at 7. Commerce should therefore value **<u>all</u>** bituminous coal using Romanian data in accordance with its policy underlying surrogate valuation to minimize distortion that occurs when using data from multiple countries. *Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27, *21 (Feb. 10, 2013); *Peer Bearing Co.-Changshan v. United States*, 804 F.Supp.2d 1337, 1353 (CIT 2011); 19 C.F.R. § 351.408(c)(1).

That Commerce characterizes the necessary Romanian data as covering "a small percentage of the volume" reported does not justify a potentially distorted SV. Remand at 28. There is no *de minimis* exception that permits Commerce to contradict its established practice of using values from a single surrogate country to value inputs. Moreover, Supplier C produced [     ] MT of merchandise under consideration and purchased [      ] MT of bituminous coal (of unknown heat value) during the POR – a significant amount. Carbon Activated Section D Questionnaire Response Pt. I (Sept. 28, 2018), CR50/PR90 ("Carbon Activated DQR I"), Att. D at 5-6/Ex. D-5. Commerce further "applied Supplier C's factors of production (FOP) data" – including bituminous coal – to "Carbon Activated's uncooperative supplier." Remand at 4-7, 28-30; *see* Commerce Memorandum (July 1, 2021), CRR14/PRR21.

Commerce's bituminous coal SV redetermination contradicts its single country regulatory preference by **using data from multiple countries to value the same input**.

Commerce explained decades ago: "unless the record convincingly demonstrates that factor values are unreliable, the Department generally prefers to stay within the same country for factor valuation wherever possible because it leads to more consistent results than picking and choosing factor values from different countries." *Silicomanganese from China*, 65 Fed. Reg. 31,514 (May 18, 2000), IDM § A.5. The record "conclusively demonstrates" that Malaysian bituminous coal data are "unreliable," without any concerns for such Romanian data. *Id*.; Remand at 7, 26. Therefore, Commerce has no basis to employ data from different countries to value the two types of bituminous coal, given the indisputably reliable Romanian data under both HTS 2701.12 and 2701.19 – which also makes Romania the superior primary surrogate country. Section II, *infra*.

## II.   COMMERCE UNLAWFULLY SELECTED MALAYSIA AS THE SURROGATE COUNTRY FOR CHINA

Initially in AR11 Commerce chose Malaysia as the primary surrogate country, finding that Romania was not a significant producer of comparable merchandise. IDM at 7-8. After this finding was remanded, *Carbon Activated*, 503 F.Supp.3d at 1286-89, Commerce reversed itself to find that Romania was a significant producer of comparable merchandise. Remand at 13-14. Consequently, the surrogate country choice must be decided by data considerations. *Id*. at 14-16.

### A.   Romania Provides Superior Data Quality

Commerce again concedes that "the three Malaysian financial statements . . . lack usable financial data in that none of them have separate line items breaking down the cost of raw materials and energy." *Id*. at 15. Commerce thus continued using the Romcarbon S.A. financial statement, but nevertheless selected Malaysia because that country provides "data for **nearly all** of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR – **including the bituminous coal input** used to produce nearly the entire production

volume of the subject merchandise reported in both mandatory respondents' respective FOP databases – **with the exception of the financial ratios**." *Id*. at 14 (emphases added).

Commerce's bituminous coal rationale is contradicted by the record. **Commerce rejected the unreliable Malaysian HTS 2701.12 data** for valuing higher calorific heat value (≥5,833 kcal/kg) bituminous coal. IDM at 14. Consequently, Commerce acknowledges the continued necessity of using Romanian HTS 2701.12 to value the significant bituminous coal of Supplier C and also for Carbon Activated's uncooperative supplier. Remand at 7; Section I.A, *supra*. Because Malaysia demonstrably fails to afford such a reliable SV while Romania does so for both grades of the most significant input, the Remand's inaccurate surrogate valuation causes distorted ADD margins.

