# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD.,<br>CARBON ACTIVATED CORPORATION, and<br>DATONG JUQIANG ACTIVATED CARBON<br>CO., LTD.,<br>    *Plaintiffs*,<br><br>    and<br><br>BEIJING PACIFIC ACTIVATED CARBON<br>PRODUCTS CO., LTD., NINGXIA GUANGHUA<br>CHERISHMET ACTIVATED CARBON CO.,<br>LTD., NINGXIA MINERAL & CHEMICAL<br>LIMITED, and SHANXI SINCERE INDUSTRIAL<br>CO., LTD.,<br>    *Plaintiff-Intervenors*,<br><br>    v.<br><br>UNITED STATES,<br>    *Defendant*,<br><br>    and<br><br>CALGON CARBON CORPORATION and<br>CABOT NORIT AMERICAS, INC.,<br>    *Defendant-Intervenors*. | Court No. 20-00007 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

CLAUDIA BURKE
Assistant Director

Of Counsel:
ASHLANDE GELIN
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
Office of the General Counsel
U.S.  Department of Commerce


August 30, 2021

MOLLIE L. FINNAN
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 353-0897
Email: mollie.l.finnan@usdoj.gov

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

ARGUMENT ........................................................................................................................2

I.    Standard Of Review ..............................................................................................2

II.   Commerce's Valuation Of Bituminous Coal, Of Known And Unknown Calorific
Values, Is Supported By Substantial Evidence And Not Contrary To Law ...........................3

      A.    Bituminous Coal With A Known Calorific Value ...........................................3

      B.    Bituminous Coal With Unknown Calorific Values .......................................5

III.  Commerce's Selection Of Malaysia As The Primary Surrogate Country, Rather
Than Romania, Is Supported By Substantial Evidence And Not Contrary To Law............10

IV.  Commerce's Adjustment To Financial Ratios Is Supported By Substantial Evidence
And Not Contrary To Law ..................................................................................................16

CONCLUSION...................................................................................................................17

**TABLE OF AUTHORITIES**

CASES ............................................................................................................Page(s)

*Ancientree Cabinet Co. v. United States*,
    No. 20-00114, 2021 WL 2931312 (Ct. Int'l Trade 2021) ................................................10, 16

*Blue Field (Sichuan) Food Indus. Co. v. United States*,
    949 F. Supp. 2d 1311 (2013) ........................................................................................6

*Calgon Carbon Corp. v. United States (Calgon AR1)*,
    35 C.I.T. 234 (2011) ................................................................................................8, 9

*Carbon Activated Tianjin Co., Ltd., et al. v. United States*,
    Slip Op. 21-35, 503 F. Supp. 3d 1278 (Ct. Int'l Trade Apr. 2, 2021) (Remand Order) .. *passim*

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)................................................................................................2, 6

*Jiaxing Brother Fastener Co. v. United States*,
    428 F. Supp. 3d 1364 (Ct. Int'l Trade 2020) ...........................................................16

*Jiaxing Bros. Fastener Co. v. United States*,
    11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .............................................................14

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .............................................................2

*Marvin Furniture (Shanghai) Co. v. United States*,
    36 C.I.T. 1185 (2012) ............................................................................................13

*Mukand, Ltd. v. United States*,
    767 F.3d 1300 (Fed. Cir. 2014)................................................................................13

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006)................................................................................17

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002)................................................................................10

*Tianjin Wanhua Co., Ltd. v. United States*,
    253 F. Supp. 3d 1318 (Ct. Int'l Trade 2017) ...........................................................15

*Zenith Elecs. Corp. v. United States*,
     988 F.2d 1573 (Fed. Cir. 1993).................................................................10

*Zhejiang Native Produce Animal By-Products Imp. & Exp. Grp. Corp., et al. v. United States*,
     Slip Op. 09-61, 2009 WL 1726360 (Ct. Int'l Trade 2009).........................9

STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................2

19 U.S.C. § 1677b(c)(1)....................................................................................6

19 U.S.C. § 1677m(d)......................................................................................13

19 C.F.R. § 351.408(c)(2)..................................................................................4

OTHER AUTHORITIES

*Antidumping Methodologies in Proceedings Involving Non-Market Economies:
     Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't of Commerce
     Jun. 21, 2011) (*Labor Methodologies*) ..................................................17

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping
     Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 68,881 (Dep't of Commerce
     Dec. 17, 2019) (*Final Results*), and IDM ...................................... *passim*

