Slip Op. 21-149

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, AND DATONG JUQIANG ACTIVATED CARBON CO., LTD.,<br><br>　　　Plaintiffs,<br><br>　　　and<br><br>BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA MINERAL & CHEMICAL LIMITED, AND SHANXI SINCERE INDUSTRIAL CO., LTD.,<br><br>　　　Plaintiff-Intervenors,<br><br>　　　v.<br><br>UNITED STATES,<br><br>　　　Defendant,<br><br>　　　and<br><br>CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC.,<br><br>　　　Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge<br>Court No. 20-00007 |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand results in the eleventh administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: October 22, 2021

Francis J. Sailer, Dharmendra N. Choudhary and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for Plaintiffs and Plaintiff-Intervenors.

Mollie L. Finnan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Ashlande Gelin, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

John M. Herrmann, R. Alan Luberda, and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, D.C., for Defendant-Intervenors.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") redetermination upon

remand in this case.  *See* Final Results of Redetermination Pursuant to Court Remand

("Remand Results"), ECF No. 68-1.[1]

Plaintiffs and Plaintiff-Intervenors (collectively, "Plaintiffs")[2] commenced this case

challenging several aspects of Commerce's final results in the eleventh administrative

review ("AR11") of the antidumping duty order on certain activated carbon from the

People's Republic of China ("China") for the period of review ("POR") April 1, 2017,

---

[1] The administrative record associated with the Remand Results is divided into a Public Remand Record ("PRR"), ECF No. 69-3 and a Confidential Remand Record ("CRR"), ECF No. 69-2.  The administrative record associated with the *Final Results* is divided into a Public Record ("PR"), ECF No. 39-5, and a Confidential Record ("CR"), ECF No. 39-4.  Parties filed joint appendices containing record documents cited in their briefs. *See* Public Remand J.A., ECF No. 75; Confidential Remand J.A. ("CRJA"), ECF No. 74. Citations are to the CRJA unless stated otherwise.

[2] Plaintiffs consist of Carbon Activated Tianjin Co., Ltd. ("Carbon Activated"), Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.

Case 1:20-cv-00007-MAB   Document 76   Filed 10/22/21   Page 3 of 24

through March 31, 2018.  *See Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019) (final results of antidumping duty admin. review; 2017–2018) ("*Final Results*"), ECF No. 39-2, and accompanying Issues and Decision Mem., A-570-904 (Dec. 11, 2019) ("I&D Mem."), ECF No. 39-3.  Plaintiffs challenged Commerce's (1) selection of Malaysia instead of Romania as the primary surrogate country; (2) selection of surrogate values for Carbon Activated and DJAC's inputs of bituminous coal and coal tar pitch; and (3) calculation of surrogate financial ratios.  *See, e.g.*, [Corrected] Confidential Mem. of Law in Supp. of Pls.' and Pl.-Ints.' Mot. For J. on the Agency R. Pursuant to USCIT Rule 56.3, ECF No. 59.

On April 2, 2021, the court remanded Commerce's selection of Malaysia as the primary surrogate country and Commerce's selection of surrogate data to value bituminous coal, sustained Commerce's selection of surrogate data to value coal tar pitch, and directed Commerce to reconsider the adjustments to the surrogate financial statements on remand.  *See Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated I*"), 45 CIT __, __, 503 F. Supp. 3d 1278 (2021).[3]

On June 30, 2021, Commerce filed its Remand Results.  Therein, Commerce retained Malaysia as the primary surrogate country, reconsidered its valuation of bituminous coal, and further explained its adjustments to the financial ratios.  *See* Remand Results at 2–19, 21–42.

---

[3] The court's opinion in *Carbon Activated I* presents background information on this case, familiarity with which is presumed.

Plaintiffs filed comments opposing the Remand Results.  *See* Confidential Pls.'

Comments in Opp'n to Remand Redetermination ("Pls. Opp'n Cmts."), ECF No. 70.

Defendant United States ("the Government") filed comments in support of the Remand

Results.  *See* Def.'s Resp. to Pls.' Comments on Commerce's Remand

Redetermination, ECF No. 73 ("Def.'s Reply Cmts.").  Defendant-Intervenors Calgon

Carbon Corporation and Cabot Norit Americas, Inc. filed a letter expressing support for

the Remand Results without further comment.  Letter from John M. Hermann to the

Court (Aug. 30, 2021), ECF No. 72.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C. § 1581(c)

(2018).[4]  The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C § 1516a(b)(1)(B)(i).