Beyond bituminous coal, financial ratios represent [          ] mandatory respondents' normal value ("NV"). Memorandum of Law in Support of Motion for Judgment on the Agency Record (June 24, 2020), ECF56/59 ("56.2 Brief"), Addendum. This outsized impact on NV must be considered when selecting surrogate countries per Commerce's court-affirmed practice. *See, e.g.*, *Steel Nails from China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013), IDM Comment 1D; *Jiaxing Brother Fastener Co. v. United States*, 11 F.Supp.3d 1326, 1333 (CIT 2014), *aff'd*, 822 F.3d 1289, 1297 (Fed. Cir. 2016). Commerce unpersuasively distinguishes this precedent by tying its basis for surrogate country selection with "the main input: steel," rather than financial statements. Remand at 37. Yet based on this rationale, only Romania qualifies as the surrogate country because it alone affords usable and reliable SV data for "the main input: bituminous coal." 56.2 Brief Addendum ([   ] for DJAC and [   ] for Carbon Activated).

Moreover, Commerce relies solely on financial statements in selecting surrogate countries because overhead, SG&A, and profit ratios – applied to the total cost of material, labor

and energy – result in these three expenses being invariably significant contributors to NV.

*Cased Pencils from China*, 78 Fed. Reg. 42,932 (July 18, 2013), IDM Comment 1 ("in

evaluating the two countries for purposes of selecting a primary surrogate, we have relied on data

availability as the deciding factor. . . . {T}he **Philippines is the better choice because of the**

**superiority of the Philippine financial data** for deriving surrogate financial ratios") (emphasis

added). This Court has affirmed Commerce's practice to select surrogate countries based on

financial statements. *Tianjin Wanhua Co. v. United States*, 253 F.Supp.3d 1318, 1324 (CIT

2017) ("Relying on a 'preference for selecting the financial statements of a producer of identical

merchandise over a producer of comparable merchandise,' Commerce preliminarily selected

Indonesia as the primary surrogate country for the administrative review. . . . Commerce issued

its <u>Final Results</u> . . . based on Indonesia as the primary surrogate country. . . . The court therefore

sustains Commerce's selection of Indonesia."). Indeed, this Court recently affirmed Commerce's

selection of Romania based solely on superior financial data:

> . . . the court concludes that **Commerce acted within its discretion when**
> **selecting the single, superior Romanian financial statement to the three**
> **Malaysian statements. While there are three Malaysian financial statements,**
> **as Commerce noted, none of them segregate energy costs** and all of them
> ambiguously account for overhead expenses. . . . Meanwhile, Sigstrat's financial
> statement has a line item for "production overhead" and an itemized expense for
> energy costs. . . . Commerce acted based on substantial evidence and within its
> discretion to determine that the **<u>Romanian financial statement was superior</u> to**
> the Malaysian financial statements **<u>for purposes of surrogate country</u>**
> **<u>selection</u>**.

*Ancientree Cabinet Co. v. United States*, CIT Slip Op. 21-87 (July 12, 2021), at 17-18 (emphases

added).

Here, unlike Romcarbon, all three Malaysian "financial statements lack usable financial

data in that {none} of them have separate line items breaking down the cost of raw materials and

energy." Decision Memorandum, PR225, at 16. *Ancientree* therefore compels Commerce to

select Romania as the primary surrogate country in AR11. Given longstanding precedent supporting selection of a surrogate country based on the availability of usable financial statements, Commerce fails to support its choice of Malaysia that lacked such a financial. "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

By contrast, no data considerations suggest that Romania should be disqualified. Indeed, Commerce acknowledges Romania's superiority: "**the record also contains complete, publicly-available contemporaneous, and input-specific Romanian data for nearly all of the inputs used by the two mandatory respondents to produce subject merchandise during the POR**." Remand at 14-15 (emphasis added). Conversely, Commerce is unable to identify a single input for which Romanian data cannot be used.

### B.  Commerce's New Bases To Favor Malaysia Are Without Merit

The entirely new bases that Commerce develops in its strained effort to salvage its selection of Malaysia do not withstand scrutiny. First, Commerce incorrectly claims that "the Romanian import data . . . Respondents placed on the record is not POR-specific because the data cover . . . 2016-2018, whereas the Malaysian data under HS 2701.19 is contemporaneous with the POR (*i.e.*, April 2017-March 2018)." Remand at 36, 38 (footnote omitted). Plaintiffs did in fact submit POR-specific data, although the auto-generated heading was titled "2016-2018" because the data source is programmed to automatically download three years of data before a "macro" is used to filter POR-specific data. Final SV Comments by DJAC and Carbon Activated (May 13, 2019), PR207-16 ("Final SV Submission"), Ex. 2. Tellingly, neither Commerce nor petitioners at any point before the Remand questioned the POR-specific nature of the Romanian data. Commerce moreover has the ability to corroborate such data and is precluded by statute

from making an adverse finding based on any perceived deficiency without providing notice and an opportunity to cure. 19 U.S.C. § 1677m(d).