*Certain Activated Carbon from the People's Republic of China: Final Results and Partial
     Rescission of Second Antidumping Duty Administrative Review*, 75 Fed. Reg. 70,208
     (Nov. 17, 2010) (*Activated Carbon AR2*), IDM at Cmt. 4b.................6, 9

*Certain Cased Pencils from the People's Republic of China: Final Results of Antidumping
     Duty Administrative Review and Determination To Revoke Order In Part; 2010-2011*,
     78 Fed. Reg. 42,932 (Dep't of Commerce Jul. 18, 2013), IDM at Cmt. 1 ...........................15

*Certain Steel Nails from the People's Republic of China: Final Results of Third Antidumping
     Duty Administrative Review*, 78 Fed. Reg. 16,651 (Dep't. of Commerce Mar. 18, 2013)
     (*Steel Nails AR3*), IDM at Cmt. 1D ....................................................14

*Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty
     Administrative Review, Final Determination of No Shipments, Final Partial Rescission;
     2014-2015*, 82 Fed. Reg. 11,434 (Dep't of Commerce Feb. 23, 2017), IDM at Cmt. 11......8, 9

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

|  |  |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., *et al.*, | ) ) ) |
| Plaintiffs, | ) |
| and | ) ) |
| BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., *et al.*, | ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) ) |
| CALGON CARBON CORPORATION, *et al.*, | ) |
| Defendant-Intervenors. | ) ) |

Court No. 20-00007

## DEFENDANT'S RESPONSE TO
## COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the consolidated

comments from plaintiffs and plaintiff-intervenors (collectively, Carbon Activated).  *See* Carbon

Act. Cmts., Jul. 30, 2021, ECF Nos. 70 (Sealed), 71 (Public).  The parties address the remand

redetermination issued by the Department of Commerce (Commerce), *see* Final Results of

Remand Pursuant to Court Remand, June 30, 2021 (*Remand Results*), ECF No. 68 (P.R.R. 20),[1]

pursuant to this Court's opinion and remand order, *Carbon Activated Tianjin Co., Ltd., et al. v.*

*United States*, Slip Op. 21-35, 503 F. Supp. 3d 1278 (Ct. Int'l Trade Apr. 2, 2021) (Remand

Order), ECF No. 66.

---

[1] "P.R." and "C.R." refer to the record underlying the final results.  *See* ECF Nos. 39-4, 39-5.  "P.R.R." and "C.R.R." refer to record of the remand proceeding.  ECF Nos. 69-2, 69-3.

## ARGUMENT

Commerce's *Remand Results* amend and supplement the final results in the eleventh administrative review of certain activated carbon from China.  *See Certain Activated Carbon from {China}: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 68,881 (Dep't of Commerce Dec. 17, 2019) (*Final Results*), P.R. 273, and the accompanying Issues and Decision Memorandum (IDM), P.R. 261.  The period of review is April 1, 2017, through March 31, 2018.  84 Fed. Reg. at 68,881.  The Court's Remand Order sustained Commerce's selection of surrogate data to value coal tar pitch and remanded for Commerce to reconsider surrogate value for bituminous coal, surrogate country selection, and adjustments to surrogate financial ratios.  On remand, Commerce maintained, in part, and adjusted, in part, its valuation of bituminous coal; continued its selection of Malaysia as primary surrogate country based on data quality; and made certain adjustments to financial ratios. Commerce has complied with the Court's Remand Order, and Commerce's remand redetermination is supported by substantial evidence and not contrary to law.  We respectfully request that the Court sustain the *Remand Results* and enter final judgment for the United States.

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

II.   **Commerce's Valuation Of Bituminous Coal, Of Known And Unknown Calorific Values, Is Supported By Substantial Evidence And Not Contrary To Law**

In the underlying administrative review, Commerce initially valued all bituminous coal using Romanian import data under the Harmonized System (HS) heading 2701.12 after finding Malaysian import data under HS 2701.12 were unreliable.  IDM at 9-16.  On remand, Commerce redetermined to use Malaysian import data under HS 2701.19 to value bituminous coal with disclosed calorific values below 5,833 kcal/kg, reported in use by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers.  *Remand Results* at 3.  However, Commerce continued its reliance on Romanian import data under HS 2701.12 to value bituminous coal with undisclosed calorific values, reported in use by Carbon Activated's other supplier (Supplier C) and by Carbon Activated's uncooperative supplier for which Commerce applied Supplier C's factors of production.  *Id.* at 4.  Carbon Activated contend that Commerce should have (i) valued all bituminous coal using Romanian HS 2701.19, or (ii) alternatively, applied Romanian HS 2701.19 for bituminous coal with known calorific values and an average of Romanian HS 2701.12 and HS 2701.19 for bituminous coal with unknown calorific values. Their arguments are not persuasive.