DISCUSSION

**I.    Legal Framework for Surrogate Country and Surrogate Value Selection**

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

When an antidumping duty proceeding involves a nonmarket economy country,

---

[4] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and
references to the U.S. Code are to the 2018 edition unless otherwise specified.

Commerce determines normal value by valuing the factors of production[5] in a surrogate

country, *see id*. §1677b(c)(1), and those values are referred to as "surrogate values."  In

selecting surrogate values, Commerce must, "to the extent possible," use "the best

available information" from a market economy country or countries that are

economically comparable to the nonmarket economy country and are "significant

producers of comparable merchandise."  *Id.* § 1677b(c)(1), (4).

In selecting a primary surrogate country, Commerce has adopted a four-step

approach:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if more
> than one country satisfies steps (1)-(3), Commerce will select the country
> with the best factors data.

*Jianxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016);

*see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate

Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/

policy/bull04-1.html (last visited Oct. 22, 2021).

Commerce generally values all factors of production in a single surrogate

country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2)

---

[5] The factors of production include but are not limited to: "(A) hours of labor require, (B)
quantities of raw materials employed, (C) amounts of energy and other utilities
consumed, and (D) representative capital cost, including depreciation." 19 U.S.C.
§ 1677b(c)(3).

(excepting labor).  *But see Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor rates from the primary surrogate country).  Commerce prefers surrogate values that are "input-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax- and duty-exclusive."  Remand Results at 25 & n.105 (citation omitted); *see also* 19 C.F.R. § 351.408(c)(1), (4) (directing Commerce to select "publicly available"/"non-proprietary information" to value factors of production and "manufacturing overhead, general expenses, and profit").  Commerce has broad discretion to determine what constitutes "the best available information" for the selection of surrogate values.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

## II.    Bituminous Coal Surrogate Value Selection

For the *Final Results*, Commerce valued all bituminous coal using Romanian import data under the Harmonized System ("HS") heading 2701.12 (Bituminous Coal, Not Agglomerated) after finding that the average unit value of Malaysian imports under HS 2701.12 was unreliable.  I&D Mem. at 13–16.  The court remanded the issue to Commerce for further explanation as to the applicability of Chapter 27, Subheading Note 2 ("Note 2")[6] to Commerce's selection of a surrogate value.  *Carbon Activated I*,

---

[6] Note 2 limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit . . . equal to or greater than 5,833 [kilocalories per kilogram ("kcal/kg")]."  I&D Mem. at 14. For the *Final Results*, Commerce declined to apply Note 2 based on the agency's view that Note 2 pertained solely to Thai HS data, not Malaysian HS data.  I&D Mem. at 14.

503 F. Supp. 3d at 1290–91.  On remand, Commerce determined that Note 2 applied to

Malaysian HS data and chose different data sets to value bituminous coal depending on

whether the calorific value of the bituminous coal was known to be below 5,833 kcal/kg.

*See* Remand Results at 3–7.[7]  Commerce continued to rely on Romanian import data

under HS 2701.12 to value bituminous coal that was not documented as having a

calorific value below 5,833 kcal/kg but determined to use Malaysian import data under

HS 2701.19 (Other Coal) to value bituminous coal with a known calorific value below

5,833 kcal/kg in light of its determination that Note 2 applied to the Malaysian import

data.  *Id.* at 7–8

### A.  Bituminous Coal Having Unknown Calorific Value

In its Draft Remand Results, Commerce determined that bituminous coal used by

two of Carbon Activated's suppliers—Supplier C and an uncooperative supplier[8]—

should be valued using Romanian import data reported under HS 2701.12 because

Commerce lacked record evidence demonstrating that such bituminous coal had a

calorific value of less than 5,833 kcal/kg as required for valuation under HS 2701.19.

Draft Results of Redetermination Pursuant to Court Remand ("Draft Remand Results")

at 7, PRR 1, CRJA Tab 11.

---

[7] Commerce changed its position regarding the applicability of Note 2 in order to be
consistent with "prior determinations in which Commerce . . . concluded that '[t]he
International Convention on the Harmonized Commodity and Coding System applies
the same [HS] six-digit prefix for products subject to international trade.'"  Remand
Results at 6–7 & n.26 (citations omitted) (alternations in original).