The other new basis advanced by Commerce is similarly without merit and unsupported by substantial evidence:

> Malaysia is one of only a small number of countries with an HS . . . ten-digit level that is specific to **coconut-shell charcoal** (*i.e.*, HTS subheading 4402.90.1000), **a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents**. . . . Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents.

Remand at 15 (emphasis added).

Commerce's claim that coconut shell charcoal was used by mandatory respondents is unsupported on the record for all three of Carbon Activated's suppliers – [

] – who reported carbonized material, not coconut shell charcoal. Carbon Activated DQR I, Att. B/Ex.D-5, Att. C/Ex.D-5, Att. D/Ex.D-5. Moreover, [          ] production process shows it used bituminous coal to produce carbonized material at the carbonization stage and mixed such self-produced carbonized material with purchased carbonized material at the activation stage. *Id*. Att. D at 4/Ex.D-2. Thus, [     ] purchased carbonized materials should have the same initial substrate – *i.e.*, coal – to form a homogeneous mixture, and ensure the integrity of the final product is not compromised. That coconut shell charcoal was not used by any Carbon Activated supplier is confirmed by the product characteristics CARBONU of CAC's subject merchandise being: [

]; notably, no products sold had a CARBONU of [                ]. Carbon Activated Section C Third Supplemental Questionnaire Response (Apr. 5, 2019), CR345-50/PR188-89, Ex. 3SC-4 (Revised Sales

Database); Carbon Activated Section C Questionnaire Response (Aug. 30, 2018), CR33-37/PR74-75, at 6.

Further, CAC's sales database evidences that its customers are [

]. *Id*. As detailed *infra*, ITC reports confirm that coal based charcoal, not coconut charcoal, are suitable and cost-effective for water purification. Moreover, since Commerce never requested additional information from Carbon Activated's suppliers, it cannot apply a SV that is *de facto* based on adverse facts for the expediency of convenience without complying with the statutory prerequisites. *Calgon Carbon*, 35 CIT at 244; 19 U.S.C. §§ 1677e, 1677m(d). Commerce incorrectly asserts that Malaysian HTS 4402.90.1000 for coconut-shell charcoal affords greater product specificity as compared with Romanian HTS 4402.90, which encompasses coconut shell charcoal as well as wood charcoal. Remand at 15. To the contrary, Romanian HTS 4002.90 is a superior SV for all of Carbon Activated suppliers' coal-based carbonized material.

First, the ITC explains that coconut shell charcoal is a very different input than coal-based carbonized material. Commerce improperly required that the Draft Remand Comments redact ITC publications, as they not only "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," but are relied upon by the Department itself where not on the record because they "can be accessed directly" from the ITC website. Reconsideration Denial; Fed. Rule Evid. 201(b)(2); *Diamond Sawblades from China*, 85 Fed. Reg. 78,827 (Dec. 7, 2020), IDM n.13; *Diamond Sawblades from China*, 79 Fed. Reg. 40,062 (July 11, 2015), IDM n.8. In its 2018 sunset review, the ITC noted the differences between coconut shell and coal-based activated carbon:

PUBLIC VERSION

> Coal is the primary raw material for activated carbon in both the United States and China. Coal-based activated carbon is used widely by municipal water treatment authorities to remove undesirable tastes and odors from drinking water and to eliminate contaminants from industrial waste water. Other uses of coal-based activated carbon include removing color and impurities from food and chemical. . . . Coconut-based activated carbon is used primarily in the gold mining and cigarette filter industries, as well as being a price premium product for home water filters. . . .
>
> Other common raw materials for making activated carbon are wood, coconut shells, olive stones, and peat. . . .
>
> **Certain activated carbon made from coconut shells typically has different properties from certain activated carbon made from coal.** Specifically, coconut-based activated carbon usually has greater hardness and smaller pore sizes than coal-based activated carbon. These differences may make coconut-based carbon better than coal based carbon for certain applications, such as gold mining and manufacturing filters for cigarettes.