A.   **Bituminous Coal With A Known Calorific Value**

On remand, Commerce redetermined to use Malaysian data under HS 2701.19 (Other Coal) to value bituminous coal input with a known calorific value (under 5,833 kcal/kg).  *Id.* at 3-8, 24-30.

As Commerce explained, its "practice, when selecting the best available information . . . is to select, to the extent practicable, {surrogate values} which are input-specific, representative of a broad-market average, publicly available, contemporaneous with the {period of review}, and tax- and duty-exclusive."  *Id.* at 25.  Further, it has long required any interested

party arguing data to be aberrational or unreliable, to provide sufficient evidence. *Id.* at 25 &
nn. 107-109. If there is sufficient evidence, Commerce "will assess all relevant price
information on the record, including any appropriate benchmark data, in order to accurately
value the input in question." *Id.* If there is insufficient evidence, "Commerce does not discard
the data." *Id.* Finally, the agency has a "strong preference to value all {factors of production} in
a single surrogate country, . . . as well as a practice 'to only resort to a secondary surrogate
country if data from the primary surrogate country are unavailable or unreliable.'" *Id.* at 25 &
n. 110; *see also* 19 C.F.R. § 351.408(c)(2).

  Consistent with this standard, Commerce determined on remand that Malaysian data
under HS 2701.19 was the best available information to value bituminous coal with known
calorific value. Commerce acknowledged its preference for Malaysian data because Commerce
was continuing its selection of Malaysia as the primary surrogate country. *Remand Results*
at 25-26. The Malaysian import data under HS 2701.19 was publicly-available and
contemporaneous with the period of review. The data was also product-specific to the heat value
of the bituminous coal (under 5,833 kcal/kg) reported in use by Datong Juqiang, Datong
Juqiang's supplier, and one of Carbon Activated's suppliers.[2] Commerce further concluded that
the Malaysian data under HS 2701.19 "is reliable, as there is no indication that the {data} is
unusable as a result of being, for example, aberrantly high or based on a limited amount of
imports." *Id.* at 7.

---

  [2] There is no longer a dispute regarding the HS notes. *See* Remand Order, 503 F.
Supp.3d at 1289-90. Commerce has redetermined that the HS chapter notes apply to all
countries in the World Customs Organization based on additional evidence Commerce placed on
the record during the remand proceeding. *Remand Results* at 5-7.

Lastly, Commerce reasoned, respondents did not provide sufficient reason to depart from reliance on the contemporaneous, publicly-available, product-specific, and reliable data from the primary surrogate country for those entities reporting use of bituminous coal with calorific values under 5,833 kcal/kg.  Commerce reasonably rejected respondents' argument that Malaysian HS 2701.19 (Other Coal) must be aberrant and unreliable simply because Commerce previously concluded that Malaysian data under a different HS code (HS 2701.12 (Bituminous Coal)) was aberrant and unreliable.  *Id.* at 26.  As Commerce reasonably surmised, there is "no evidentiary basis" on the record to extend its conclusion regarding the quality of Malaysian data under HS 2701.12 to the quality of Malaysian data under HS 2701.19.  *Id.*  "Respondents do not identify any record information to support their claim . . . and the record lacks any appropriate benchmark data or other price information to support their contention."  *Id.*  In addition, it is Commerce's longstanding practice not to reject data without an evidentiary basis for doing so.  *Id.*

Carbon Activated do not dispute Commerce's preference for HS 2701.19 to value bituminous coal with known calorific value; but they argue that Commerce should favor Romanian HS 2701.19 because that would allegedly minimize distortions vis-à-vis the agency's use of Romanian HS 2701.12 to value bituminous coal with unknown heat value.  Commerce acknowledged its regulatory preference to value data from a single primary surrogate country where appropriate.  *Id.* at 29.  Commerce reasonably determined, however, that the preference favors Malaysia as the primary surrogate country and therefore Malaysian HS 2701.19 to value inputs of bituminous coal with known heat value.  *Id.*

### B.     Bituminous Coal With Unknown Calorific Values

Commerce determined to use a different dataset for valuation of bituminous coal with unknown calorific values.  On remand, Commerce reasonably determined to continue reliance on Romanian HS 2701.12 (Bituminous Coal) as the best available information on which to value the

input with unknown calorific values reported in use by Carbon Activated's Supplier C and Carbon Activated's uncooperative supplier. *Id.* at 3-8, 26-30; IDM at 9-16.