[8] The names of Supplier C and the uncooperative supplier are proprietary and not
relevant to the court's disposition of this case.

For the Remand Results, Commerce further explained that "the plain language description of . . . HS 2701.12 . . . matche[d] the mandatory respondents' description of their input (i.e., bituminous coal)."  Remand Results at 28.  Furthermore, without record evidence demonstrating that the coal input the mandatory respondents identified as "bituminous coal" was actually the "kind and grade more appropriately classified under HS 2701.19" (i.e., coal with a calorific value limit of less than 5,833 kcal/kg), Commerce stated that it could not consider that coal to fall under HS 2701.19.  *Id.*

In their comments on the Draft Remand Results, Plaintiffs argued that Commerce never asked Supplier C to provide test reports documenting the calorific value of its inputs.  *See id.* at 22, 26.  Commerce explained that although it did not specifically ask "Supplier C to provide test results for its bituminous coal input, [it] asked Supplier C to 'provide a detailed description of "smoke coal" and explain the difference between smoke coal and bituminous coal.'"  *Id.* at 26 & n.113 (citing Carbon Activated Resp. to Sec. D Suppl. Questionnaire (Part I) (Feb. 21, 2019) ("Carbon Activated's SDQR") at 19, Ex. SD-27, PR 162–65, CR 254–88, CRJA Tab 5).  Supplier C responded that "[b]oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal."  *Id.*at 26 & n.114 (citing same).   However, Supplier C provided only "a test report for its smoke coal input," and not for its bituminous coal, leading Commerce to find that Supplier C failed to substantiate that the two were equivalent.  *Id.* at 26–27.  Without these test results, Commerce continued to use import data reported under Romanian HS subheading 2701.12 to value bituminous coal used by Supplier C and the uncooperative supplier.  *Id.* at 30.

### 1. Parties' Contentions

Plaintiffs contend that Commerce should have valued all bituminous coal with an unknown calorific value using the average of Romanian HS 2701.12 and HS 2701.19 data. Pls. Opp'n Cmts. at 2. Plaintiffs argue that because the record establishes that "the heat value of the bituminous coal input used by [DJAC], [DJAC's] supplier, and one of Carbon Activated's suppliers [was] below 5,833 kcal/kg," and thus was covered by HS 2701.19, *id.* at 3 (quoting Remand Results at 7), Commerce "impermissibly speculate[d] that the bituminous coal having unknown calorific value should be classified under [HS] 2701.12," *id.* Plaintiffs further argue that "Commerce never asked Carbon Activated's Supplier C . . . to provide calorific value information for its bituminous coal input" and is thus "precluded from . . . 'impos[ing] a de facto adverse facts available rate.'" *Id.* at 3–4 (quoting *Calgon Carbon Corp. v. United States*, 35 CIT 234, 244 (2011)) (emphasis omitted).

The Government contends that, with respect to bituminous coal having unknown calorific value, Commerce reasonably relied on Romanian HS 2701.12. Def.'s Reply Cmts. at 5–6. The Government argues that (i) there is "no record evidence" to support valuing these suppliers' "bituminous coal under HS 2701.19," (ii) "[t]he plain language description of HS 2701.12 . . . matches [Plaintiffs'] own description of their own input," (iii) Commerce's "decision to use different datasets for different respondents 'is consistent with Commerce's practice,'" and (iv) "Commerce's path to reliance on Romanian HS 2701.12 . . . is reasonably discernable." *Id.* at 6–7.

**2. Commerce's Selection of Romanian HS 2701.12 Data to Value Bituminous Coal of Unknown Calorific Value is Supported by Substantial Evidence**

There is no dispute that the record lacks evidence regarding the heat value of the input for Carbon Activated's Supplier C and Carbon Activated's uncooperative supplier. While Plaintiffs argue that Commerce impermissibly speculated that bituminous coal should be classified as "bituminous coal" under HS 2701.12, *see* Pls.' Opp'n Cmts. at 3–5, any basis for Commerce to apply HS 2701.19 was equally speculative. The court declines to reweigh the record evidence and finds that substantial evidence supports Commerce's decision to value bituminous coal of unknown calorific value under HS 2701.12.