*Activated Carbon from China*, Inv. 731-TA-1103 (2nd Review), USITC Pub. 4797 (June 2018), at 9, I-10–12 (emphasis added).

These differences between the two types of activated carbon, which clarify fundamental dissimilarities between the underlying raw materials – coal-based carbonized materials and coconut shell charcoal – are summarized below.

| Coconut shell-based charcoal | Coal-based charcoal |
| --- | --- |
| Greater hardness | Lower hardness |
| Smaller pore sizes | Larger pore sizes |
| Different pore distribution ||
| Uses: Cigarette filters, home water filters, gold mining | Uses: Processing drinking water, filtering air and gases |

*Id.*; *see Activated Carbon from China*, Inv. No. 731-TA-1103 (Final), USITC Pub. 3913 (Apr. 2007), at 26-27 ("the record indicates that there is **very little interchangeability between coal-based and coconut-based activated carbon**. . . . The **limited interchangeability of coconut-based and coal-based activated carbons** is further confirmed by record evidence indicating a lack of customer overlap for the two products. *** This shows that coconut- and coal-based activated carbons are being sold to different markets, demonstrating limited substitutability

between the two.") (emphases added). Given such fundamental dissimilarities between their physical characteristics and end-uses, coconut shell charcoal is unsuitable for valuing coal-based carbonized material.

Second and on the other hand, Commerce has in prior proceedings accepted that wood and nut charcoal can be used to produce activated carbon: "**Petitioners correctly state that activated carbon may be manufactured from wood or nut charcoal**, in addition to coal." *Activated Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013), IDM Comment 6 (emphasis added) (footnotes omitted). Therefore, both wood- and nut-based charcoal and coconut shell-based charcoal can be used as carbonized materials to produce subject merchandise.

In the fourth administrative review ("AR4"), Commerce valued coal-based carbonized materials based using HTS 4402 (averaging both wood- and nut-based and coconut shell-based charcoal) – a decision affirmed by the U.S. Court of Appeals for the Federal Circuit ("CAFC").

> **Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise.** . . .
>
> **Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood charcoal and coconut shell charcoal**. . . .
>
> Here, the material input in question is carbonized material made of coal. . . . With regard to the carbonized material made of coal, which constitutes the bulk of the subject merchandise, there is no evidence on this record comparing wood charcoal and coconut shell charcoal. **There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal.** Thus for the bulk of the imports at issue, **there is no proof that coconut shell charcoal is a better surrogate**. Neither of these data sources is specific to carbonized material made of coal. . . . We cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence.

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015) (emphases added). Therefore, the CAFC in AR4 affirmed Commerce's decision that: (a) wood charcoal

could be used to produce the subject merchandise; and (b) between wood charcoal and coconut shell charcoal, the latter is **not** more comparable to coal-based carbonized materials.

The AR11 record does not contain any evidence that detracts from the above conclusion. Therefore, as compared to the Malaysian HTS 4402.90.1000 data for coconut shell charcoal only, the choice of Romanian HTS 4402.90 – which encompasses both coconut shell charcoal and wood- and nut-based charcoal – affords a more reliable and representative SV for all of Carbon Activated's suppliers' coal-based carbonized material.

Third, Romanian HTS 4402.90 provides vastly superior data quality than Malaysian HTS 4402.90.1000. Romanian HTS 4402.90 import data are based on imports from 23 partner countries with a total quantity of 27,152,840 kg. Final SV Submission Ex. 2A. On the other hand, Malaysian HTS 4402.90.1000 import data are based on Malaysian imports from only four partner countries with a total quantity of merely 336,395 kg. Petitioners' Submission of SVs (Nov. 9, 2018), PR115-20, Att. 1. That is, the commercial significance of the Romanian import data is 81 times greater than that of Malaysia. *See id*. Therefore, the Romanian data are substantially more representative of a broad market average.

In sum, Romanian HTS 4402.90 is vastly superior to Malaysian HTS 4402.90.1000 for valuing Carbon Activated's suppliers' coal-based carbonized material. As such, the Remand's reliance on an additional metric – the carbonized material SV – to support maintain Malaysia as the surrogate country is demonstrably misguided and undermined by both record evidence **and** longstanding precedent.