First, there was no record evidence (*i.e.*, test reports) regarding the heat value of this input for these suppliers, such as would support valuing their bituminous coal under HS 2701.19 (Other Coal), limited to a calorific value under 5,833 kcal/kg. *Remand Results* at 5, 7.

Second, Commerce explained that it "has long relied on a plain meaning of the HS descriptions to determine the best available information to value a specific input." *Id.* at 28 & n. 123. The plain language description of HS 2701.12—"Bituminous Coal, Not Agglomerated"—matches the entities' own description of their own input. *Id.* at 28 & n. 122. Stated another way, "Commerce cannot consider the application of HS 2701.19 with the description 'Other Coal,' without record evidence to demonstrate that the coal input the mandatory respondents identify as 'bituminous coal,' is actually of the kind and grade that is more appropriately classified under HS 2701.19 (Other Coal)." *Id*. at 28.

Third, the agency's decision to use different datasets for different respondents "is consistent with Commerce's practice in which {the agency} appl{ies} different {surrogate values} for the same input used by different respondents, based on the available evidence regarding input specificity." *Id.* at 7-8, 30 & nn. 30, 128 (citing *Certain Activated Carbon from {China}*, 75 Fed. Reg. 70,208 (Nov. 17, 2010) (*Activated Carbon AR2*), IDM at Cmt. 4b (using different datasets to value steam coal). This approach is not contrary to law. *See* 19 U.S.C. § 1677b(c)(1); *Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311, 1326 (2013) ("The court will uphold Commerce's surrogate value choices if {it} fairly considered record evidence when choosing surrogates, so that a reasonable mind could accept Commerce's findings." (citing *Consol. Edison*, 305 U.S. at 217)).

Fourth, Commerce's path to reliance on Romanian HS 2701.12 rather than Malaysian HS 2701.12 is reasonably discernible.  Commerce had determined the latter was aberrantly high and based on a limited import volume, and thus unreliable.  *Remand Results* at 2 (citing IDM at 9-16).  No party challenges that determination.  There were no similar concerns raised with Romanian data under HS 2701.12.  Accordingly, as between Romanian data under HS 2701.12 and Malaysian data under HS 2701.12, the best available information was the Romanian data. *Id.* at 25 (explaining resort to a secondary surrogate country only if data from the primary surrogate country are unavailable or unreliable).

Carbon Activated argue that Commerce (i) should not have relied on Romanian data under HS 2701.12 based on the absence of heat value information from Supplier C and the uncooperative supplier, and (ii) should have instead used Romanian data under HS 2701.19 for all bituminous coal regardless of known or unknown heat value.  They reason that Commerce never asked the entities to provide test reports demonstrating the calorific value of their input.  However, as Commerce reasonably determined, the plain reading of the description for HS 2701.12 matches what the entities did report regarding their own operations—their use of "bituminous coal."  *Id*. at 28.  Commerce has no record basis to assume the entities' use of some other form of bituminous coal, instead encompassed by HS 2701.19 ("Other Coal").  *Id*.

Furthermore, the agency did "ask{} Supplier C to 'provide a detailed description of 'smoke coal' and explain the difference between smoke coal and bituminous coal.'"  *Id.* at 7, 26 & nn. 29, 113.  In response, Supplier C provided test reports only for smoke coal and thus failed to provide evidentiary support for "its claim that {b}oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal . . . ."  *Id.* at 26-27 & nn. 114-115.

Commerce further determined respondents were misplacing reliance on the final results of the first administrative review of the activated carbon antidumping duty order. *Id.* at 27; *see Calgon Carbon Corp. v. United States (Calgon AR1)*, 35 C.I.T. 234 (2011). In that review, a respondent provided supplemental information during verification concerning hydrochloric acid's purity, which Commerce had not asked for but accepted. *Calgon AR1*, 35 C.I.T. at 244. The Court held that Commerce was not required to accept the information but once it did, the agency should have given the other respondent a similar opportunity to provide that information. *Id.* Failure to have done so "led to arbitrary and unfair treatment." *Id.* In this eleventh administrative review, however, Commerce determined that "similar circumstances do not exist here." *Remand Results* at 27. Carbon Activated simply failed to substantiate their own claim that smoke coal and bituminous coal were similar. *Id.* Moreover, "it is {the agency's} long-standing practice in this case for parties to provide the calorific values of the inputs." *Id.* at 27 & nn. 118. Because Supplier C failed to provide such information, Commerce reasonably found "that HS 2701.12, based on the description of the input{,} is the best available information to value Supplier C and the uncooperative supplier's bituminous coal input." *Id.* at 28-29.