Neither Supplier C nor Carbon Activated's uncooperative supplier documented the heat value of the bituminous coal they used. *See* Remand Results at 28. While Commerce specifically asked Carbon Activated "to provide a detailed description of 'smoke coal' *and* explain the difference between smoke coal and bituminous coal," Carbon Activated's SDQR at 19 (emphasis added), Carbon Activated only documented the calorific value of Supplier C's smoke coal, *see id.*, Ex. SD-27. Because Carbon Activated failed to document the calorific value of Supplier C's bituminous coal and acknowledged that "the two types of coal differ in terms of key parameters such as volatile matter content, moisture and heat value," Carbon Activated's SDQR at 19, Commerce declined to value such coal as "Other Coal" under HS 2701.19, Remand Results at 30. Carbon Activated provided no information regarding the calorific value of the bituminous coal used by its uncooperative supplier. *Id*. at 7.

Plaintiffs' reliance on *Calgon Carbon* to argue that Commerce was required to

provide Supplier C with a "similar opportunity" to submit evidence of the calorific value

of its bituminous coal is inapposite.  *See* Pls.' Opp'n Cmts. at 4 (citing *Calgon Carbon*,

35 CIT at 244).  *Calgon Carbon* involved a respondent that voluntarily provided

supplemental information at verification concerning the purity of hydrochloric acid.  35

CIT at 244.  Commerce accepted this supplemental information and, based on that

information, selected a different surrogate value for that respondent than it did for

another respondent.  *Id.*  The court held that although Commerce had no obligation to

accept the supplemental information, once it did, the agency had an obligation to give

the other respondent an opportunity to provide comparable information, and failure to do

so "led to arbitrary and unfair treatment."  *Id.*  Unlike the respondent in *Calgon Carbon*,

Carbon Activated had an opportunity to substantiate its claim that smoke coal and

bituminous coal had similar calorific values, but failed to do so.

Without evidence of the calorific value of the bituminous coal reported by Carbon

Activated's suppliers, Commerce turned to other methods to value bituminous coal used

by these suppliers.  Specifically, Commerce reasoned that the "plain language

description" of HS 2701.12—"Bituminous Coal, Not Agglomerated"—most accurately

described the bituminous coal in question.  Remand Results at 28.  The court has found

that Commerce may rely on the plain meaning of HS descriptions to determine the best

available information to value a specific input.  *See Mid Continent Steel & Wire, Inc. v.*

*United States*, 42 CIT __, __, 321 F. Supp. 3d 1313, 1325 (2018) (sustaining use of a

surrogate value based on the HS description that best matched the description provided

by the respondent).  Having reviewed the record and Commerce's explanation for its

valuation of bituminous coal without a reported calorific value, the court finds that

Commerce has provided a reasoned explanation based on substantial evidence to

value bituminous coal.

### B.  Bituminous Coal Having Known Calorific Value

As discussed above, having found that Note 2 applied to Malaysian HS

subheading 2701.19, and having found no indication that the average unit value for

Malaysian imports under HS 2701.19 was unreliable or aberrantly high, in the Draft

Remand Results Commerce valued bituminous coal inputs with documented heat value

below 5,833 kcal/kg using Malaysian HS 2701.19.  Draft Remand Results at 7.

Plaintiffs argued that because Commerce found Malaysian data reported under HS

2701.12 to be aberrant and unreliable, the agency should also disregard Malaysian data

reported under HS 2701.19.  Second Redacted and Resubmitted Comments on Draft

Remand (June 23, 2021) ("Second Comments on Draft Remand") at 10–11, PRR 19,

CRR 13, CRJA Tab 19.  Commerce responded that it continued to find the Malaysian

HS 2701.19 subheading preferable to Romania's because there was no evidence on

the record showing that the Malaysian data was distorted, aberrational, or otherwise

unreliable.  Remand Results at 26.  Commerce further noted that it had a preference for

selecting surrogate values from the primary surrogate country which, in this case, was

Malaysia.  Remand Results at 25–26.

### 1. Parties' Contentions

Plaintiffs contend that Commerce should have valued all bituminous coal having known calorific value below 5,833 kcal/kg using Romanian HS 2701.19.  Pls. Opp'n Cmts. at 2.  Plaintiffs argue that because Commerce found Malaysian HS 2701.12 data to be "aberrant and unreliable, . . . Commerce should be skeptical of Malaysian [HS] 2701.19" data.  *Id.* at 6.  Further, they argue that because Commerce has "acknowledge[d] that Romanian data is necessary to value bituminous coal" of unknown calorific value, Commerce should use Romanian data to value all bituminous coal "in accordance with [Commerce's] policy underlying surrogate valuation to minimize distortion that occurs when using data from multiple countries."  *Id.*

The Government contends that Commerce's selection of Malaysian import data under HS 2701.19 should be sustained because Commerce provided a reasoned explanation for its selection of such data and Plaintiffs' assertions of unreliability are unsupported.  Def.'s Reply Cmts. at 4–5.