It simply cannot be said that Malaysian data constitute "**the best available information**" under these circumstances. 19 U.S.C. § 1677b(c)(1)(B) (emphasis added). Given the lack of Malaysian data for surrogate financial ratios (that account for a large portion of NV) and at least

some of the bituminous coal used by respondents during the POR, "a reasonable mind" could not conclude that Malaysia is an appropriate surrogate country for AR11. *Globe Metallurgical Inc. v. United States*, 781 F.Supp.2d 1340, 1348 (CIT 2011) (quoting *Goldlink, Indus. Co. v. United States*, 30 CIT 616, 619 (2006)).

### C.   AR7/AR8 Precedent Supports Switching to Romania

In litigation involving the seventh and eighth administrative reviews ("AR7/AR8"), Commerce on remand reversed its surrogate country from Thailand to Indonesia (AR7) and Malaysia (AR8). *Jacobi Carbons AB v. United States*, 422 F.Supp.3d 1308, 1311 (CIT 2019) ("Commerce changed its primary surrogate country selection from Thailand to Indonesia. . . . . Commerce used Indonesian data for all {SVs} with the exception of the surrogate financial ratios. . . . Commerce used the financial statements of a company in the Philippines") (citation omitted); *Jacobi Carbons AB v. United States*, 443 F.Supp.3d 1312, 1315 (CIT 2020) ("Commerce issued redetermination, under protest, changing its primary surrogate country selection from Thailand to Malaysia, but determined that Malaysian data for carbonized material were unreliable and, thus, used data from Philippine industry publication. . . . Commerce's valuation of carbonized material complies with the court's order . . . by providing reasoning supported by substantial evidence for declining to rely on the Malaysian data . . .").

In both cases, Commerce switched to new surrogate countries even though it lacked SV data for critical FOPs – financial ratios in AR7 and carbonized material in AR8. Here, Romania affords reliable SV data for **all** FOPs. Therefore, the selection of Romania in AR11 is compelled by this Court's AR7/AR8 precedent.

PUBLIC VERSION

### III.   COMMERCE UNLAWFULLY DECLINED TO FURTHER ADJUST FINANCIAL RATIOS

Commerce erroneously allocated Romcarbon's "Social Contributions" and "Meal Tickets" under SG&A, unpersuasively reasoning that Malaysian labor SV data "provides no information" about these costs. Remand at 19, 40-41; Final SV Submission Ex. 10 at 29 (Note 7). Absent evidence that Malaysian labor data excluded these costs, these two costs are presumed to be embedded within the reported labor cost, and thus merit allocation under labor. Commerce was obligated to invoke a presumption similar to the one used to consider "Other gains" as part of general operations in absence of evidence to the contrary. Moreover, this issue is mooted by selecting Romanian labor data, which expressly enumerates such costs – "direct expenditures: the gross amounts paid from other funds (in kind rights included) . . . and indirect expenditure: the employer's contributions to the social security. . . ." Final SV Submission Ex. 7.

### CONCLUSION

As set forth above, Plaintiffs/Plaintiff-Intervenors respectfully submit that this Court order another remand for Commerce's reconsideration.

Respectfully submitted,

*/s/ Dharmendra Choudhary*
Francis J. Sailer
Dharmendra Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

Dated: July 30, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this filing complies with the word limitation requirement.  The word count for Consolidated Plaintiffs' Comments in Opposition to Final Results of Remand Redetermination Pursuant to Court Order, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP's word processing system Microsoft Word 2007, is 4,998 words, within the 5,000 word limit set by the Court in Slip Op. 21-35.

/s/ Jordan C. Kahn
Jordan C. Kahn

*Counsel for Plaintiffs/ Plaintiff-Intervenors
Carbon Activated Tianjin Co. Ltd., Carbon
Activated Corporation, Datong Juqiang
Activated Carbon Co., Ltd., Beijing Pacific
Activated Carbon Products Co., Ltd.,
Ningxia Guanghua Cherishmet Activated
Carbon Co., Ltd., Ningxia Mineral &
Chemical Limited, and Shanxi Sincere
Industrial Co., Ltd.*

11223941_1