Commerce rejected Carbon Activated's claim, in the alternative, that averaging the surrogate values reported in HS 2701.19 and HS 2701.12 would be more appropriate than HS 2701.12 for bituminous coal with unknown heat value. *Id.* at 29. Carbon Activated cite to *Xanthan Gum from China*, to explain a practice of calculating surrogate values through averages reported "under multiple {HS} codes to obtain a more representative and reliable SV." Carbon Act. Cmts. at 4-5. *Xanthan Gum* is distinguishable. In that review, Commerce calculated weighted averages reported under all HS subcategories at the 11-digit level. 82 Fed. Reg. 11,434 (Dep't of Commerce Feb. 23, 2017), IDM at Cmt. 11. Commerce then selected the 6-digit Thai

8

HS 2815.12 "as the category most closely matching the input consumed by the respondents." *Id.* Here, in contrast, Commerce selected the 6-digit Romanian HS category 2701.12 based on the description of the input that respondents themselves provided, which matched the HS category. Substantial evidence supports Commerce's use of HS 2701.12, without resorting to any averaging.

Moreover, as already mentioned, Commerce has a practice of assigning different surrogate values if the record reflects differences in input specificity. *See Activated Carbon AR2*, IDM at Cmt. 4b. Carbon Activated do not cite authority that would require averaging in these circumstances. *Cf. Calgon AR1*, 35 C.I.T. at 243 (rejecting Calgon's request to remand so that Commerce could average surrogate value data because Commerce already reasonably determined that a single dataset was superior); *Zhejiang Native Produce Animal By-Products Imp. & Exp. Grp. Corp., et al. v. United States*, Slip Op. 09-61, 2009 WL 1726360, at *5 (Ct. Int'l Trade 2009) (holding Commerce has discretion to select or average equally reliable data sets).

Carbon Activated further argue Commerce should use HS 2701.19 for bituminous coal with unknown heat value because the agency used HS 2701.19.20 in the second administrative review. Carbon Act. Cmts. at 5 (citing *Activated Carbon AR2*, IDM at Cmt. 4b). They fail to establish an evidentiary basis to extend Commerce's selection of HS codes on that record in that administrative review (nine reviews ago), to this record in this review. In any event, the second administrative review lends further support for, rather than detracts from, Commerce's approach in this eleventh administrative review. In *Activated Carbon AR2*, Commerce similarly relied on different datasets for different respondents based on differences in specificity of the steam coal reported by the respondents. *See Remand Results* at 8 n. 30.

Lastly, Carbon Activated unfairly accuse Commerce of "impermissibly speculat{ing} that the bituminous coal having unknown calorific value should be classified under HTS 2701.12" and of "impos{ing} a de facto adverse facts available {(AFA)} rate."  Carbon Act. Cmts. at 3-4.  Neither is true.  In the absence of the input specificity that Carbon Activated themselves failed to report, Commerce accepted their representation that they used "bituminous coal," which matched HS 2701.12 (Bituminous Coal).  This was not unreasonable.  *See Ancientree Cabinet Co. v. United States*, No. 20-00114, 2021 WL 2931312, at *13 (Ct. Int'l Trade 2021) (recognizing constraints from a "limited record" may affect Commerce's choice of surrogate HTS heading).  Carbon Activated bore the burden of creating an accurate record.  *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production {belongs} to the party in possession of the necessary information.")).  Accordingly, rather than Commerce, it is Carbon Activated who speculate that their reported "bituminous coal" of undisclosed heat value is instead "other coal" under HS 2701.19.  Commerce's valuation of bituminous coal input, of both known and unknown calorific value, is supported by substantial evidence and not contrary to law.