### 2. Commerce's Selection of Malaysian HS 2701.19 Data to Value Certain Bituminous Coal is Sustained

Pursuant to 19 C.F.R. § 351.408(c)(2), Commerce "normally will value all [factors of production] in a single surrogate country."  The court has acknowledged Commerce's regulatory preference "to use surrogate value data from the primary surrogate country to minimize distortion."  *Tri Union Frozen Prods., Inc. v. United States*, 41 CIT __, __, 227 F. Supp. 3d 1387, 1400 (2017).  Furthermore, the court has upheld Commerce's practice of requiring a party to provide support for any argument that data are

aberrational or unreliable.  *See, e.g.*, *Jinan Farmlady Trading Co. v. United States*, 41

CIT __, __, 228 F. Supp. 3d 1351, 1356–57 (2017) (finding Commerce's determination

that data was not aberrational reasonable when respondent had not provided

demonstrative evidence).

Here, Plaintiffs have not provided any evidence that the Malaysian HS 2701.19

data are aberrant or unreliable.  *See* Pls.' Opp'n Cmts. at 6–7.  Plaintiffs have also failed

to justify their position that Commerce should have found Malaysian HS 2701.19 data to

be distorted simply because the agency separately found Malaysian HS 2701.12 data to

be distorted.  *See id*.  Accordingly, Plaintiffs' argument that Romanian HS 2701.19 data

"is preferable to Malaysia because . . . Romanian [HS] 2701.12 data is undistorted,"

Pls.' Opp'n Cmts. at 6, is without support.  Commerce has provided a reasoned

explanation for not rejecting the Malaysian HS 2701.19 data—such import data is

presumed to be reliable and the record is devoid of evidence to the contrary.  The

parties to the proceeding bear the burden of establishing an adequate record, *QVD*

*Food Co.*, 658 F. 3d at 1324, and Plaintiffs have not met that burden with respect to this

issue.

Commerce explained that it selected Malaysian HS 2701.19 data pursuant to its

preference to value all factors of production in a single surrogate country, which, in this

case, was Malaysia.  *See* Remand Results at 25–26 & n.111 (citation omitted); *see also*

19 C.F.R. § 351.408(c)(2).  Plaintiffs have not shown that Commerce was unreasonable

in its selection of Malaysian HS 2701.19 data to value bituminous coal when the record

demonstrated that the coal had a calorific value of less than 5,833 kcal/kg and

Commerce's decision was otherwise supported by substantial evidence.

### III.   Surrogate Country Selection

In *Carbon Activated I*, the court was "unable to discern Commerce's reasons for

rejecting Romania as a primary surrogate country" and "selecting Malaysia as the

primary surrogate country" and accordingly remanded the matter to Commerce for

reconsideration and further explanation.  503 F. Supp. 3d at 1289.  On remand,

Commerce determined that both Malaysia and Romania qualified as potential surrogate

countries, finding that both countries were economically comparable to China and

significant producers of comparable merchandise.  Remand Results at 11–14.

However, Commerce again selected Malaysia as the primary surrogate country after

finding that Malaysian surrogate value data was superior to Romanian data based on its

relative specificity.  *Id.* at 14–16; 34.

With respect to the valuation of charcoal, Commerce explained that the

Malaysian data reflected "a tariff classification at the 10-digit level that is specific to

coconut-shell charcoal (i.e., [HS] subheading 4402.90.1000), a direct material that is

consumed in significant quantities in the production of the subject merchandise by the

mandatory respondents;" however, the Romanian data reflected only "a six-digit basket

category HS subheading, 4402.90, which covers wood-based charcoal [but] also

includes nut-based charcoal, which is an input not used by the mandatory respondents."

*Id.* at 15.