## III.   Commerce's Selection Of Malaysia As The Primary Surrogate Country, Rather Than Romania, Is Supported By Substantial Evidence And Not Contrary To Law

The Court's Remand Order expressed concern that Commerce's *Final Results* had inappropriately selected Malaysia, and rejected Romania, without reasoned analysis.  On remand, Commerce reconsidered issues of significant production and further explained its rationale for continuing to select Malaysia based on data considerations.  Commerce redetermined that both Malaysia and Romania qualified as potential surrogate countries.  Both countries were economically comparable to China, as well as significant producers of

comparable merchandise based on their export volumes under HS 3802.10, as a proxy for production data. *Remand Results* at 11-14. Preference for Malaysia arose based on relative data quality and availability. *Id.* at 14-15. Commerce concluded that record data from both countries is "complete, publicly-available, contemporaneous, and input-specific . . . for nearly all of the inputs used . . . to produce the subject merchandise during the {period of review}." *Id.* However, based on relative specificity of the data, the Malaysian surrogate value data are superior to Romanian data. *Id.* at 14-16, 34.

Commerce explained that the Malaysian data reflect a tariff classification at the 10-digit level that is specific to "coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), a direct material . . . consumed in significant quantities in {Carbon Activated's} production of the subject merchandise . . . ." *Id.* at 15. The Romanian data reflect only "a six-digit basket category HS subheading, 4402.90, which {includes both} a wood-based and nut-based charcoal." *Id.* The latter is an input *not* used by Carbon Activated. *Id.* Commerce further considered that the record reflects multiple Malaysian financial statements representative of the respondents' experience, but the statements lack breakouts for raw material, labor, and energy. *Id.* The Romanian financial statement has that specificity. Therefore, Commerce concluded, it would continue relying on Malaysia as the primary surrogate country and using the Romcarbon financial statement for surrogate financial ratios. *Id.* at 15-16.

Carbon Activated argue that the lack of usable data for some of the bituminous coal input renders Romania a more appropriate choice for primary surrogate country. Commerce reasonably rejected this argument. First, the aberrancy of Malaysian HS 2701.12, based on its limited import volume and lack of historical data, is not sufficient to compel discarding Malaysia as a primary surrogate country. *Id.* at 35-36. Commerce still had usable Malaysian data

"covering nearly all of the bituminous coal input used by the mandatory respondents." *Id*. at 36. Second, as for bituminous coal with unknown calorific values, Commerce continued to value the bituminous coal input used by Supplier C and the uncooperative supplier under Romanian HS 2701.12 because the Malaysian HS 2701.12 data was unusable and the suppliers' description of their input matched HS 2701.12. *Id*. at 35. Third, Carbon Activated provided no evidence to support discarding Malaysian data beyond the data under Malaysian HS 2701.12. *Id.* at 35-36. Fourth, the Romanian HS 2701.19 data are not as specific to the period of review because they cover 2016-2018, whereas the Malaysian HS 2701.19 is contemporaneous. *Id.* at 36 & nn. 151-152. Fifth, the control numbers reported under Supplier C comprise only a small percentage of the overall volume of subject merchandise. *Id*. at 36. Sixth, Carbon Activated have not established that either the law or the record (i) precluded valuing differently the bituminous coal with known and unknown inputs, or (ii) compelled averaging of available data.

Commerce also reasonably rejected the argument that Romania is a better choice for primary surrogate country because Romanian HS 4402.90 (Wood Charcoal (Including Shell or Nut Charcoal), Excluding That of Bamboo)) allows for valuation of the coal-based charcoal allegedly used by three of Carbon Activated's suppliers. As Commerce observed, it could value coal-based carbonized material with either coconut shell or wood charcoal. *Id.* at 38. However, the record also indicates "Datong Juqiang used coconut shell charcoal in the production of the subject merchandise {and in significant amounts}." *Id*. Commerce reasonably exercises discretion to rely on the HS covering coconut-shell notwithstanding respondents' preference for a different HS subheading.

While Carbon Activated assert that the Romanian data are superior, they do so without identifying record evidence that the Malaysian subheading HS 4402.90.100 is aberrational or

unreliable.  *Id.*  Lastly, Commerce does not err in considering carbonized material input in this manner at this stage of the proceeding.  By virtue of procedural posture, this is the first time in the review that Commerce has reached the analysis of data reliability with respect to Romania. *Id.* at 37.