Despite selecting Malaysia as the primary surrogate country, Commerce again chose the financial statement of Romcarbon, a Romanian producer of comparable merchandise, to determine financial ratios because that statement provided specific breakouts for raw material, labor, and energy that were not provided in the Malaysian financial statements. *Id.* at 15–16

### A.  Parties' Contentions

Plaintiffs contend that Commerce should have chosen Romania over Malaysia as the primary surrogate country because, in their view, "Romania provides superior data quality" to Malaysia.  Pls.' Opp'n Cmts. at 7 (emphasis and capitalization omitted).  As evidence of this superiority, Plaintiffs point to the aberrant Malaysian HS 2701.12 data and Commerce's concession that the Malaysian financial statements lacked usable financial data.  *Id.* at 7–8.  Plaintiffs argue that Commerce incorrectly claimed that Romanian import data placed on the record was not POR-specific, *id.* at 10, and that Commerce's reliance on the more specific HS subheading for coconut-shell charcoal is unsupported because Carbon Activated's suppliers do not use coconut shell charcoal as an input, *id.* at 11.

The Government contends that Commerce's reliance on the specificity of the tariff classification for coconut shell charcoal, used by some respondents, provides support for Commerce's selection of Malaysia as the primary surrogate country.  Def.'s Reply Cmts. at 12.  The Government asserts that Commerce has the discretion to "value coal-based carbonized material with either coconut shell or wood charcoal" and the record indicated that "[DJAC] used coconut shell charcoal in the production of the

subject merchandise." *Id.*  The Government also rejects Plaintiffs' contention that the

aberrancy of Malaysian HS 2701.12 precluded Commerce from selecting Malaysia as

the primary surrogate country.  *Id.* at 11.  According to the Government, "Commerce still

had usable Malaysian data 'covering nearly all of the bituminous coal input used by the

mandatory respondents,'" *id.* at 11–12 (quoting Remand Results at 36), and Plaintiffs

"provided no evidence to support discarding Malaysian data beyond the data under

Malaysian HS 2701.12," *id.* at 12.

### B. Commerce's Selection of Malaysia as the Primary Surrogate Country is Sustained

In its Remand Results, Commerce determined that both Malaysia and Romania

were significant producers of comparable merchandise; thus, Commerce selected the

primary surrogate country based on data considerations.  Remand Results at 11–16.

While Plaintiffs invite the court to second guess the agency's determination, it is the

court's task to determine whether Commerce has supported its determination with

substantial evidence.  *Huaiyin Foreign Trade Corp. (30)*, 322 F.3d 1369, 1374 (Fed. Cir

2003).  Upon consideration of the Remand Results, the court finds that Commerce's

selection of Malaysia as the primary surrogate country is supported by substantial

evidence.

First, Commerce has provided a reasoned explanation as to why it selected

Malaysia as the primary surrogate country: the specificity of the HS number for a known

input (coconut shell charcoal) and data that was more contemporaneous with the POR.

*See* Remand Results at 15, 34–39.  While Carbon Activated's suppliers do not use

coconut shell charcoal, Carbon Activated Resp. to Sec. D Questionnaire (Sept. 28, 2018), Att. B/Ex.D-5, Att. C/Ex. D-5, Att. D./Ex. D-5, PR 90, CR 50-74, CRJA Tab 2, Plaintiffs ignore Commerce's rationale for relying on the specificity provided by the Malaysian HS data.  *See* Pls.' Opp'n Cmts. at 11 (focusing solely on Carbon Activated's suppliers to the exclusion of DJAC).  Specifically, another mandatory respondent, DJAC, used coconut shell charcoal in the production of the subject merchandise.  *See* Remand Results at 38 & n.159 (citations omitted).  Because Commerce needed to value coconut shell charcoal for at least one of the respondents, and because Malaysia—and not Romania—was able to provide data at that level of specificity, Commerce's discussion of coconut shell charcoal supports its selection of Malaysia as the primary surrogate country.  Furthermore, Plaintiffs fail to identify any record evidence suggesting that the Malaysian HS 4402.90.100 data is aberrational or unreliable—they simply disagree with Commerce's use of such data.

Plaintiffs also object to Commerce's consideration of the Malaysian surrogate value information as more contemporaneous with the period of review than the Romanian data.  *See* Pls.' Opp'n Cmts. at 10–11.  While Plaintiffs aver that the Romanian data they submitted were contemporaneous with the POR, *id*. at 10, those data were presented to Commerce as covering the period "2016-2018."  *See* Final Surrogate Value Comments by DJAC and [Carbon Activated] (May 13, 2019) ("Final SV Comments") at Ex. 2A, PR 207–16, CRJA Tab 7.  Now, before the court, Plaintiffs seek to clarify that, "the auto-generated heading was titled '2016-2018' because the data source is programmed to automatically download three years of data," but before the

data was submitted to Commerce, "a 'macro' [was] used to filter POR-specific data."