As stated above, the Malaysian data are also contemporaneous with the period of review and the Romanian data are not.  *Id.* at 38.  Carbon Activated argue that they did submit data specific to the period of review, but the data was mistitled due to a technical glitch.  They further argue that neither Commerce nor the petitioners questioned the contemporaneity of the Romanian data and that Commerce "is precluded by statute from making an adverse finding based on any perceived deficiency without providing notice and an opportunity to cure."  Carbon Act. Cmts. at 10-11 (citing 19 U.S.C. § 1677m(d)).  Section 1677m(d) is inapplicable.  "While its provisions do allow for a party to correct infirm filings, it applies to insufficient information that was submitted in 'response to a request for information.'"  *Marvin Furniture (Shanghai) Co. v. United States*, 36 C.I.T. 1185, 1191 (2012); *see generally Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304–06 (Fed. Cir. 2014).  In contrast, Carbon Activated provided the data on its own initiative, not in response to a request.

Carbon Activated further argue that the primary surrogate country should be weighted toward the country from data is drawn for financial ratios, because financial ratios represent a significant portion of the respondents' normal value.  They cite no law requiring Commerce to weight its analysis in this fashion.  Instead, they misplace reliance on authorities in which a *main input*'s outsized impact on the normal value build up led Commerce to prioritize that input in making its surrogate country selection, *not* source data for financial ratios.

In *Steel Nails AR3*, Commerce selected Thailand as the primary surrogate country not only because Thailand provided usable data for financial ratios but also "{s}pecific data to value *the two primary inputs*, steel wire rod and steel plate, the comprise the majority of normal value." *Remand Results* at 36-37 (citing *Certain Steel Nails from {China}: Final Results of Third Antidumping Duty Administrative Review*, 78 Fed. Reg. 16,651 (Dep't. of Commerce Mar. 18, 2013) (*Steel Nails AR3*), IDM Cmt. 1D).

Likewise, in *Jiaxing Brother*, the Court sustained Commerce's choice of Thailand as the primary surrogate country, noting that the Thai steel data provided superior quality for steel, the main input. *Id.* (citing *Jiaxing Bros. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014)). Commerce reasonably selected Thailand despite the relative weakness in the Thai financial statements and another input because "{n}either input influences . . . normal value nearly as much as the steel input, meaning a reasonable mind could conclude as Commerce did that the overall accuracy of the calculation is best enhanced by reliance on a more specific steel surrogate value than on the financial statements or the {alternative data source for a different one of the other inputs}." *Jiaxing Bro.*, 11 F. Supp. 3d at 1333.

Neither *Steel Nails* nor *Jiaxing Brother* stand for the proposition that the data source for financial ratios must weigh more heavily in selection of primary surrogate country than the data source for one or more inputs, especially a material input. Rather, Commerce acted reasonably in those reviews, as here, in favoring overall accuracy and/or source material for a main input. *Remand Results* at 37.

Carbon Activated further points to several administrative decisions to demonstrate that Commerce has, on occasion, relied on the source for financial ratios in selecting the primary surrogate country. Carbon Act. Cmts. at 8-9. These reviews do little to advance Carbon

Activated's argument.  These reviews instead show, *inter alia*, that Commerce may exercise a preference for producers of identical merchandise with respect to data quality, and Commerce has discretion in deciding between two reasonable surrogate values.  In any event, none of these authorities require Commerce to weigh the source for financial ratios more heavily than the sources for inputs.

In *Cased Pencils from China*, there was more to Commerce's analysis than a blanket preference for the Philippines "because of the superiority of {its} financial data . . . ."  78 Fed. Reg. 42,932 (Dep't of Commerce Jul. 18, 2013), IDM at Cmt. 1.  The Philippine producer was a producer of identical merchandise (cased pencils) while the alternative Thai producer was primarily in the business of comparable merchandise (pens).  *Id*.  "{W}e now have financial information from a producer of identical merchandise," Commerce reasoned, which "is a better source for the surrogate financial ratios," thereby tipping the balance to the Philippines in selecting a primary surrogate country.  *Id*.

Similarly, in *Tianjin Wanhua Co., Ltd. v. United States*, the Court sustained Commerce's selection of Indonesia based on both the relatively superior Indonesian financial statement and the Indonesian producer's status as a producer of identical merchandise.  253 F. Supp. 3d 1318, 1324 (Ct. Int'l Trade 2017).  As the Court further explained, for a remand directing Commerce to use other surrogate values, the respondent needed to establish that the requested values were "*the one and only reasonable surrogate selection on {the} administrative record*, not simply that {the requested value} may have constituted another possible reasonable choice."  *Id*. (emphasized in original).  Carbon Activated have not shown that Romania is the "one and only reasonable surrogate selection" for primary surrogate country.