Pls.' Opp'n Cmts. at 10.  This additional information is not part of the administrative

record, which otherwise supports Commerce's finding that the Malaysian surrogate

value data is more contemporaneous with the POR than the Romanian data.

The court also rejects Plaintiffs' argument that Commerce was required to give

the respondent an opportunity to address any deficiency in the data.  Potential

surrogate value data is submitted to Commerce on a party's own initiative, not in

response to a request by Commerce.  *See, e.g.*, *Shenzhen Xinboda Indus. Co. v.*

*United States*, 42 CIT __, __, 357 F. Supp. 3d 1295, 1305 & n.25 (2018).  Thus, 19

U.S.C. § 1677m(d) is inapplicable here.  *See id.*  In short, there was no apparent

deficiency in the Romanian data; Commerce accepted the data as presented; and

Commerce evaluated the quality of that data in comparison to the quality of the

Malaysian data.  Commerce's finding that the Malaysian data was more

contemporaneous with the POR is supported by substantial evidence.

Likewise, Plaintiffs' argument that the primary surrogate country should be

weighted toward the country from which the financial ratios are drawn is unconvincing.

Not only do Plaintiffs fail to cite to any provision of law or regulation requiring Commerce

to weight its analysis in such a way, but they rely on instances in which a production

input's outsized impact on normal value led Commerce to prioritize that input in

selecting a surrogate country, not the financial ratios' impact on the normal value; thus,

such reliance is inapposite.  Pls.' Opp'n Cmts. at 8–9 (relying on Issues and Decision

Mem. for the Final Results of the Third Antidumping Duty Admin. Review at 13–14,

*available at* https://enforcement.trade.gov/frn/summary/prc/2013-06173-1.pdf (last

visited Oct. 22, 2021) (outsized impact of steel wire rod led to selection of Thailand as

the primary surrogate country); *Jiaxing Brother Fastener Co. v. United States*, 11 F.

Supp. 3d 1326, 1333 (2014), *aff'd* 822 F.3d 1289 (Fed. Cir. 2016) (sustaining

Commerce's choice of primary surrogate country based on superior data quality despite

the relative weakness in financial statements from that country and the more limited

impact of the financial ratios on normal value)).

      Furthermore, Plaintiffs' focus on Commerce's previous reliance on the source of

financial ratios to select a primary surrogate country is misplaced.  *See* Pls.' Opp'n

Cmts. at 8–9.  At most, these examples show that Commerce *may* consider the source

of financial ratios to determine the primary surrogate country, not that Commerce *must*.

*See Tianjin Wanhua Co. v. United States*, 41 CIT __, __, 253 F. Supp. 3d 1318, 1327–

29 (2017) (affirming Commerce's selection of Indonesia as the primary surrogate

country based on the relative superiority of the Indonesian financial statements);

*Ancientree Cabinet Co. v. United States*, 45 CIT __, __, Slip Op. 21-87, 2021 WL

2931313, at *8–9, *11 (CIT July 12, 2021) (concluding that Commerce acted within its

discretion when selecting Romania as the primary surrogate country based on superior

financial data); *Certain Cased Pencils from the People's Republic of China*, 78 Fed.

Reg. 42,932 (Dep't Commerce July 18, 2013) (final results of antidumping duty

administrative review and determination to revoke order in party; 2010-2011), and

accompanying Issues and Decision Mem., A-570-827, (July 10, 2013),

https://enforcement.trade.gov/frn/summary/prc/2013-17160-1.pdf (last visited Oct. 22,

2021) (selecting the Philippines as primary surrogate country because of the superiority of Philippine financial data for deriving surrogate financial ratios).  Indeed, Carbon Activated has not cited, and this court cannot find, any authority indicating that Commerce must base the selection of a primary surrogate country on the quality of financial data.  Accordingly, the court sustains Commerce's selection of Malaysia as the primary surrogate country as based on substantial evidence.