Carbon Activated fares no better with *Ancientree*.  In that review, as here, Commerce declined to rely on Malaysian financial statements lacking discrete line items for raw material, labor, and energy.  2021 WL 2931312, at *8; *Remand Results* at 15-16.  But that similarity does not compel Commerce to reject Malaysia as a primary surrogate country in this review, as it did in *Ancientree*.  In both reviews, Commerce engaged in a broader case-specific analysis of data and exercised its statutory discretion to choose between reasonable alternatives for surrogate value sources.  Further, Carbon Activated demand too much in seeming to argue Commerce must not only compare data within this review but also compare data to other reviews of other products involving entirely different records.  *See* Carbon Act. Cmts. at 10.  *But see Jiaxing Brother Fastener Co. v. United States*, 428 F. Supp. 3d 1364, 1379 n. 29 (Ct. Int'l Trade 2020) ("antidumping proceedings are . . . independent proceedings . . . which lead to independent determinations").  Commerce reasonably selected Malaysia as primary surrogate country.

## IV.   Commerce's Adjustment To Financial Ratios Is Supported By Substantial Evidence And Not Contrary To Law

In accordance with the Remand Order, Commerce reconsidered the adjustments to the Romcarbon financial statements used to calculate financial ratios.  Commerce redetermined to offset pre-tax profits by the amounts listed under "Gain/(Loss)" for "adjustment" and "disposal" of "investment property."  *Remand Results* at 17-18.  Commerce also redetermined to offset reported selling, general, and administrative expenses (SG&A) by "Other Gains."  *Id.* at 18-19. With respect to "Social Contributions" and "Meal Tickets," however, Commerce continued to allocate these line items under SGS&A.  *Id.* at 19.  Carbon Activated contends these two line items belong instead under the labor cost category.  Carbon Act. Cmts. at 17.  They reason that "{a}bsent evidence that Malaysian labor data excludes these costs," they are "presumed to be

embedded within the reported labor cost," similar to Commerce's adjustments under "Other Gains."  *Id.*

Commerce's determination to retain "Social Contributions" and "Meal Tickets" under SG&A is supported by substantial evidence and not contrary to law.  *Remand Results* at 16-19, 40-42.  In order to avoid double-counting, Commerce explained it "will adjust the surrogate financial ratios when the available record information—in the form of itemized indirect labor costs—demonstrates that labor costs are overstated."  *Id.* at 40 (quoting *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,094 (Dep't of Commerce Jun. 21, 2011) (*Labor Methodologies*)).  On this record, however, the Malaysian surrogate values for labor provide no information whether "social contributions" or "meal tickets" are included in that cost category.  *Id.* at 41.  Thus, Commerce reasoned, there is no record evidence demonstrating the labor surrogate value used was overstated, and Commerce reasonably continued to classify the line items under SG&A.  *Id.*  Further, while Carbon Activated appear to argue that the agency's approach is inconsistent with its practice, *see* Carbon Act. Cmts. 17, they do little to support this argument and make no effort to address the prior determinations, this Court's precedents, or agency guidelines in *Labor Methodologies* cited by Commerce in support of its approach.  *See Remand Results* at 41 & nn. 173-175; *see SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) (arguments not raised or developed in opening brief are waived).

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's *Remand Results* and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

*/s/Claudia Burke*
CLAUDIA BURKE
Assistant Director

Of Counsel:                                    */s/Mollie L. Finnan*
ASHLANDE GELIN                       MOLLIE L. FINNAN
Attorney                                       Senior Trial Counsel
Office of the Chief Counsel           U.S. Department of Justice
  for Trade Enforcement & Compliance   Civil Division
Office of the General Counsel         Commercial Litigation Branch
U.S.  Department of Commerce      P.O. Box 480, Ben Franklin Station
                                               Washington, DC 20044
                                               Tel.: (202) 353-0897
                                               Email: mollie.l.finnan@usdoj.gov

August 30, 2021                             *Attorneys for Defendant*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Standard Chambers Procedure ¶ 2(B), I hereby certify that this filing

complies with the word-count limitation.  In making this certification, I have relied upon the

word count function of the Microsoft Word processing system used to prepare this brief.

According to the word count, this brief contains 4,964 words, within the 5,000 word limit set by

the Court in Slip Op. 21-35.

*/s/Mollie L. Finnan*
MOLLIE L. FINNAN

August 30, 2021