**IV.   Financial Ratios**

In *Carbon Activated I*, the court remanded the *Final Results* to Commerce to reconsider certain adjustments to the financial ratios, including: (i) offsetting pre-tax profits by the amount listed under "Gain/(Loss)" for adjustment and disposal of investment property; (ii) offsetting sales, general and administrative expenses ("SG&A") by the amount listed under "Other Gains"; and (iii) allocating the amount listed under "Social Contributions" and "Meal Tickets" to labor costs instead of SG&A.  503 F. Supp. 3d at 1294–95.  The remand provided Commerce with the opportunity to address its treatment of these issues in AR11 in light of its treatment of similar adjustments to the financial ratios in the tenth administrative review ("AR10") of this antidumping duty order.  *See id.*  On remand, Commerce offset pre-tax profits by the amount listed under "Gain/(Loss)" for adjustment and disposal of investment property and offset SG&A by the amount listed under "Other Gains."  Remand Results at 17–19.  With respect to "Social Contributions" and "Meal Tickets," however, Commerce continued to allocate these line items to SG&A.  *Id.* at 19.

### A.  Parties' Contentions

Plaintiffs contend that Commerce "erroneously allocated [ ] 'Social Contributions' and 'Meal Tickets' under SG&A" instead of labor costs.  Pls.' Opp'n Cmts. at 17. Plaintiffs argue that, "[a]bsent evidence that Malaysian labor data excluded these costs," such "costs are presumed to be embedded within the reported labor cost."  *Id.*

The Government contends that Commerce's retention of "Social Contributions" and "Meal Tickets" under SG&A is supported by substantial evidence and lawful.  Def.'s Reply Cmts. at 17.

### B.  Commerce's Allocation of "Social Contributions" and "Meal Tickets" to SG&A is Sustained

In *Carbon Activated I*, the court instructed Commerce to reconsider or further explain why "Social Contributions" and "Meal Tickets" should be allocated to SG&A instead of labor expenses as was the case in AR10.  503 F. Supp. 3d at 1295.  In the Remand Results, Commerce explained that it will "avoid double-counting costs [when] the requisite data are available to do so."  Remand Results at 40 & n.169 (citation omitted).  Thus, "when labor items . . . are clearly included in the [surrogate value] for labor, [Commerce] will include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses."  Issues and Decision Mem. for the Final Results of the First Antidumping Duty Admin. Review, A-570-985 (February 13, 2017) at 73, https://enforcement.trade.gov/frn/summary/prc/2017-03505-1.pdf (last visited Oct. 22, 2021); *see also Hangzhou Yingqing Material Co. v. United States*, 40 CIT __, __,195 F. Supp. 3d 1299, 1310–1311 (2016) (citing agency decisions in which

Commerce adjusted surrogate financial ratios to avoid double counting labor costs).

Commerce's practice of adjusting financial ratios to avoid such double counting has

been accepted by the court.  *See Elkay Mfg. Co. v. United States*, 40 CIT __, __,180 F.

Supp. 3d 1245, 1256–1258 (2016) (sustaining a determination Commerce made in

order to avoid the possibility of double-counting).

        In the Remand Results, Commerce explained that the source of the Malaysian

surrogate value for labor did not indicate whether "Social Contributions" or "Meal

Tickets" were included in that surrogate value and there was no record evidence

indicating "that the labor [surrogate value] used was overstated."  Remand Results at

41.  Plaintiffs do not, and during the remand proceeding did not, point to any evidence

that these items are included in the surrogate value for labor.  *See* Pls.' Opp'n Resp at

17; Second Comments on Draft Remand at 23–24.  Instead, Plaintiffs simply assert,

without citation to any prior Commerce determinations, court precedent, or Commerce

guidelines, that absent evidence that the Malaysian surrogate labor data excluded

"Social Contributions" and "Meal Tickets," such costs "are presumed to be embedded

within the reported labor cost."  Pls.' Opp'n Cmts. at 17.  Commerce rejected this

unsupported assertion and noted the absence of record evidence demonstrating that

the labor surrogate value included these costs.  *See* Remand Results at 41.

Accordingly, this court finds that Commerce has adequately explained the basis for its

allocation of "Social contributions" and "Meal tickets" to SG&A and sustains

Commerce's adjustments to the financial ratios as supported by substantial evidence.

Court No. 20-00007                                                              Page 24

### CONCLUSION

For the forgoing reasons, the court will sustain Commerce's Remand Results.

Judgment will enter accordingly.


                                                    /s/      Mark A. Barnett
                                                    Mark A. Barnett, Chief Judge

Dated: October 22, 2021
        New York, New York